IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

NICK VINCENT FLOR,

      Plaintiff,

      v.                                        No. 1:20-cv-00027-JAP-LF

THE UNIVERSITY OF NEW MEXICO,
a public university, CAMILLE CAREY,
individually and in her official capacity,
ANGELA CATENA, individually and
un her official capacity, SARA M.
CLIFFE, individually and in her official
capacity, and EVA CHAVEZ,

      Defendants.

## PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST DEFENDANTS THE UNIVERSITY OF NEW MEXICO, CAMILLE CAREY, ANGELA CATENA, AND SARA M. CLIFFE

At issue in this case is the University of New Mexico's unconstitutional and unlawful actions which have dealt a body blow to due process and fairness at our state's largest and most prominent institution of higher education.  Through those actions, the University of New Mexico has suspended Plaintiff, who is an Associate Professor with the Anderson School of Management, for one year without pay, without affording Plaintiff the right to challenge the allegations made against him through an in-person hearing, the opportunity to present a defense or witnesses with relevant and exculpatory information regarding the allegations made against him and the credibility of his accuser, or the right to have those accusations reviewed free from bias because of his gender.  Plaintiff now moves, according to Federal Rule of Civil Procedure 65, for a Temporary Restraining Order and Preliminary Injunction enjoining the University of New Mexico from enforcing its decision to suspend him for one year without pay.

## I.     FACTUAL BACKGROUND

Plaintiff met Defendant Chavez in May of 2018, through an in-person interaction that was less than five minutes in length and occurred in a public area of the University.  *See* Ex. A, at 4. Defendant Chavez was thirty-three years old at the time of this interaction, and while Defendant Chavez was a graduate student at the University of New Mexico, she was not Plaintiff's student, was not his advisee, and was not his employee.  *Id.* at 6 (repeating that Defendant Chavez told Plaintiff: "I'm not one of your grad students").  Following that initial interaction, Defendant Chavez began sending e-mail communications to Plaintiff.

Over the course of approximately three months, Defendant Chavez sent 3,258 e-mails to Plaintiff.  Ex. A at 6.  Of those e-mails, 134 included implicit or explicit sexual content.  *Id.* Plaintiff sent 2,218 e-mails to Defendant Chavez, including 69 e-mails including implicit or explicit sexual content.  *Id.*  Approximately three days after sending the first e-mail to Plaintiff, Defendant Chavez sent the first e-mail containing any sexual content.  *Id.* at 7.  That e-mail included a picture of a male University faculty member and a woman, with the woman's left breast and the man's pubic area circled.  *Id.*  A few days later, Defendant Chavez sent another e-mail, this time including the lyrics to a love song.  *Id.*  The next day, Defendant Chavez sent another message, this time with another love song, to which Plaintiff responded that the song was about them, and to which Defendant Chavez responded in agreement.  *Id.*  Defendant Chavez later sent more messages including love songs and love horoscopes, often referring to herself as the lover in the horoscope.  *Id.* at 7-8.  The e-mail communications later began to include explicit sexual content.  *Id.* at 9.  Almost all of the e-mail communications including sexual content, however, were initiated by Defendant Chavez or included a request for more messages from Plaintiff or a

response from Plaintiff with graphic sexual content. *Id.* at 9-10 (Defendant Chavez responding to an e-mail including sexual content by stating "Sounds great, now you must tell me more").

Interspersed in these communications are a discussion of a brief, research assistant position that Plaintiff had available. Ex. A at 7. That position was limited to 35 hours of work and $703 in pay.[1] *Id.* On June 9, 2018, however, Defendant Chavez rejected that job offer, stating that the offer was for "a small amount of money" and that she knew she would end up working "way more than 8 hours per week and already have." *Id.* at 16-17 (Defendant Chavez further stating, when rejecting the job offer: "I have never worked on anything less than 8 hours in a day more or less a week and [I] did not want to get bamboozled when I would literally be immersing myself into it"). Defendant Chavez later brought up the paid research position once again, at which time Plaintiff stated that Defendant Chavez had already rejected his offer, so he had used that remaining research money to buy some equipment. *Id.* at 7. Defendant Chavez stated that it was fine because she did not intend to take the job position. *Id.*

Plaintiff later decided to stop engaging in these e-mail communications with Defendant Chavez. At that point, Defendant Chavez began sending a series of harassing and threatening communications. For example, on June 1, 2018, Defendant Chavez sent an e-mail with the subject line "Annoyed" stating that she was unhappy because she felt like Plaintiff was no longer reading her e-mails. Ex. A at 14. Another e-mail sent the next day included Defendant Chavez stating "Hey, it's okay if you don't like me anymore and think I'm difficult to communicate with, but you don't have to make up silly stories about why no romantic stories . . . . [Romantic stories are p]robably the only thing that would help actually . . . lol not lol." *Id.* The next day, Plaintiff

---

[1] There was also discussion of a teaching assistantship for Defendant Chavez, but the record makes clear that discussions never progressed because Defendant Chavez was not qualified and did not have the relevant expertise for the position. Ex. A. at 7.

responded stating that he had a lot of work to do related to his research activities and he could not immediately respond to her e-mails. *Id.*

Defendant Chavez's threats escalated, with her sending an e-mail on June 24, 2018 stating that she would "respond all" to University e-mails during which she would attach Plaintiff's sexually explicit communications so that she could illicit reactions from strangers "to prove a point." Ex. A, at 19. Defendant Chavez sent another e-mail the next day, attaching a screen shot of all the times that she had called Plaintiff without him answering the phone, and ordering Plaintiff to pick up her phone calls or else she would disclose their sexually explicit communications to Plaintiff's department chair. *Id.* Defendant Chavez also sent more than one hundred text messages to Plaintiff in a single day, including a text message "threatening to send clips of earlier communication[s] of a sexual nature composed by [Plaintiff] to various individuals at the University," and other communications stating "You want me to just continue heckling you until I do things that you would not believe I would do." *Id.* In another e-mail sent around the same time, Defendant Chavez stated "if you're my friend, truly – then you can know you can TRUST me 100%. that i [sic] will never intentionally hurt or attack you, frustrate you etc. However, on the other hand, if you are not my friend, that is a different story and i [sic] can 100% not make those promises." *Id.* at 20. Plaintiff responded to Defendant Chavez and stated "Please stop communicating with me." *Id.*

### A. The University of New Mexico Office of Equal Opportunity Investigates Plaintiff's and Defendant Chavez's Complaints.

Following the harassing and threatening communications, Plaintiff filed a complaint with the University's Office of Equal Opportunity, alleging that Defendant Chavez's communications and actions violated the University's sexual harassment policy. Ex. C at 1. That complaint was the result of a communication to the Office of Equal Opportunity by Dr. Mary Margaret Rogers,

on June 27, 2018, during which she stated that Plaintiff was being harassed by Defendant Chavez after informing her that he could not pursue a romantic relationship with her.  *Id.*

On July 13, 2018, the University contacted Defendant Chavez to inform her of the complaint and asked to meet with her on July 25, 2018.  Ex. A at 1.  At that meeting, Defendant Chavez alleged that Plaintiff had sexually harassed her and asked to file a formal complaint. *Id.* This was the first instance that Defendant Chavez stated that the messages were unwelcome or unwanted in any way.  The Office of Equal Opportunity then accepted jurisdiction of both complaints and began its investigation.  *Id.*; *see also* Ex. C, at 1.

That investigation was initially conducted by a third-party, contracted investigator named Ben FitzSimons.  Mr. FitzSimons contacted and interviewed Plaintiff and Defendant Chavez and reviewed the e-mail and text communications between them.  Ex. B at 2.  Mr. FitzSimons then prepared a draft investigation report, which he distributed to Plaintiff and Defendant Chavez to review.  *See generally* Ex. B.[2]

The Office of Equal Opportunity affords those accused of violating policy the opportunity to submit evidence and a list of potential witnesses for the investigation.  The Office of Equal Opportunity, however, did not interview any witnesses submitted by Plaintiff during their investigation.  *See* Ex. B at 3 ("No other witnesses . . . were identified"); Ex. D at 2-3 (listing Plaintiff's requested witnesses).  After the submission of the draft report, Mr. FitzSimons was removed as the independent investigator, and Defendant Cliffe was assigned to complete the investigation.  Plaintiff prepared a response to the draft report, including the identity of potential witnesses who he believed should be interviewed.  Ex. D, at 2-3; Ex. E, at 2-3.  Those witnesses

---

[2] The complete Exhibit B, which is more than 500 pages, is included as an exhibit even though this motion does not reference the entire exhibit.  Other exhibits, however, have internal references to exhibits.  Those internal references are all to the exhibits included as part of Exhibit B.

included other faculty members who had been subjected to unmeritorious and retaliatory complaints by Defendant Chavez, as well as students and other individuals with information regarding the job opportunity, Defendant Chavez's credibility, and Plaintiff's credibility. *Id.* For example, one of the witnesses which Plaintiff requested the Office of Equal Opportunity to interview was another University faculty member, Reilly White. That faculty member was said to have exculpatory information and information related to Defendant Chavez's credibility. This was recognized by the University when, in the preliminary letter of determination, the University states that Defendant Chavez had a relationship with White which ended with "him telling her he could not communicate with her any longer." Ex. A, at 16. This potential pattern of conduct is directly relevant to Defendant Chavez's credibility, and Defendant Cliffe should have interviewed White as a witness. Defendant Cliffe refused to interview those witnesses, however, determining that any statement from them was irrelevant or immaterial. Ex. E, at 1. That determination was made without talking to any of the proposed, but excluded, witnesses. *Id.*

Defendant Cliffe then prepared a Preliminary Letter of Determination. *See* Ex. A. In that letter, Defendant Cliffe analyzed the draft investigation report and determined that Plaintiff violated University policy in his interactions with Defendant Chavez. *Id.* at 23. A separate preliminary letter of determination found that Defendant Chavez did not violate University policy in her interactions with Plaintiff. Ex. C. Plaintiff was again given the opportunity to submit "new factual information," which he did. Ex. E, at 1.

Defendant Cliffe then issued the Final Letter of Determination finding that Plaintiff violated University policy. Ex. E. Plaintiff was not afforded a live hearing during which he could challenge the evidence against him, was not given an opportunity to present a defense or witnesses

of his choosing, and was not given the opportunity to confront or cross-examine his accuser or challenge her credibility before Defendant Cliffe made this finding.

Plaintiff appealed the finding of a policy violation to the President of the University.  *See* Ex. D, at 1.  The President of the University denied his appeal.  Ex. F.  Plaintiff then exercised his final appeal regarding the policy violation by appealing to the University's Board of Regents.  *See generally* Ex. D.  The Board of Regents also denied the appeal.  Ex. G.  The finding that Plaintiff violated University policy became final on September 18, 2019, making Plaintiff eligible for discipline up to and including termination of his employment with the University.  *Id.*  Neither Defendant Cliffe nor Defendant University afforded Plaintiff the opportunity to a hearing, the opportunity to present a defense of his choosing, the opportunity to present witnesses with relevant information, the opportunity to attack Defendant Chavez's credibility,  or the opportunity to cross-examine or probe evidence and witnesses against him before finding that Plaintiff violated University policy.

### B.  The University's Flawed and Constitutionally Infirm Sanctioning Process.

After finding that Plaintiff violated University policy, the University then commenced a flawed, and clearly biased, sanctioning process.  This sanctioning process was governed by University Policy C07, which is the faculty disciplinary policy.  That policy states that any "member of the faculty . . . who violates a published University policy may be subject to warning, censure, suspension without pay, or dismissal."  *See* Ex. H, § 2.  Moreover, that policy requires, after the completion of an investigation by the Office of Equal Opportunity, that the investigation findings be reviewed by the faculty member's department chair, and that the department chair consider which, if any, discipline to impose.  *Id.*, § 10.  If the department chair chooses to recommend that a faculty member be suspended without pay, then that decision must be reviewed

and approved by the dean of school where the faculty member teaches.  *Id.*  Both reviews must be made through the lens of C07's mandate that "progressive discipline" is "normally" used, and that such "discipline is intended to be corrective, not punitive in nature."  *Id.*, § 1.

According to this policy, the University first appointed Plaintiff's department chair, Dr. Mary Margaret Rogers, to review the Office of Equal Opportunity investigation and to discipline Plaintiff.  Ex. I, at 4.  Dr. Rogers was given the Preliminary and Final Letters of Determination to review.  Following her review of those materials, Dr. Rogers decided that Plaintiff's discipline should be a written censure.  *Id.*  Dr. Rogers circulated that proposed discipline to Senior Vice Provost Barbara Rodriguez and Defendant Catena.  *Id.*  Senior Vice Provost Rodriguez disagreed with that discipline, stating in a later hearing that she believed that Plaintiff should be terminated. *Id.* at 5.  Defendant Catena also disagreed with the proposed discipline, first asking Dr. Rogers to change her proposed discipline to a more severe result, and when Dr. Rogers refused, preparing a memorandum or a letter to the Provost's office stating that Dr. Rogers' proposed suspension could not be allowed to go into effect.  *Id.* at 4.

Based upon that disagreement, Senior Vice Provost Rodriguez and Defendant Catena set out on a campaign to more harshly discipline Plaintiff.  In carrying out this pre-decided punishment, Senior Vice Provost Rodriguez then fabricated a conflict of interest in order to remove Dr. Rogers as the sanctioning chair for Plaintiff. Ex. I, at 4.  The stated basis for that the conflict of interest included three things.  First, that Dr. Rogers initially reported the communications between Plaintiff and Defendant Chavez to the Office of Equal Opportunity.  That reporting, however, could not have created a legitimate conflict of interest because the University, Senior Vice Provost Rodriguez, and Defendant Catena were all aware that Dr. Rogers had made those reports before assigning Dr. Rogers the task of disciplining Plaintiff.  Second, Senior Vice Provost

Rodriguez alleged a conflict of interest because Dr. Rogers received a sanction from the University for not reporting the communications between Plaintiff and Defendant Chavez to the Office of Equal Opportunity sooner.  That sanction, however, was not imposed until *after* Dr. Rogers had made her sanctioning decision and communicated that decision to Senior Vice Provost Rodriguez and Defendant Catena.  And third, the University alleged a conflict of interest because Dr. Rogers had expressed to Senior Vice Provost Rodriguez that she may not be able to be impartial when conducting a separate investigation into Plaintiff and Defendant Chavez.  That investigation, however, which was focused upon whether Plaintiff's communications with Defendant Chavez violated University Policy 2215,[3] which requires disclosure of consensual sexual relationships between faculty and students, was launched *after* Dr. Rogers had submitted her sanctioning decision, and *after* Dr. Rogers had been disciplined for failure to report.  And it was that discipline which Dr. Rogers stated formed the basis of her inability to be impartial.

Senior Vice Provost Rodriguez then sought to appoint a new sanctioning chair to replace Dr. Rogers.  After concluding that all other department chairs associated with the University's Anderson School of Management also held conflicts of interest, Senior Vice Provost Rodriguez appointed Defendant Carey, the Vice Dean of the Law School to serve as Plaintiff's sanctioning chair.  Ex. I, at 4.  Defendant Carey then met with Defendant Catena, during which Defendant Catena provided Defendant Carey the same materials that were provided to Dr. Rogers, but also provided a guide to sanctioning student sexual misconduct prepared by the Association of Title IX Administrators (ATIXA), as well as two letters documenting the only other disciplinary actions

---

[3] The investigation into whether the communications between Plaintiff and Defendant Chavez violated University Policy 2215 resulted in a finding of no policy violation. *See* Ex. J.  That conclusion was based on a finding that "a superior and subordinate [relationship] did not exist" between Plaintiff and Defendant Chavez. *Id.* at 2.

against University professors for violations of the sexual harassment policy.  Both sanctions were against male tenured professors.

After reviewing those materials and conferring with Defendant Catena, Defendant Carey recommended that Plaintiff be suspended for one year without pay.  *See* Ex. K.  Defendant Carey also proposed that Plaintiff be prohibited from publishing the results of any of his research while stating that he was affiliated with the University of New Mexico during the duration of the suspension.  *Id.*  In accordance with University Policy C07, Defendant Carey then sought a meeting with Plaintiff's Dean, who was Dean Shawn Berman of the University's Anderson School of Management.  Ex. I at 4.  Because Defendant Carey proposed a sanction including a suspension without pay, University Policy C07 mandates that Plaintiff's Dean, in this case Dean Shawn Berman, review and approve of the proposed sanction.  Dean Berman served in that role, however, despite the fact that Dean Berman had also reported the communications between Plaintiff and Defendant Chavez to the Office of Equal Opportunity and despite the fact that Dean Berman was also disciplined for failing to report those communications sooner.  In contrast to Dr. Rogers, however, Dean Berman was disciplined for his failure to report as related to this case *before* he reviewed Dean Carey's proposed sanction.  Dean Berman eventually met with Dean Carey and approved the discipline of a suspension for one year, without pay.  *Id.*

### C.  The University's Disparate Treatment of Same or Similar Alleged Conduct of Plaintiff and Defendant Chavez.

Plaintiff was later notified that an Inspection of Public Records Request was submitted by the Albuquerque Journal seeking records of Defendant Chavez's complaints against Plaintiff, and other complaints that Defendant Chavez had filed against other University faculty members.  *See* Ex. L.  This notification was received after the University had entered a no contact order prohibiting Plaintiff from contacting Defendant Chavez, Ex. M, and Defendant Chavez from

contacting, or asking a third-party to contact, Plaintiff.   Ex. N.  Plaintiff believed the request to be evidence that Defendant Chavez had been discussing the complaints she had filed with the local press.  Plaintiff then sought to file a retaliation complaint against Defendant Chavez because of her disclosures to the press.  That request was first denied by the University's Dean of Students, who stated that talking the press about an Office of Equal Opportunity complaint was not retaliation and that the University would not presume that the person making the disclosures was Defendant Chavez.  *See* Ex. O.  The request was also denied by the Office of Equal Opportunity, with Defendant Catena stating that while the Office of Equal Opportunity would not disclose information related to complaints and investigations, a party to a complaint was welcome to talk to the press and share their story in any manner they chose.  Ex. P.

The suspension of Plaintiff later received considerable media attention.  First, Reason.com, which is an independent news organization, published an article detailing Defendant Chavez's complaint, discussing the University's investigation, and criticizing the University's findings.  Ex. Q.  That article led to a column by syndicated columnist Diane Dimond, which was published in the Albuquerque Journal and other national publications, during which Ms. Dimond also criticized the University and the University's policy findings.  *See* Ex. R. The Albuquerque Journal and other news organizations later covered this lawsuit, including an eventual editorial by the Editorial Board of the Albuquerque Journal stating that the University's actions detailed in this lawsuit "should frighten any faculty member or student at UNM – or any parent considering whether his or her child should enroll there.  Or work there." Ex. S.  None of these articles identified Defendant Chavez by name.

Defendant Chavez then filed a new complaint against Plaintiff, alleging that Plaintiff engaged in prohibited retaliation by talking to the press and alleging that Plaintiff encouraged

journalists to contact her.  *See* Ex. T at 1.  Despite the fact that the University refused to allow Plaintiff to file an almost identical retaliation complaint against Defendant Chavez, Defendant University accepted jurisdiction of Defendant Chavez's retaliation complaint against Plaintiff.  *Id.* The University is currently investigating that complaint.

### D.  Plaintiff's Suspension, but Not the Finding of Policy Violations, is Reviewed by the Faculty Peer Committee.

The only process for Plaintiff to appeal the sanction of a one-year suspension, without pay, was for Plaintiff to seek a faculty peer hearing.  *See* Ex. H § 11.  The faculty pear hearing includes an in-person hearing, with the opportunity to present exhibits and witnesses, and cross-examine the other sides witnesses.  Through that hearing, however, a faculty member is *only* permitted to challenge the sanction imposed on them; faculty members are *prohibited* from challenging any finding that they violated University policy during any faculty peer hearing.

During that hearing, Plaintiff challenged that the sanctioning process violated University policy, that the sanction failed to follow the University's mandate of progressive, corrective discipline, and that the sanction was unduly harsh for the behavior underlying the policy violation. *See generally* Ex. I.  Following an initial meeting regarding scheduling, Plaintiff's faculty peer hearing was scheduled for February 21, 2020.  Because the University's sanction was going to be defended by Defendant Carey, who is a lawyer and an experienced litigator, Plaintiff later requested to be represented by counsel at the peer hearing.  Ex. U.  The faculty peer committee rejected that request.  Ex. V.  The result was that the University's sanction was defended by an experienced litigator, who received the assistance of University counsel, while Plaintiff was required to represent himself.  Plaintiff was allowed to have a legal advisor present, but Plaintiff's legal advisor was not allowed to speak or participate in the hearing.  *See* Ex. X.

The committee's prohibition on Plaintiff being represented by counsel was further exacerbated when Defendant Carey submitted a motion to the committee to exclude certain evidence submitted by Plaintiff.  Ex. W.  That motion, which was styled as a motion to exclude, included citations to case law and included the application of the Rules of Evidence to contend that Plaintiff should not be allowed to present certain evidence during the faculty peer hearing.  *Id.* That motion also contended that Dean Carey should be allowed to submit such motions, even though University policy did not authorize such motions practice in faculty peer hearings, because they are recognized judicial tools for limiting the scope of proceedings.  *Id.*  Despite the fact that University policy made clear that faculty peer hearings were not judicial proceedings, the peer committee accepted the motion. Plaintiff later responded but was required to argue the motion before the faculty peer committee without the assistance of counsel.

The committee for Plaintiff's faculty peer hearing issued its decision on Monday, March 9, 2020, through which the committee affirmed the sanction imposed on Plaintiff.  Ex. I.  Plaintiff has exhausted all internal appeals of his sanction, making that sanction final.[4]  The result is a stark disparity based upon gender.  Plaintiff was effectively terminated from his tenured faculty position, while Defendant Chavez was not disciplined at all.   Moreover, all of the University's actions were taken despite the fact that Plaintiff was never afforded a hearing before the University suspended him, Plaintiff was never afforded an opportunity to challenge the evidence that was relied upon to find that he violated policy during a hearing, Plaintiff was never allowed to confront his accuser, and Plaintiff was never allowed to present evidence or witnesses as part of a defense to the allegations that he violated University policy.  Plaintiff now files this motion seeking a temporary

---

[4] Plaintiff also sought to have the sanction reviewed by the University's Academic Freedom & Tenure Committee.  That request was denied.

restraining order and a preliminary injunction prohibiting the University from enforcing its decision to suspend him without pay.

## II.     ARGUMENT

### A. Plaintiff is Entitled to a Temporary Restraining Order and a Preliminary Injunction.

The requirements for the issuance of a temporary restraining order "are essentially the same as those for a preliminary injunction." *People's Trust Fed. Credit Union v. Nat. Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018).  Before the issuance of such an order, the moving party must demonstrate that "immediate and irreparable injury, loss, or damage will result" unless a court issues the order.  Fed. R. Civ. P. 65(b).  A moving party must also "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Applying this standard, the Tenth Circuit examines motions for a temporary restraining order and preliminary injunctions using a four-part test:

> (i) Whether the moving party will suffer irreparable injury unless the injunction issues; (ii) whether there is a substantial likelihood that the moving party will eventually prevail on the merits; (iii) whether the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; and (iv) whether the injunction, if issued, would not be adverse to the public interest.

*Herrera v. Santa Fe Pub. Sch.*, 792 F. Supp. 2d 1174, 1181 (D.N.M. 2011) (citing *Resolution Trust Corp. v. Cruce*, 972 F.3d 195, 1198 (10th Cir. 1992)).  The likelihood of success and irreparable harm facts are "the most critical" in this analysis.  *Nken v. Holder*, 556 U.S. 418, 434 (2009).

### B.  The University's Decision to Suspend Plaintiff is Now Final.

As a preliminary matter, this motion is filed approximately three months after the filing of the initial complaint in this matter because Plaintiff has only recently exhausted all opportunities to internally appeal the sanction in this matter.  At the time this case was initially filed, Plaintiff had received notice of the suspension, but the suspension did not yet become effective.  The filing of the initial complaint, which was filed in the Second Judicial District Court in Bernalillo County, was accompanied by a motion for a temporary restraining order and a preliminary injunction seeking to prevent the University from suspending Plaintiff.  That motion was not ruled upon by the state court before the University suspended Plaintiff.  The Defendants in this matter than removed this case to federal court.

At the time this matter was removed, Plaintiff still had one more opportunity to appeal the sanction, although not the finding of the policy violation.  That opportunity was a Peer Committee Hearing, which was held on February 21, 2020.  The University issued its final decision affirming the sanction of a one-year suspension without pay on March 9, 2020.  At that time, the suspension became final.  Plaintiff then filed this motion for a temporary restraining order and a preliminary injunction asking that the University be prohibited from enforcing its decision to suspend him without pay without due process.

### C.  Plaintiff is Likely to Succeed on His Claims.

"The Tenth Circuit has adopted . . . [a] liberal definition of the probability of success" prong of the preliminary injunction analysis.  *Otero Savings & Loan Ass'n v. Fed. Reserve Bank*, 665 F.2d 275, 278 (10th Cir. 1981).  Under this more "lenient" standard, *see Kansas Hosp. Ass'n v. Whiteman,* 835 F. Supp. 1548, 1552 (D. Kan. 1993), a plaintiff, upon a showing that the other three prongs of the analysis have been met, will have shown that there is a likelihood of success on the merits if the motion "raise[s] questions going to the merits so serious, substantial, difficult

and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Otero Savings,* 665 F.2d at 278 (internal citation and quotations omitted).  Plaintiff meets this standard for his both his due process and Title IX claims.

> ### i. Plaintiff Was Deprived of Due Process of the Law During the University's Investigation, Findings, and Sanctioning Process.

Because Plaintiff is a tenured professor with a public university, his employment creates a property interest protected by due process.  *Tonkovich v. Kansas Bd. of Regents.*, 159 F.3d 504, 517 (10th Cir. 1998); *Brenna v. Southern Colo. State College,* 589 F.2d 475, 476 (10th Cir. 1978) ("Professor Brenna was tenured and thus had a property interest deserving of the procedural and substantive protections of the Fourteenth Amendment.").  Applying *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 535 (1985) and *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976), the Tenth Circuit has previously held that "a fundamental principle of procedural due process is a hearing before an impartial tribunal."  *Tonkovich*, 159 F.3d at 517.  Therefore, before a public employee, such as a tenured professor may be terminated, that employee must be afforded "an opportunity to be heard at a meaningful time and in a meaningful manner *before* termination." *Langley v. Adams County, Colo.*, 987 F.2d 1473, 1480 (10th Cir. 1993). *See also Perry v. Sinderman*, 408 U.S. 593, 602-03 (1972) and *Board of Regents v. Roth,* 408 U.S. 564, 570 (1972) (holding that like tenured faculty members, who conclusively possess a property or liberty interest in their continued employment requiring a hearing, non-tenured faculty members *may* have a property interest requiring the same process as those with tenure).  Such a hearing must be before "an impartial tribunal," must occur after "notice of charges given a reasonable time before the hearing," and must occur "pretermination . . . except in emergency situations."  *Langely*, 987 F.2d at 1480.  This hearing, and the process in general, must also include granting the employee "an

16

opportunity to present his side of the story." *Gressley v. Deutch*, 890 F. Supp. 1474, 1495 (D. Wyo. 1994).

How much process is due to Plaintiff, who has a property and liberty interest in his continued employment, is determined by applying the *Matthews v. Eldridge* balancing test, which examines (1) the private interest, (2) the risk of an erroneous deprivation of that interest through the procedures used and the probative value, if any, of alternative procedures, and (3) the government's interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens. *Matthews*, 424 U.S. at 335. The availability of post-disciplinary proceedings is also relevant to the necessary scope of the pre-disciplinary procedures. *Loudermill,* 470 U.S. at 547 n.12. Applying that balancing test in this case demonstrates that Plaintiff should have been afforded a hearing, during which he could have presented a defense, witnesses of his own choosing, and cross-examine his accuser, before Defendants determined that Plaintiff had violated University policy and suspended him without pay.

In this case, the private interest that Plaintiff was deprived of was his interest in continued, tenured employment as an Associate Professor with the University's Anderson School of Management. That private interest is a highly coveted and fiercely protected property interest. *See Loudermill*, 470 U.S. 532. The private interest prong therefore leans heavily in favor of heightened due process.

Moreover, the risk of erroneous deprivation of that property interest is high under the Office of Equal Opportunity's current procedures. For example, the Office of Equal Opportunity allowed Plaintiff to submit certain written materials to them, and to identify potential witnesses who have relevant or exculpatory information. The Office of Equal Opportunity, however, is not required to consider all evidence put forward by Plaintiff. Nor is that office required to interview

Plaintiff's proposed witnesses to determine whether they possess exculpatory or relevant information. In fact, in this case, the Office of Equal Opportunity refused to interview several witnesses that had relevant and exculpatory information regarding Defendant Chavez's complaint. Also, Plaintiff was not afforded a hearing with the opportunity to confront or cross-examine his accuser, creating an increased likelihood of an erroneous deprivation because, as the Office of Equal Opportunity recognized, this matter presented a credibility contest through which the University determined whether there was a policy violation solely on the statements of the parties. *See Coy v. Iowa,* 487 U.S. 1012, 1019 (1988) ("It is always more difficult to tell a lie about a person 'to his face' then 'behind his back.' In the former context, even if the lie is told, it will often be told less connivingly. . . . That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult. It is a truism that constitutional protections have costs."). Alternative procedures, such as granting Plaintiff the opportunity to present a defense of his choosing, confronting his accuser, and presenting witnesses of his choosing could have alleviated those risks. The risk of erroneous deprivation prong therefore also counsels towards a heightened level of due process before a suspension without pay in this case.

Finally, there is limited risk of encroaching upon the University's interest in discipline, because, such additional process would not necessarily be required when the University was faced with an emergency scenario requiring the immediate deprivation of a property right. *See, e.g., Langley*, 987 F.2d at 1480. Nor would there be an undue administrative burden on the University. Affording parties proper process before deprivation of a protected interest lessens the likelihood of erroneous deprivations, and therefore lessens the administrative burden of defending erroneous decisions. And while additional process may burden the University and result in the expenditure

of additional fiscal resources, any such burden is significantly outweighed by complying with the obligation to respect and safeguard constitutionally protected interests. Requiring Defendants to hold a hearing, during which Plaintiff would have been able to present a defense of his choosing and to confront or cross-examine his accuser was required before he could be suspended without pay.

The same conclusion has been reached by other courts considering the amount of process necessary before suspending a tenured faculty member without pay. In *Peacock v. Board of Regents of the Universities and State Colleges of Arizona*, a professor and department head in the school of medicine was removed from his administrative position and suspended with pay. 380 F. Supp. 1081, 1084-85 (D. Ariz. 1974). First stating that due process requires a hearing before an individual can be deprived of a property or liberty interest, the court in that case determined that the failure to give the plaintiff a hearing prior to suspending him with pay, violated his right to due process. *Id.* at 1088 (affirmed by *Peacock v. Board of Regents of the Universities and State Colleges of Ariz.*, 510 F.2d 1324, 1326 (9th Cir. 1975)). *See also Gross v. Univ. of Tenn.*, 448 F. Supp. 245, 246 (W.D. Tenn. 1978) (detailing the district court's previous order that several professors suspended be reinstated pending a hearing relating to their suspension); *Pesce v. J. Sterling Morton High School*, 830 F.2d 789, 793 (7th Cir. 1987) (holding that a tenured teacher's due process rights were not violated when that teacher was given notice of the allegations against him, a hearing to present argument and evidence with the assistance of an attorney, and a written statement containing the rationale for suspending him). Thus, it logically follows that if suspending a tenured professor *with* pay requires a hearing before that action is taken, then the more serious punishment of suspending a tenured professor *without* pay requires a hearing before finding that they violated University policy and should be suspended without pay. At least one

federal court of appeals has also held that due process requires the ability of the accused to cross-examine the accuser in cases of sexual misconduct.  *See Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018).  And while the *Doe* court was reviewing instances of deprivation of a property interest in the context of student disciplinary proceedings, such a right must also apply to the deprivation of a tenured faculty member's property right in their continued employment.

Plaintiff should have been afforded a hearing, during which he had the opportunity to present a defense of his choosing, present witnesses with relevant or exculpatory information, and confront or cross-examine his accuser.  He was not.  He is therefore likely to succeed on the merits of his due process claim.  A temporary restraining order or preliminary injunction should be issued, order Defendants to cease enforcement of their decision suspending Plaintiff without pay.

### ii. The University's Actions Violate Title IX Because the Suspension of Plaintiff is Based Upon His Gender.

Plaintiff has pled three theories on which he may prevail on his Title IX claims: 1) erroneous outcome; 2) selective enforcement; and 3) retaliation.  If Plaintiff shows a likelihood of success on the merits for any of those three theories, then it would be appropriate to issue a temporary restraining order or preliminary injunction.  To succeed on an erroneous outcome claim under Title IX, John Doe must combine evidence of "a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome" with "particularized allegation[s] in relation to a causal connection between the flawed outcome and gender bias."  *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).  In essence, an erroneous outcome alleges "that the plaintiff was innocent and wrongly found to have committed an offense."  *Id.*

There is little doubt in this case that the University has disciplined Plaintiff based upon an erroneous outcome following a procedurally and otherwise flawed proceeding.  As discussed in

more detail above, Plaintiff was not afforded due process in that he was not given a hearing, an opportunity to present his own defense, or an opportunity to confront or cross-examine his own accuser.  The lack of such processes has been found to be procedural flaws in the Title IX context. *See, e.g., Doe v. University of Connecticut,* 2020 WL 406356 (D. Conn. Jan 23, 2020) (granting a temporary restraining order to a student and finding that the student's claims were likely to succeed on the merits because of "important procedural shortcoming in exploring the critical issue of credibility").  For example, proposed rules from the Department of Education will, if finally implemented, require a live hearing for any complaint related to sexual harassment.  *See* 83 F.R. 61474.  The same proposed regulation would require "the decision-maker [to] permit each party to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility."  *Id.*

Plaintiff will be also able to show that Defendants "adopt[ed] . . . a policy of bias favoring one sex over the other in a disciplinary dispute," which amounts to sex discrimination under Title IX even if "the motive for the discrimination did not come from ingrained or permanent bias against that particular sex."  *Doe v. Columbia University*, 831 F.3d 46, 58 n.11 (2d Cir. 2016).  Here, Plaintiff will not only be able to show that there is a prevailing atmosphere of public criticism, but also activism that puts pressure on the University to increase the prosecution of male faculty members in the name of "supporting survivors," instructing that individuals should "validate" the feelings of "survivors" by not "question[ing] whether or not a personal was actually violated, assaulted, or raped," to not question "why the survivor has decided to [report] now, even if it has been months or years since" the alleged misconduct, and to let those who report sexual misconduct know "that you believe them and that there is no need to minimize what happened to them."  This includes a policy of "Keep Calm and Protect the Pack," which is a University

campaign against sexual misconduct, which seeks to "empower" survivors, and Title IX Guidelines for Faculty and Staff which direct faculty to state "I believe you" to reporting students.

And Plaintiff will be able to show that Defendants selectively enforced their sexual harassment and Title IX policy because of the stark difference in the treatment between Plaintiff and Defendant Chavez. For example, both Plaintiff and Defendant Chavez sent e-mails containing sexually explicit content. In fact, Defendant Chavez sent more e-mails with sexually explicit content than Plaintiff. Yet, only Plaintiff was disciplined. Also, when Plaintiff sought to have the University investigate whether Defendant Chavez communications with the press were improper, the University refused to do so. Yet, when Defendant Chavez filed a retaliation complaint against Plaintiff because of press coverage related to the Office of Equal Opportunity investigation and this lawsuit, the University accepted jurisdiction and is now investigating Plaintiff. These differences for the same alleged conduct are sufficient for Plaintiff to show that his discipline was based upon gender bias in violation of Title IX.

### D. Plaintiff Will Suffer Irreparable Harm if a Temporary Restraining Order or Preliminary Injunction is Not Granted.

"[T]he moving party must show irreparable injury in order to obtain a preliminary injunction" or a temporary restraining order. *Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986) (citing *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). Irreparable harm is an injury of the type that compensatory relief will not remedy; therefore, irreparable injury will only be shown if "damages are not adequate to compensate that injury." *Id.*

Irreparable harm is often presumed in cases involving the enforcement of civil or constitutional rights. *See, e.g., Kikumura v. Hurley,* 242 F.3d 950, 963 (10th Cir. 2001); *Doe v. Rector & Visitors,* No. 3:19-cv-00038, 2019 U.S. Dist. LEXIS 108990, at *18 (W.D. Va. Jun. 28,

2019) (explaining that "courts have recognized that when constitutional rights are being threatened or impaired, irreparable injury is presumed"); *Able v. United States*, 847 F. Supp. 1038, 1043 (E.D.N.Y. 1994) ("[P]ossible violation of constitutional rights . . . constitutes irreparable harm.") *Vietnamese Fisherman's Ass'n v. Knights of the Ku Klux Klan*, 543 F. Supp. 198, 218 (S.D. Tex. 1982) ("Victims of discrimination suffer irreparable injury, regardless of pecuniary damage."); *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1424 (11th Cir. 1984) (holding that housing discrimination "almost always results in irreparable injury"). Here, Plaintiff was effectively terminated, prohibited from completing any research required under his grants, and prohibited from publishing that research while identifying himself as a professor affiliated with the University of New Mexico. Defendants attempted to give an appearance of going through the motions, but in reality, Plaintiff received insufficient due process capped by a hearing during which Plaintiff was barred from challenging University's investigation, findings, and statements made by Defendant Chavez. Plaintiff is essentially barred from completing the research required for his grants, which require him to publish the findings of that research as a professor affiliated with a university, and he faces uncertain prospects regarding his future at the University and his ability to obtain future employment through other employers. Plaintiff therefore faces all the damage to his future and reputation that come with an erroneous finding that he violated the University's sexual harassment and Title IX policies.

Moreover, several federal courts have found similar circumstances involving students to have been considered irreparable injury meriting the issuance of a preliminary injunction. For example, in *King v. Depauw University,* 2014 WL 4197507, *39-40 (S.D. Ind. Aug. 22, 2014), the court found that there the plaintiff established that there was irreparable injury because a gap in the student's education "would require him to reveal that he was found guilty of sexual

misconduct" regardless of whether he prevailed in his lawsuit because this lawsuit "could not erase the gap." *See also Doe v. Univ. of Mich.*, 325 F. Supp. 3d 821, 826 (E.D. Mich. 2018) (granting a preliminary injunction prospectively prior to expulsion where the plaintiff may "presently be without sufficient due process protect" and be "at immediate risk of expulsion [and] [m]oreover, ha[d] already suffered injury [because] sexual assault allegations may impugn his reputation and integrity, thus implicating a protected liberty interest). Such an irreparable injury for a student should also be an irreparable injury for an affected professor.

Moreover, courts have found that the suspension of faculty members and teachers results in irreparable harm separate from any loss of pay. For example, in *Chalk v. United States District Court for the Central District of California,* 840 F.2d 701, 709 (9th Cir. 1988), a teacher that was administratively reassigned out of a classroom setting was found to have suffered irreparable injury because "[h]is closeness to his students and his participation in their lives [was] a source of tremendous personal satisfaction and joy to him," and the administrative reassignment "involve[d] no student contact, and [did] not utilize his skills, training or experience."

"[T]he violation of a constitutional right must weigh heavily" in favor of a finding of irreparable injury. *See Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016). *See also Elrod v. Burns,* 427 U.S. 347, 374 (1976) (holding that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Kikumura*, 242 F.3d at 963 ("When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.") (citing 11A Charles Allen Wright et al., Federal Practice & Procedure § 2948.1 (2d ed. 1995)). Therefore, the existence of a clear violation of a constitutional right, paired with the irreparable harms caused by suspending Plaintiff for one-year, satisfies the irreparable harm prong of the temporary restraining order and preliminary injunction analysis.

## E.  There is No Possibility of Harm to Defendants if Relief is Granted.

In contrast to the direct and immediate harm to Plaintiff, Defendants cannot identify any harm that they will suffer at all.  From the finding of the policy violation until January 1, 2020, Plaintiff and Defendant Chavez coexisted peacefully when on campus.  Both operated under no contract directives and there have been no reports that either violated those directives while Plaintiff was working at the University.  There is no evidence that any harm resulted to Defendants or anyone else by the nearly six-month period that Plaintiff continued to work before the suspension became effective.  Plaintiff therefore has also established that there is no possibility of harm to defendants if this motion is granted.

## F.  There is a Strong Public Interest in Granting Plaintiff's Motion.

Plaintiff's motion should further be granted because issuing a temporary restraining order and preliminary injunction is not averse to the public interest.  *City of Chanute v. Kansas Gas & Elec. Co.*, 754 F.3d 310, 312 (10th Cir. 1985).  Courts have overwhelmingly determined that the public interest favors universities being held to account for breaking their own policies and engaging in deprivations of due process.  *See, e.g., Doe v. Univ. of Mich.*, 325 F. Supp. 3d at 829 (stating that protecting a person's right to due process is "always in the public interest").  There is also a public interest in ensuring that statutory provisions enacted for the benefit of the public are faithfully followed so that discrimination is prevented.  *See, e.g., Betts v. Rector and Visitors of the Univ. of Virginia*, 939 F. Supp. 461, 470 (D. W.Va. 1996); *Cohen v. Brown Univ.*, 809 F. Supp. 978, 1001 (D.R.I. 1992) (explaining that "the public interest will be served by vindicating a legal interest that Congress has determined to be an important one.").   This includes compliance with Title IX and the prevention of violations an individual's constitutional rights.  *See, e.g., Barrett v. West Chester Univ. of Penn.*, 2003 WL 22803477, at *15 (E.D. Penn. Nov. 12, 2003) ("Promoting

compliance with Title IX serves the public interest."); *Favia v. Indiana Univ. of Penn.*, 812 F. Supp. 578, 585 (W.D. Penn. 1993) ("The public has a strong interest in the prevention of any violation of constitutional rights.").

**CONCURRENCE OR OPPOSITION OF THE PARTIES**

Defendants University of New Mexico, Cantena, Cliffe, and Carey oppose this motion. According to Local Rule 10.5, the parties state that they have agreed that Plaintiff may submit exhibits in excess of fifty pages in support if this motion.

**CONCLUSION**

Plaintiff respectfully requests that the Court grant his motion for a temporary restraining order and preliminary injunction and enter a Temporary Restraining Order prohibiting Defendants from enforcing their decision to suspend him for one year without pay.  The Court should also order a full hearing on Plaintiff's Motion for a Preliminary Injunction.

Respectfully submitted,

*/s/ Nicholas T. Hart*

Carter B. Harrison, IV
Nicholas T. Hart
Harrison & Hart, LLC
1001 Luna Circle NW
Albuquerque, NM 87102
T: (505) 295-3261
F: (505) 341-9340
carter@harrisonhartlaw.com
nick@harrisonhartlaw.com

*Attorneys for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction was filed with the United States District Court for the District of New Mexico's CM/ECF e-filing system, on March 16, 2020, which caused service upon all parties through counsel of record.

*/s/ Nicholas T. Hart*
Nicholas T. Hart