IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NICK VINCENT FLOR,

      Plaintiff,                                  No. 1:20-cv-00027-JAP-LF

v.

THE UNIVERITY OF NEW MEXICO;
CAMILLE CAREY, individually and in her
official capacity; ANGELA CATENA,
individually and in her official capacity;
SARA M. CLIFFE, individually and in her
official capacity; and EVA CHAVEZ,

      Defendants.

## **PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

THIS MATTER comes before me on Plaintiff Nick Flor's Motion for a Temporary

Restraining Order and Preliminary Injunction Against Defendants the University of New

Mexico, Camille Carey, Angela Catena, and Sara M. Cliffe,[1] filed March 16, 2020.  Doc. 22.

University Defendants filed a response in opposition on March 26, 2020 (Doc. 30), and Plaintiff

filed a reply on April 1, 2020 (Doc. 33).

Senior United States District Judge James A. Parker referred the motion to me to conduct

hearings, if warranted, and to perform any legal analysis required to recommend to the Court an

ultimate disposition pursuant to the provisions of 28 U.S.C. § 636(b).  Doc. 28.  I held a hearing

on the motion on April 2, 2020.  Docs. 34–35.  Having considered the parties' submissions, the

relevant law, and the arguments presented at the hearing, I recommend that the Court DENY the

motion.

---

[1] I refer to these defendants collectively as "University Defendants."

## I.      Statement of Facts

Plaintiff Nick Flor is an associate professor in the Anderson School of Management at the University of New Mexico.  Doc. 22-2 at 1.  During the time period at issue in this case, Defendant Eva Chavez was a graduate student in the Anderson School of Management.  Doc. 22-4 at 7.[2]  On May 9, 2018, Prof. Flor met Ms. Chavez briefly in person.  Doc. 22-1 at 2. Following that meeting, Ms. Chavez sent Prof. Flor an email, and the two began corresponding. *Id.*  Their communications, while initially about Prof. Flor's teaching schedule, soon became sexually explicit in nature.  *Id.* at 2–3.

Interspersed throughout their conversations, Prof. Flor and Ms. Chavez discussed her existing graduate assistant work schedule.  *See* Doc. 22-2 at 40, 50–51.  Prof. Flor indicated that he would like Ms. Chavez to work with him.  *Id.* at 53 ("Let me check . . . and see if I have spare [grant money] for the summer.  That would be awesome if we could work together studying viral spreading of information on Twitter.").  On May 18, 2018, Prof. Flor emailed Ms. Chavez informing her that he had $703 of grant money available and could pay her $20/hour for approximately 35 hours.  *Id.* at 70.  Ms. Chavez responded that "35 hours for 7 weeks is fine if that's all there's availability for . . ."  *Id.* at 69 (ellipses in original).  A few days later, on May 21, 2018, Prof. Flor emailed several university employees, asking if they could draw up a summer employment contract for Ms. Chavez to work for him as a project assistant ("PA").  *Id.* at 126.  It was not until June 9, 2018, that Ms. Chavez first indicated that she would not accept the PA position.  *Id.* at 364, 367.  She wrote to Prof. Flor that

> I do not think we should do it (for various reasons) . . . mainly because I truly valued our friendship that much more, but now I'm wondering where our friendship even stands based on your responses to me . . . but I did not want to complicate things and how much I appreciate you, for such a small amount of

_____

[2] Ms. Chavez was never Prof. Flor's student or advisee.  Doc. 22-1 at 6 (describing how Ms. Chavez told Prof. Flor: "I'm not one of your grad students").

> money and hours when I already know for I [sic] fact I will work WAY more than
> 8 hours per week and already have, and I do not want to be bamboozled either,
> and I wanted more so to maintain our friendship . . . . . .

*Id.* at 367–68 (ellipses in original).  Two days later, Prof. Flor informed Ms. Chavez that he

"think[s] [he] can use that money to buy brainwave equipment."  *Id.* at 397.  From the time Prof.

Flor requested a contract be prepared for Ms. Chavez, to when he informed her that he would

spend that money elsewhere, the two continued to exchange sexually explicit and other personal

communications.  *See* Doc. 21-1 at 3 (describing sexually explicit emails sent on May 26, 2018,

May 27, 2018, and June 5, 2018).

Their communications soon soured.  On June 24, 2018, Ms. Chavez sent Prof. Flor an

email with the subject line: "Mary Margaret Rogers."  Doc. 22-2 at 442.  In that email, Ms.

Chavez wrote:

> Have you pondered how simple and easy it would be for me to slide a simple
> screenshot into [Mary Margaret Roger's] [direct messages] and see how well she
> really does first-hand at her new department chair role?  just curious . . .
>
> ***Or imagine this one instead***: Imagine me replying to those UNM PA-ship emails
> (with all those ladies included) and say, "Has anybody heard from Nick?  He sent
> me the attached correspondence on June 5th, and I have not heard from him
> since?"
>
> . . . .
>
> I'm certain you do not find the whole scenario as humorous as I do . . . but take
> this as a great reminder that you should definitely be more careful when you are
> haphazardly and carelessly saying such non-truths and making such empty
> promises to supposed 'bff's'[3] who you are supposedly hiring as your PA.

*Id.* (first and third ellipses and emphasis in original).  Around this time, Ms. Chavez sent other

emails and text messages to Prof. Flor threatening to expose their communications.  *See* Doc. 22-

1 at 18–20 (describing emails and text messages sent between June 22, 2018, and July 2, 2018).

---

[3] I believe "bff's" to be shorthand for "best friends forever."

Finally, on July 2, 2018, Prof. Flor sent Ms. Chavez a text message that stated: "Please stop communicating with me."  Doc. 22-2 at 524.

On June 27, 2018, a mandatory Title IX reporter at the University of New Mexico contacted the University's Office of Equal Opportunity ("OEO") to report that Ms. Chavez was harassing Prof. Flor after he informed her that he could not pursue a romantic relationship with her.  Doc. 22-3 at 1.  A little less than one month later, the OEO accepted jurisdiction over Prof. Flor's complaint against Ms. Chavez ("OEO Flor v. Chavez").  *Id.* at 2.  The lead investigator on Prof. Flor's OEO complaint was contract-investigator Ben FitzSimons.  *Id.*

On July 13, 2018, the OEO contacted Ms. Chavez regarding Prof. Flor's OEO complaint against her.  Doc. 22-1 at 1.  At that time, Ms. Chavez informed the OEO that Prof. Flor had harassed her, and she opened a formal complaint ("OEO Chavez v. Flor").  *Id.*  Mr. FitzSimons was also the lead investigator on Ms. Chavez's complaint against Prof. Flor.  *Id.*

On November 28, 2018, a draft report was issued in OEO Chavez v. Flor, signed by Mr. FitzSimons, Interim Title IX Coordinator Defendant Sara Cliffe, and OEO Director Defendant Francie Cordova.  Doc. 22-2 at 21.  The draft report described the scope of the OEO's investigation, including Ms. Chavez's allegations against Prof. Flor.  *Id.* at 1–5.  The report also summarized the evidence collected and reviewed.  *Id.* at 5–21.  The draft report did not include any findings.  The OEO invited the parties to submit any "new, relevant factual information" within five days of the report and informed the parties that "[a]ll factually relevant information will be considered in making a determination in this case."  *Id.* at 21.  There is no indication that Prof. Flor responded to the OEO draft report.[4]

---

[4] Prof. Flor claims that he responded to the OEO draft report and included in his response the names of witnesses he believed should be interviewed.  *See* Doc. 22 at 5.  Yet the record citations on which Prof. Flor relies indicate that he prepared a response to the OEO's Preliminary

Following the issuance of the draft report, Ms. Cliffe replaced Mr. FitzSimons as the lead

investigator.  Doc. 22-3 at 2.  Then, on February 8, 2019, the OEO issued a Preliminary Letter of

Determination in OEO Flor v. Chavez.  *See id.* at 1.  The letter indicated that the OEO

investigation did not support a finding that Ms. Chavez had violated the University's sexual

misconduct policy with respect to her interactions with Prof. Flor.  *Id.*  In reaching that

preliminary determination, the OEO considered:

1. Whether the conduct was reasonably perceived to be sexual in nature;
2. Whether the conduct was subjectively and objectively unwelcome;
3. Whether a reasonable person would have known that the conduct was unwelcome;
4. The frequency and/or severity of the conduct;
   a. OEO considers whether the conduct was physically threatening and/or humiliating in assessing the frequency and/or severity of the conduct; and
5. Whether the conduct has the purpose or effect of unreasonably interfering with an employee's work performance and/or advancement or a student's academic performance and/or advancement, or creating an intimidating, hostile, or offensive work or academic environment.

*Id.* at 15.  The letter explained that

> [t]he parties mutually engaged in flirtatious and romantic banter, eventually exchanging intimate, overtly sexual communications.  Neither [Prof. Flor] nor [Ms. Chavez] has challenged the authenticity of the evidence of their voluminous communications.  The written record in this case establishes by a preponderance that at least three of the five necessary elements for harassment are not met.
>
> First, those communications of [Ms. Chavez] that were sexual in nature were both subjectively and objectively welcomed by [Prof. Flor].  In fact, [Ms. Chavez's] sexual communications were solicited by [Prof. Flor].  As such, a reasonable person would not have known that the conduct was unwelcome.
>
> Conversely, the vast amount of communications that [Prof. Flor] is concerned with are not sexual in nature.  With regard to these steady and voluminous communications, it cannot be said that they were objectively unwelcome or that a reasonable person would know the volume of communications was unwelcome. [Prof. Flor] told [Ms. Chavez] that he liked her communications and there is no evidence that he expressed to [Ms. Chavez] that he objected to her

Letter of Determination issued on February 8, 2019, not the OEO draft report.  *See* Doc. 22-4 at 2–3; Doc. 22-5 at 1, 2–3 ("[B]oth parties provided additional factual information in response to the Preliminary Letter of Determination . . . issued from this office on February 8, 2019.").

communications until July 2, 2018.  Once [Prof. Flor] requested that [Ms. Chavez] cease her communications, they stopped.

Lastly, OEO finds that [Ms. Chavez's] communications neither interfered with [Prof. Flor's] work performance or advancement, or created an intimidating, hostile, or offensive work environment for him.  The vast majority of the communications between the parties were conducted through [Prof. Flor's] personal email.  [Ms. Chavez] was not present in [Prof. Flor's] work space as they never met face-to-face after their initial meeting.  OEO is aware that [Prof. Flor] is concerned over harm to his professional career, but this potential harm flowed from [Ms. Chavez's] possibly reporting their communications to University officials, and not the communications themselves.

*Id.* at 15–16 (footnote and citations omitted).

On February 8, 2019, the OEO also issued a Preliminary Letter of Determination in OEO *Chavez v. Flor*.  Doc. 22-1 at 1.  The preliminary letter provided that the OEO was prepared to find that Prof. Flor's conduct violated the University's sexual misconduct policy, because Prof. Flor engaged in sexual harassment and retaliation.  *Id.*  Regarding sexual harassment— specifically, quid pro quo—the OEO considered:

1. Whether submission to sexual conduct was made either explicitly or implicitly a term or condition of an individual's employment or academic advancement; or
2. Whether submission to or rejection of sexual conduct by an individual was used as the basis for employment decisions or academic decisions affecting the affected party.

*Id.* at 20.  The preliminary findings were that

[Prof. Flor] has not challenged the authenticity of the communications.  There can be no dispute that the conduct at issue was sexual in nature . . . .  [Prof. Flor] admitted to first making comments of an explicitly sexual nature.

Further, OEO finds that the chronology of communications establishes that [Ms. Chavez's] receptiveness and reciprocation of [Prof. Flor's] sexual overtures was an implied term or condition of her hire by [Prof. Flor] as a graduate or project assistant.  An implicit term is the opposite of a direct statement . . . .  The parties first discussed an employment relationship, then [Prof. Flor] initiated sexual overtures, and then the parties exchanged intimate, personal, and overtly sexual communications.  An employment relationship remained possible throughout all of the sexual communications until [Prof. Flor] first withdrew his romantic and sexual interest in [Ms. Chavez] and then, the assistantship opportunity.

6

Essential to this analysis is <u>UNM Policy 2215: Consensual Relationships and Conflicts of Interest</u>.  Although the OEO does not evaluate whether <u>Policy 2215</u> has been violated, it must consider the strong University interest present in that policy to avoid difficulties which arise from relationships like that at issue here, due in no small part to the Policy's explicit recognition of the "inherent power differential" between a faculty member and a student which can render consent difficult to assess or construe it to be coercive.  While [Ms. Chavez] was never a student of [Prof. Flor's], he possessed considerable authority as she was a student in the graduate program in which he taught and she was his department chair's graduate assistant.  In addition to [Prof. Flor's] ability to affect [Ms. Chavez's] existing employment, the contemplation of an additional employment opportunity only further solidified the authority [Prof. Flor] had over [Ms. Chavez's] situation. A reasonable college student in [Ms. Chavez's] position would feel pressure to please a person in [Prof. Flor's] professional position.  [Prof. Flor's] reliance on [Ms. Chavez's] flirtations, apparent consent, and her failure to ask him to stop such communications ignores the inherent power he possessed to affect her employment (existing and potential) and possibly, her education at UNM.

Accordingly, OEO finds that it is more-likely-than-not that succumbing to [Prof. Flor's] sexual written communications was implicitly a term or condition of [Ms. Chavez's] employment with [Prof. Flor].

*Id.* at 20–21 (underlining in original, footnote and citations omitted).

The OEO considered the following factors to determine whether Prof. Flor had retaliated

against Ms. Chavez:

1. Whether [Ms. Chavez] engaged in good faith civil rights protected activity, such as opposing an individual or University's discriminatory conduct or practice, initiating a complaint with OEO, responding to an OEO complaint, acting as a witness in an OEO investigation, or requesting an accommodation for a religious practice or disability;
2. Whether [Prof. Flor] had knowledge of [Ms. Chavez's] participation in protected activity;
3. Whether [Ms. Chavez] suffered an adverse employment or academic action after [Prof. Flor] gained knowledge of [Ms. Chavez's] participation in protected activity; and
4. Whether [Prof. Flor] took the adverse action because of [Ms. Chavez's] protected activity.

*Id.* at 21.  The OEO's preliminary letter indicated that it was prepared to find that Prof. Flor had

violated policy by retaliating against Ms. Chavez.  *Id.*  Specifically,

OEO first finds that [Ms. Chavez] engaged in good faith civil rights protected activity when she notified [Prof. Flor] of her intent to report their sexual communications to administrators at the University. [Prof. Flor] suggests that [Ms. Chavez's] threats to forward their prior sexual communications to multiple individuals at the University was due to anger that he would no longer engage in the behavior and wanted to get revenge. Such may be the case. That truth would not negate that [Ms. Chavez] nevertheless believed she had a rational good-faith complaint to make, and given OEO's conclusion(s) above, she did. [Prof. Flor] relies on the fact that [Ms. Chavez] did not express the communications were harassment or misconduct. This is misdirection, as discussed above, due to the power differential between them, [Ms. Chavez] was not in a position to object directly, and further, her attempts (and at times, demands) for closure by letting [Prof. Flor] know that reporting his conduct was an available option only highlights that she had a good faith belief that there was something problematic to report in the first place.

Since [Ms. Chavez] notified [Prof. Flor] of her intent to report their sexual acts directly, OEO finds he was aware of her participation in protected activity. Further, as a result of [Prof. Flor's] report to his Department Chair which resulted in a report to the University's OEO, and then his July 2, 2018 visit to the Dean of Students' Office, [Ms. Chavez] has been put in the position of needing to defend herself with the OEO and being issued a sternly worded communications ban by the Dean of Students' Office. Without a doubt, the OEO and Dean of Students' Office's interactions with [Ms. Chavez] have been stressful and embarrassing for her, at the least.

Finally, the chronology of events supports finding it more-likely than-not that [Prof. Flor] complained to his Department Chair and to the Dean of Students because [Ms. Chavez] reported that she might report their sexual relationship to University authorities. On June 24, 2018, [Ms. Chavez] informed [Prof. Flor] that his Department Chair was waiting to hear about her experiences with Anderson faculty. The next day, [Ms. Chavez] emailed [Prof. Flor] that if he continued to avoid her and her messages, she would address it all directly with his Department Chair. [Prof. Flor] finally responded to [Ms. Chavez] on June 26, 2018 and maintained his distance, indicating he would get to her messages eventually. That same day, [Ms. Chavez] again said in a text message that she was going to meet with [Prof. Flor's] Department Chair and possibly add "all of this feedback." It was the next day that [Prof. Flor] made his report about [Ms. Chavez] to his Department Chair. Thus, the evidence establishes that when his June 26 email was not sufficient for [Ms. Chavez], and she still persisted with the available option of reporting [Prof. Flor's] conduct, he beat her to it and reported her first. OEO is struck by the Department Chair's observation that "[Prof. Flor's] impression is the student is attempting to pursue a romantic relationship. She began the harassment after he told her he could not pursue such a relationship." Clearly, [Prof. Flor] neglected to mention that it was he who pursued a sexual

relationship with [Ms. Chavez], instead giving the impression that the problematic behavior was [Ms. Chavez's], not his own.

Likewise, on July 2, 2018, [Ms. Chavez] notified [Prof. Flor] of a meeting with Associate Dean Kathryn Jacobson and additionally said she would eventually meet with "CW" (believed to be Dean Craig White).  This is the very same day [Prof. Flor] went to the Dean of Students' Office complaining about the volume of communications from [Ms. Chavez].

Against this backdrop, OEO concludes that the evidence established by a preponderance of the evidence that [Prof. Flor] twice engaged in retaliation against [Ms. Chavez].

*Id.* at 21 (footnote and citations omitted); Doc. 30 at 25.

Like the draft report, both Preliminary Letters of Determination invited the parties to submit additional factual information to be considered by the OEO prior to its final determinations.  Doc. 22-1 at 22; Doc. 22-3 at 16.  Prof. Flor provided a response and identified witnesses whom be believed should be interviewed.  *See* Doc. 22-5 at 1–3 (describing the witnesses Prof. Flor had identified).

On March 25, 2019, the OEO issued its Final Letter of Determination in OEO Chavez v. Flor, signed by Ms. Cliffe, Ms. Cordova, and Title IX Coordinator Defendant Angela Catena.  *Id.* at 1.  There, the OEO found that Prof. Flor had violated the sexual misconduct policy by engaging in sexual harassment (quid pro quo) and retaliation.  *Id.* at 4.  In the Final Letter of Determination, the OEO acknowledged that Prof. Flor had submitted a response to the OEO's Preliminary Letter of Determination.  *Id.* at 1.  But, as the OEO explained, it did not interview witnesses identified by Prof. Flor because it believed the testimony those witnesses would provide was irrelevant to its findings.  *Id.* at 1–3.

Prof. Flor exercised his right to appeal the Final Letter of Determination to University President Garnett Stokes.  Doc. 30 at 26.  He, with the assistance of counsel, argued that no reasonable person could conclude that he sexually harassed or retaliated against Ms. Chavez.  *Id.*

9

Specifically, with respect to the sexual harassment finding, Prof. Flor argued that sexual harassment must be unwelcome, stating that "[Ms. Chavez's] e-mails show [she] welcomed and encouraged the contact between the parties." *Id.* Regarding retaliation, Prof. Flor again identified several witnesses that the OEO declined to interview. *Id.* at 28–29. President Stokes denied Prof. Flor's appeal, noting that Prof. Flor had not "presented any new arguments that would support remanding this matter back to [the] OEO at this time." Doc. 22-6 at 1.

One month after President Stokes denied Prof. Flor's appeal, Prof. Flor sought a discretionary appeal from the University of New Mexico Board of Regents. Doc. 22-4 at 1. The Board of Regents declined to exercise discretionary review over Prof. Flor's appeal. Doc. 22-7.

The sanctioning process began after Prof. Flor exhausted all his opportunities to appeal the OEO's findings. According to the Faculty Disciplinary Policy, a "member of the faculty . . . who violates a published University policy may be subject to warning, censure, suspension without pay, or dismissal." Doc. 22-8 at 1. Normally, a faculty member's department chair determines the appropriate sanction. *Id.* at 2. In Prof. Flor's case, Defendant Camille Carey, professor and Vice Dean and Associate Dean for Academic Affairs at the University of New Mexico School of Law, acted as department chair. Doc. 22-11 at 1. Importantly, Senior Vice Provost Barbara Rodriguez tasked Prof. Carey with this job because of "identified conflicts of interest within [Prof. Flor's] academic department." *Id.* at n.1.

Prof. Carey issued the following sanctions:

- You are suspended without pay for twelve (12) months, beginning January 1, 2020, and ending December 31, 2020. During this time, you are relieved from all academic duties, including teaching, research, and service. While suspended, you may not represent UNM on any committees, in any public forums, any national conferences or meetings, or at any international conferences or meetings. You will not use your office or visit the Anderson School of Management during the period of suspension.

- Effective January 13, 2020, and in light of this sanction relieving you of any teaching, research, or advising duties for a period of one year, you may not engage in any electronic communication with any UNM student utilizing the UNM email system.
- Effective immediately, all in-person and electronic communications with any UNM student must be completely devoid of any reference of physical or sexual contact.
- Effective immediately, you must cease all contact with [Ms. Chavez] for a period of one year.
- Effective immediately, you should exercise caution if speaking about [Ms. Chavez] to any colleagues or students at the Anderson School of Management, in light of the FERPA and this action.

*Id.* at 1–2.

Prof. Flor sought a faculty peer hearing to appeal his sanctions.  Doc. 22-8 at 3–4. During the hearing, Prof. Flor was permitted to have counsel present, and although counsel could not directly intervene, Prof. Flor could consult counsel during the hearing.  Doc. 22-22 at 1. Further, Prof. Flor had the right to present evidence and witnesses at the hearing, should he choose.  *Id.* at 3–4.

The peer review panel upheld Prof. Flor's sanctions.  Doc. 22-9 at 8.  The issues considered by the panel included "whether the process that led to the sanction followed policy, but restricted only to the [Faculty Disciplinary Policy's] sanctioning policy," and "the appropriateness of the sanction."  *Id.* at 2.  The hearing panel did not consider whether the OEO followed appropriate policy and process in arriving at its conclusion that Prof. Flor violated the University's sexual misconduct policy.  *Id.*[5]

Prof. Flor asserts that he has exhausted all his administrative appeals (Doc. 22 at 13), but University Defendants maintain that Prof. Flor has elected not to pursue an appeal of the peer

---

[5] Prof. Flor does not rely on the substance of the peer review hearing in his arguments for a temporary restraining order and preliminary injunction.  Thus, I have omitted those facts from this Proposed Findings and Recommended Disposition.

review panel's decision to the Provost (Doc. 30 at 15). *See also* Doc. 22-8 at 4 (setting forth

process for appealing peer review panel's decision).

Separate from the policy violation and sanctioning processes, Prof. Flor maintains that

the University treated him and Ms. Chavez differently regarding interactions with third parties.

Doc. 22 at 10–11. Specifically, on November 7, 2018, Prof. Flor sent the OEO an email

claiming that he believed Ms. Chavez violated the OEO's no-contact directive by contacting the

Albuquerque Journal. Doc. 22-12. The Albuquerque Journal submitted an Inspection of Public

Records Act ("IPRA") Request to Prof. Flor. *Id.* Under the terms of the no-contact directive,

Ms. Chavez was prohibited from contacting the Albuquerque Journal—a third-party—for the

purposes of attempting to contact Prof. Flor through the third party, or to use the Albuquerque

Journal to "harass, harm, humiliate, or otherwise portray negatively [Prof. Flor]." Doc. 22-14

at 2. But several days after he complained to the OEO about the Albuquerque Journal, Prof. Flor

admitted that "the student [i.e., Ms. Chavez] didn't file the IPRA [Request]," but that he

nonetheless believed that Ms. Chavez had contacted the Journal about him. Doc. 22-15 at 1. An

OEO representative instructed Prof. Flor not to assume Ms. Chavez had contacted the Journal

and stated that even if she had, merely contacting the Journal may not be a violation of the no

contact directive. *Id.*

Meanwhile, in December 2018, Ms. Chavez claims that she was contacted by multiple

reporters. Doc. 22-20 at 3. That same month, "several news publications" interviewed Prof. Flor

regarding the University's sexual misconduct findings and sanctioning process. *Id.* Given the

circumstances, Ms. Chavez believed that Prof. Flor had provided her name and contact

information to reporters. *Id.* Unlike Prof. Flor's complaint, the OEO accepted jurisdiction over

Ms. Chavez's complaint. *Id.* at 1. According to Prof. Flor, the OEO's investigation into Ms. Chavez's complaint is ongoing. Doc. 22 at 12.

On December 31, 2019, Prof. Flor filed a lawsuit in the Second Judicial District Court of Bernalillo County, seeking declaratory and injunctive relief as well as damages. *See* Doc. 1 at 5. Defendants removed the case to this Court on January 9, 2020. Doc. 1. Shortly thereafter, Prof. Flor filed his First Amended Complaint. Doc. 17. In it, he asserts various federal and state claims against University Defendants, including, *inter alia*, violations of procedural due process and violations of Title IX. *See id.* at 20–24, 25–29. Prof. Flor now moves for a temporary restraining order and preliminary injunction to prevent University Defendants from enforcing their decision to suspend him for one year without pay. Doc. 22 at 1. He relies on his procedural due process and Title IX claims to support his request for an injunction. *Id.* at 16, 20.

## II.      Standard

"The substantive requirements for a preliminary injunction and temporary restraining order are identical." *Valley Cmty. Pres. Comm'n v. Mineta*, 246 F. Supp. 2d 1163, 1165–66 (D.N.M. 2002), *aff'd on different grounds*, 373 F.3d 1078 (10th Cir. 2004). The Supreme Court has observed "that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original). Similarly, the Tenth Circuit has explained "[a] preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019) (citation omitted). In order for a party to be entitled to a temporary restraining order or a preliminary injunction, that party must show:

> (1) he or she will suffer irreparable injury unless the injunction issues; (2) the threatened injury outweighs whatever damage the proposed injunction may cause

the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood of success on the merits.

*Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003)) (alterations omitted).

There is, however, a certain class of injunctions that are disfavored by courts. *See Free the Nipple-Fort Collins*, 916 F.3d at 797. "[A] disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." *Id.* "To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: She must make a 'strong showing' that these tilt in her favor." *Id.*

## III.   Discussion

Prof. Flor argues that he is entitled to a temporary restraining order and preliminary injunction based on the strength of his procedural due process and Title IX claims against University Defendants. Doc. 22 at 16, 20. University Defendants maintain that Prof. Flor is seeking a mandatory injunction—one of the disfavored injunctions that requires a heightened showing on two of the four factors. Doc. 30 at 17–18. University Defendants further assert that Prof. Flor cannot make the requisite showing to succeed in securing a temporary restraining order or preliminary injunction. *Id.* at 18–24.

Based on the analysis set forth below, I recommend that the Court conclude that Prof. Flor is not entitled to a temporary restraining order or a preliminary injunction. Further, because I find that Prof. Flor has not satisfied the standard requirements for an injunction, I do not recommend a disposition regarding whether the injunction Prof. Flor seeks is mandatory in nature.

14

A.  Likelihood of Success on the Merits

In order to satisfy the likelihood-of-success-on-the-merits factor, "the burden is upon the one requesting such relief to make a prima facie case showing a reasonable probability that he will ultimately be entitled to the relief sought." *Automated Mktg. Sys., Inc. v. Martin*, 467 F.2d 1181, 1183 (10th Cir. 1972); *see also Planned Parenthood Assoc. of Utah v. Herbert*, 828 F.3d 1245, 1252 (10th Cir. 2016) ("Although [t]he courts use a bewildering variety of formulations of the need for showing some likelihood of success, [a]ll courts agree that plaintiff must present a prima facie case but need not show a certainty of winning." (internal quotation marks and citations omitted)).[6]

1.  *Due Process Claim (Count One)*

The crux of Prof. Flor's due process claim is that he should have been given an in-person hearing where he could have presented a defense of his choosing and probe Ms. Chavez's credibility prior to the University's finding that he violated policy.  Doc. 22 at 20; Doc. 33 at 8. Because Supreme Court and Tenth Circuit authority does not recognize that Prof. Flor had such a right, the likelihood-of-success-on-the-merits element does not weigh in favor of granting a temporary restraining order or preliminary injunction.

---

[6] Prof. Flor requests that I apply the standard articulated in *Otero Sav. & Loan Ass'n v. Fed. Reserve Bank of Kansas City, Mo.*, 665 F.2d 275, 278 (10th Cir. 1981).  *See* Doc. 22 at 15–16. There, the Tenth Circuit described a:

> liberal definition of the "probability of success" requirement.  When the other three requirements for a preliminary injunction are satisfied, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."

*Id.* (quoting *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir. 1964)). This "liberal" standard is inapplicable here because as I conclude below, Prof. Flor has not established that the other three requirements for a preliminary injunction weigh in his favor.

"To assess whether an individual was denied procedural due process, courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process." *Montgomery v. City of Ardmore*, 365 F.3d 926, 935 (10th Cir. 2004) (quoting *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir. 1996)).

Tenured professors "possess[] a property interest deserving of procedural due process protections" prior to termination. *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 517 (10th Cir. 1998). Of course, Prof. Flor was not terminated, but rather suspended for one year without pay—a lesser punishment than termination. In *Gilbert v. Homar*, 520 U.S. 924 (1997), the Supreme Court assumed, without deciding, that a government entity's suspension, *without pay*, of a public employee, who has a protected property interest in his continued employment, amounts to a property deprivation sufficient to implicate due process protections. 520 U.S. at 929 (noting "we have not had occasion to decide whether the protections of the Due Process Clause extend to discipline of tenured public employees short of termination"). The Tenth Circuit similarly has assumed this issue without deciding it. *See, e.g.*, *Kirkland v. St. Vrain Valley Sch. Dist. No. Re-1J*, 464 F.3d 1182, 1191 (10th Cir. 2006) ("For purposes of this appeal, we assume, without deciding, that a government employee's suspension without pay amounts to a deprivation triggering some degree of due process protections."). University Defendants "concede that Plaintiff *likely* has a valid property interest related to his employment without suspension." Doc. 30 at 19 (emphasis added). That concession, while not absolute, is sufficient for me to assume that Prof. Flor possessed a property right deserving of due process protection.

The question then becomes what kind of process Prof. Flor was due. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a

16

meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks

omitted); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("An essential

principle of due process is that a deprivation of life, liberty or property be preceded by notice and

opportunity for hearing appropriate to the nature of the case." (internal quotation marks and

citation omitted)).  Thus, "the root requirement" of the due process clause is that "an individual

be given an opportunity for a hearing *before* he is deprived of any significant property interest."

*Id.* (brackets, quotation and citation omitted).  "For government employees, such a hearing

requires: (1) oral or written notice to the employee of the charges against him; (2) an explanation

of the employer's evidence; and (3) an opportunity for the employee to present his side of the

story." *Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009) (brackets, quotation, and

citation omitted).  "A full evidentiary hearing is not required," but the employee must "be given

notice and an opportunity to respond."  *Id.* (quotation omitted).  The Tenth Circuit has:

> upheld as sufficient to meet these requirements informal proceedings, such as
> pretermination warnings and an opportunity for a face-to-face meeting with
> supervisors, and even a limited conversation between an employee and his
> supervisor immediately prior to the employee's termination.  The objective of the
> process is an initial check against mistaken decisions—essentially, a
> determination of whether there are reasonable grounds to believe that the charges
> against the employee are true and support the proposed action.

*Id.* (quotation, footnote, and citations omitted).  "The objective of the process is an initial check

against mistaken decisions—essentially, a determination of whether there are reasonable grounds

to believe that the charges against the employee are true and support the proposed action."  *Id.*

(internal quotation marks omitted).  The procedures that are constitutionally required depend on

the circumstances of a particular case.  *See Sutherland v. Tooele City Corp.*, 91 F. App'x 632,

640 (10th Cir. 2004) (unpublished) (indicating that "due process is flexible and calls for such

procedural protections as the particular situation demands." (brackets and citation omitted)).

Here, Prof. Flor concedes that he had notice of the OEO charges against him. *See* TRO Hr'g Tr. at 80:17–18, Apr. 2, 2020 ("We agree that Dr. Flor was given notice."). But he contests whether he had an opportunity to respond. *Id.* at 80:18–19. As noted above, the Due Process Clause does not impose onerous hearing requirements on employers. *See Riggins*, 572 F.3d at 1108. Indeed, the Tenth Circuit has held that an informal conversation in which an employee was notified of the charges against him can also satisfy the "opportunity to respond" requirement described in *Loudermill*. *See Powell v. Mikulecky*, 891 F.2d 1454, 1459 (10th Cir. 1989) ("That conversation was, itself, the notification of the charges against him. At that time, Powell had an opportunity to rebut that charge but chose instead to admit to it."). In this case, Prof. Flor received multiple opportunities to respond to the allegations against him. First, Mr. FitzSimons interviewed Prof. Flor about Ms. Chavez's complaint against him. Doc. 22-1 at 2. Then, the OEO solicited a response from Prof. Flor after providing him the draft report in OEO Chavez v. Flor, and again after preparing the Letter of Preliminary Determination in the same case. Doc. 22-2 at 21–22.[7] Prof. Flor maintains that he responded to both the draft report and the preliminary letter. Doc. 22 at 5, 6.[8] Accordingly, the minimum requirements of due process— namely, notice, an explanation of the evidence against him, and an opportunity to respond—were likely satisfied.

---

[7] Although not emphasized in briefing or during the April 2, 2020, hearing, due process requires that Prof. Flor receive an explanation of the evidence against him. *See Riggins*, 572 F.3d at 1108. Here, Prof. Flor received the OEO's draft report and Preliminary Letter of Determination, both of which summarized the evidence against him. Thus, I find that requirement of due process is likely satisfied.

[8] As noted in footnote 4, Prof. Flor claims to have responded to the OEO's draft report. He has not, however, provided record citations that support that claim. Regardless, the record confirms that he responded to the OEO's Preliminary Letter of Determination.

This is not a case where Prof. Flor was unable to tell "his side of the story." *Montgomery*, 365 F.3d at 936. Rather, Prof. Flor wants to tell his side of the story unhindered from the constraints of the University's processes. The due process clause does not afford him that right. Prof. Flor consistently has argued that he was entitled to an in-person hearing prior to the OEO's finding that he violated University policy. But, as the Tenth Circuit has recognized, "[i]t would be remarkable if [a formal] hearing were constitutionally required [before adverse employment action less than termination], since the Constitution does not even require such a hearing before an employee is *fired.*" *Hulen v. Yates*, 322 F.3d 1229, 1247 (10th Cir. 2003) (emphasis in original) (examining due process protections in the case of a professor's department transfer). Indeed, the "hearing" requirements of due process are informal and often do not resemble a formal hearing, be it in-person or otherwise. *See Riggins*, 572 F.3d at 1108.

Moreover, even if I were to credit Prof. Flor's position that the pre-deprivation process he received was insufficient to meet due process requirements, I find that he likely received adequate post-deprivation process. *Benavidez v. City of Albuquerque*, 101 F.3d 620, 626 (10th Cir. 1996) (stating that "[w]hen the [pre-deprivation] process offers little or no opportunity for the employee to present his side of the case, [post-deprivation procedures] become much more important"); *Montgomery*, 365 F.3d at 938 (noting that in the employment context, the due process clause mandates that "[i]f only minimal procedural protections occur before the adverse employment action, due process requires post-termination procedures that provide the employee with the opportunity to challenge [the adverse employment action] in a more detailed fashion" (internal quotation marks omitted)). Here, with regard to post-deprivation procedures, Prof. Flor exercised his right to appeal the OEO's policy violation determination twice. *See* Doc. 30 at 26; Doc. 22-4 at 1. In addition, he sought and received a peer review hearing where he was

permitted to present evidence and witnesses, testify, and cross-examine witnesses against him.
Doc. 22-22 at 1, 3–4.  Although Prof. Flor was unable to challenge the OEO's finding that he
violated University policy, he was able to attack the process by which the University took
adverse employment action against him.  Combined with the pre-deprivation process he
received, I find that these post-deprivation procedures likely provided Prof. Flor with all the
process he was due.  *See Benavidez*, 101 F.3d at 626–27.

   Finally, in connection with his due process claim, Prof. Flor argues that University
Defendants should have employed "heightened due process" measures because this case is
fundamentally based on the credibility of the parties.  Doc. 33 at 2.  He posits that at a minimum,
he should have been permitted to cross-examine Ms. Chavez and present a defense and witnesses
of his choosing.  *Id.*  In support, he relies on non-binding case law in which students brought due
process claims against their universities based on the universities' responses to Title IX
complaints.  In particular, the cases cited by Prof. Flor involve allegations of sexual assault.  *See,*
*e.g.*, *Lee v. Univ. of New Mexico*, 2020 WL 1515381, at *4 (D.N.M. Mar. 30, 2020) (concerning
whether sexual activity between the complainant and the respondent was non-consensual); *Doe*
*v. Univ. of Connecticut*, 2020 WL 406356, at *5 (D. Conn. Jan. 23, 2020) (recognizing that a
sexual assault allegation involves a "he said/she said dispute hinging on the credibility of Roe
and the Plaintiff" (internal quotation marks omitted)); *Doe v. Pennsylvania State Univ.*, 276 F.
Supp. 3d 300, 302 (M.D. Pa. 2017); *Nokes v. Miami Univ.*, 2017 WL 3674910, at *1 (S.D. Ohio
Aug. 25, 2017).  In the sexual assault context, the fundamental inquiry is whether the sexual
activity was consensual.  Thus, in those cases, the credibility of the accuser and the accused is
paramount, because there often is little other evidence that can establish consent.  Accordingly,

courts have required due process protections that probe at the credibility of both parties prior to taking any adverse action. *See Lee*, 2020 WL 1515381, at *36.

Prof. Flor's reliance on those cases is misplaced. First, unlike the cases relied on by Prof. Flor, virtually all the communications between Prof. Flor and Ms. Chavez were conducted via email or text message. Tr. at 20:11–13 ("[A]lmost all of their communications were by text and e-mail. There were some phone communications but very, very few."). As a result, the parties and the Court have a detailed record of the communications between Prof. Flor and Ms. Chavez. This is not a case where the only evidence is one party's word against the other's. Further, all the due process cases cited in Prof. Flor's reply involve allegations by a student against a university. *See* Doc. 33 at 4–8. In the employment context, the contours of procedural due process are well established by *Loudermill* and its progeny. Prof. Flor has not provided a single authoritative case from the Supreme Court or the Tenth Circuit requiring heightened pre-deprivation protections in the employment context. Thus, the cases on which Prof. Flor relies are inapposite. Prof. Flor has not established that he is likely to succeed on the merits of his constitutional due process claim.

## 2. *Title IX Claim (Count Four)*

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Prof. Flor alleges that University Defendants violated Title IX based on two theories: (1) erroneous outcome, and (2) selective enforcement. Doc. 22 at 20.[9]

---

[9] Prof. Flor appears to also allege a third Title IX theory based on retaliation. Doc. 22 at 20. But because he failed to argue this theory in his motion (beyond mentioning it in a list) and at the April 2, 2020, hearing, I will not consider it.

(a)  Erroneous Outcome

To state an erroneous outcome theory, a plaintiff must plead: (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding, and (2) a particularized causal connection between the flawed outcome and gender bias.  *See Doe v. Baum*, 903 F.3d 575, 585 (6th Cir. 2018); *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994); *Ruff v. Bd. of Regents of Univ. of New Mexico*, 272 F. Supp. 3d 1289, 1298 (D.N.M. 2017).  Facts that cast doubt on the outcome of a disciplinary proceeding can include "procedural flaws affecting the proof."  *Yusuf*, 35 F.3d at 715.  Meanwhile, evidence demonstrating causation between the flawed outcome and a gender bias can be shown, for example, by "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender."  *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016) (unpublished) (quoting *Yusuf*, 35 F.3d at 715).

Prof. Flor's erroneous outcome claim is premised on his constitutional due process claim. He again asserts that he "was not afforded due process in that he was not given a hearing, an opportunity to present his own defense, or an opportunity to cross-examine his own accuser." Doc. 22 at 21.  As detailed above, Prof. Flor has not shown that he is likely to succeed on his constitutional due process claim.  Because Prof. Flor has not shown that the OEO's findings and the University's sanctioning process were the result of "procedural flaws affecting the proof," *Yusuf*, 35 F.3d at 715, he fails to establish a prima facie case for his erroneous outcome claim.[10]

(b)  Selective Enforcement

"Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline."  *Yusuf*, 35 F.3d at 715.  In selective enforcement cases, "regardless

---

[10] Because Prof. Flor failed to establish the first element of an erroneous outcome claim, I do not address the second element.

of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.* "[A] plaintiff demonstrates selective enforcement through the identification of a comparator of the opposite sex who was treated more favorably by the educational institution when facing similar disciplinary charges." *Doe v. Case W. Reserve Univ.*, 2015 WL 5522001, at *6 (N.D. Ohio Sept. 16, 2015) (citing *Yusuf*, 35 F.3d at 716).

Prof. Flor's selective enforcement claim targets two separate actions by University Defendants: (1) the OEO's finding that Prof. Flor violated the University's sexual misconduct policy, but that Ms. Chavez did not, and (2) the OEO's acceptance of jurisdiction over Ms. Chavez's complaint alleging that Prof. Flor violated their no-contact directive, but its rejection of Prof. Flor's similar allegations against Ms. Chavez. Doc. 22 at 22.

Prof. Flor's first argument is unavailing. The OEO investigated different allegations of sexual misconduct in OEO Chavez v. Flor and OEO Flor v. Chavez. In particular, OEO Chavez v. Flor focused on whether there was quid pro quo harassment or retaliation. A key factor in the OEO's analysis was the inherent power imbalance between Prof. Flor (a tenured professor) and Ms. Chavez (a graduate student). Doc. 22-1 at 20–21. By way of contrast, in OEO Flor v. Chavez, the OEO found that the sexually explicit communications from Ms. Chavez were welcomed by Prof. Flor and that the "communications neither interfered with [Prof. Flor's] work performance or advancement, or created an intimidating, hostile, or offensive work environment for him." Doc. 22-3 at 16. The OEO's findings thus were premised on an understanding of the power imbalance between professors and students. Accordingly, Ms. Chavez, because of her status as a student, is not a proper comparator for Prof. Flor to rely on when making this claim. Their circumstances are not sufficiently similar to support Prof. Flor's selective enforcement

Title IX theory. *Cf. Mallory v. Ohio Univ.*, 76 F. App'x 634, 641 (6th Cir. 2003) (unpublished) (explaining that the plaintiff, a male student, "must demonstrate that a female was in circumstances *sufficiently similar* to his own and was treated more favorably by the University" (emphasis added)).

Turning to Prof. Flor's second argument, he maintains that the OEO treated him unfairly based on his sex when it accepted jurisdiction over Ms. Chavez's complaint that alleged that he violated the University's no-contact directive by engaging with the press. Doc. 22 at 27. Prof. Flor had previously made a similar allegation to the OEO against Ms. Chavez, but the OEO declined to investigate his claim. Doc. 22-12; Doc. 22-15 at 1–2.

At the April 2, 2020, hearing, University Defendants asserted that the OEO did not accept jurisdiction over Prof. Flor's claim because Prof. Flor could not establish that Ms. Chavez had anything to do with the IPRA Request from the Albuquerque Journal. Tr. at 74:2–7, 14–17; Doc. 20-22 at 3. They further explained that the OEO accepted jurisdiction over Ms. Chavez's case because evidence existed that Prof. Flor actively spoke to the press, whereas Prof. Flor's allegation was based solely on his unsubstantiated belief that Ms. Chavez had spoken to the Albuquerque Journal. Tr. at 74:18–22; Doc. 22-12. Because Prof. Flor could provide no link between Ms. Chavez and the Albuquerque Journal's IPRA Request, the OEO had no basis to accept jurisdiction. Tr. at 74:23–25, 75:1–6.

Complicating matters, following Prof. Flor's initial allegation against Ms. Chavez and his own admission that she had not filed the IPRA Request, a representative of the OEO informed Prof. Flor that "[e]ven if [Ms. Chavez had contacted the Albuquerque Journal], I do not think that would violate the no contact directive." Doc. 22-15 at 1. Prof. Flor asserts that this statement shows that the OEO selectively enforced its policy to his detriment. Tr. at 93:24–25,

94:1–13.  But fatal to Prof. Flor's position, he does not allege that he would have (or could have)

filed a formal complaint against Ms. Chavez for purported violations of the no-contact directive,

but for that statement.  Indeed, the record is devoid of evidence that Ms. Chavez had contact with

the press, whereas Prof. Flor clearly gave interviews about the University's sanctioning process.

*See* Docs. 22-17, 22-18 (quoting Prof. Flor about the University's investigation and his sanction).

In light of Prof. Flor's concession that Ms. Chavez did not file the IPRA Request and the lack of

evidence or allegation that Ms. Chavez spoke to the press, the University was free to decline to

investigate his allegation against her.  Prof. Flor's failure to demonstrate that he was in fact

treated differently "do[es] not demonstrate an inconsistency that warrants further inquiry."

*Yusuf*, 35 F.3d at 716.  At this stage, Prof. Flor has not demonstrated that he will likely succeed

on the merits of his selective enforcement Title IX claim.

      B.   <u>Irreparable Harm</u>

      Establishing irreparable harm is "not an easy burden to fulfill."  *Greater Yellowstone*

*Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003).  "To constitute irreparable harm, an

injury must be certain, great, actual and not theoretical."  *Heideman*, 348 F.3d at 1189 (internal

quotation marks omitted).  "Any deprivation of any constitutional right fits th[e] bill."  *Free the*

*Nipple-Fort Collins*, 916 F.3d at 806 (internal citation omitted); *see also Kikumura v. Hurley*,

242 F.3d 950, 963 (10th Cir. 2001) ("When an alleged constitutional right is involved, most

courts hold that no further showing of irreparable injury is necessary." (quoting 11A Charles

Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1

(2d ed.1995)).

      Here, Prof. Flor alleges that University Defendants violated his constitutional right to

procedural due process.  But, at this stage, Prof. Flor has failed to demonstrate a likelihood of

success on that claim. The cases in which the Tenth Circuit has held that the irreparable harm element is satisfied by an alleged constitutional violation have also held that the movant was likely to succeed on the merits of those constitutional claims. *See, e.g.*, *Free the Nipple-Fort Collins*, 916 F.3d at 805 (concluding that the plaintiffs had made a strong showing with respect to their constitutional equal protection claim and that the alleged constitutional violation satisfied the irreparable harm prong of the preliminary injunction analysis); *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016) (recognizing that "the violation of a constitutional right must weigh heavily in [the irreparable injury] analysis" after concluding that the plaintiffs had met their burden of demonstrating their likelihood of succeeding on the merits of their constitutional elections clause claim); *cf. Kikumura*, 242 F.3d at 962–63 (concluding that damages could not adequately compensate the plaintiff for violations of his religious rights and remanding the RFRA claim to the district court for determination of the merits). That is not the case here. Because Prof. Flor has failed to establish that he is likely to succeed on the merits of his procedural due process claim, he cannot rely on that alleged constitutional violation to satisfy the irreparable injury element for an injunction.

Irreparable harm may also be shown "when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Kikumura*, 242 F.3d at 963 (citing *Tri–State Generation & Transmission Assoc., Inc., v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1354 (10th Cir. 1989)). Prof. Flor asserts that he "is essentially barred from completing the research required for his grants . . . and he faces uncertain prospects regarding his future at the University and his ability to obtain future employment . . . ." Doc. 22 at 23. Further, Prof. Flor maintains that he faces damage to his future and reputation due to the finding that he violated University policy. *Id.* But "[i]t is . . .

well settled that simple economic loss . . . does not, in and of itself, constitute irreparable harm[, because] such losses are compensable by monetary damages." *Heideman*, 348 F.3d at 1189. Moreover, the Supreme Court has drawn an important "distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or *reputation*—and an equitable action for specific relief." *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (emphasis added). The Tenth Circuit accordingly has embraced the principle that "[a]ny loss of prestige, standing, or reputation that [the plaintiff] may have suffered prior to filing this action can be remedied through money damages and does not justify a preliminary injunction." *Schrier*, 427 F.3d at 1266. Thus, Prof. Flor has not established that he will suffer irreparable injury due to the uncertainty of his economic future or his perceived reputational harms. This factor does not weigh in favor of the Court granting Prof. Flor's requested injunction.

       C.  <u>Balance of Harms</u>

Next, I balance the harm to Prof. Flor against the harm to University Defendants if the injunction is granted. *See Fish*, 840 F.3d at 754. As described above, Prof. Flor has identified multiple harms that he will suffer if the Court does not grant an injunction. These harms are primarily economic and reputational in nature. Doc. 22 at 23. As previously explained, these claims are compensable by money damages. Meanwhile, University Defendants assert that they will be harmed if they lose control over their administrative processes and their ability to sanction employees. Doc. 30 at 23. Further, they posit that students are harmed if the University is unable to take corrective steps when employees commit policy violations. *Id.* Given the significant hardships identified by both parties, this factor is neutral in my analysis.

D.  Public Interest

An injunction must "not be against the public interest."  *Free the Nipple-Fort Collins*, 916 F.3d at 807.  And "it's always in the public interest to prevent the violation of a party's constitutional rights."  *Id.* (internal quotation marks omitted).  Again, Prof. Flor alleges that University Defendants violated his constitutional due process rights.  But like the irreparable harm requirement, the mere allegation of a constitutional deprivation is insufficient to satisfy this element.  *See, e.g.*, *id.* (concluding that the public interest factor weighed in the plaintiffs' favor because the challenged ordinance was likely unconstitutional).  Even so, "the public interest will be served by vindicating a legal interest that Congress has determined to be an important one," for example, Title IX.  *Cohen v. Brown Univ.*, 809 F. Supp. 978, 1001 (D.R.I. 1992).  But, like his due process claim, Prof. Flor has not shown that he is likely to succeed on the merits of his Title IX theories.  At this stage, Prof. Flor has failed to show that an injunction would be in the public interest.

Meanwhile, University Defendants claim there is a strong public interest in their ability to protect students and sanction policy violators.  Doc. 30 at 23–24.  Indeed, the Tenth Circuit has recognized that schools have a legitimate interest in providing a safe environment for students.  *See Butler v. Rio Rancho Pub. Sch. Bd. of Educ.*, 341 F.3d 1197, 1201 (10th Cir. 2003) ("There is no doubt the School has a legitimate interest in providing a safe environment for students and staff."); *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1364 (10th Cir. 2000) ("[M]aintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures.").  Accordingly, the public interest factor does not favor the granting of an injunction.

## IV.    Conclusion

When balanced against each other, the factors do not support the issuance of a temporary restraining order or preliminary injunction.  Prof. Flor has not met his burden of showing that he will likely succeed on the merits of his claims.  Further, he has failed to show that he will be irreparably harmed if University Defendants are not enjoined or that an injunction would be in the public interest.[11]  Given that Prof. Flor bears the burden of establishing an injunction is appropriate, and has failed to do so, I recommend that the Court DENY Prof. Flor's motion.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  Written objections must be both timely and specific.  *United States v. One Parcel of Real Prop., With Buildings, Appurtenances, Improvements, & Contents, Known as: 2121 E. 30th St., Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996).  A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  Failure to file timely and specific objections will result in waiver of *de novo* review by a district or appellate court.  In other words, if no objections are filed, no appellate review will be allowed.**

---

_Laura Fashing_
Laura Fashing
United States Magistrate Judge

---

[11] This is so, even without considering whether the requested injunction is mandatory and thus subject to a heightened showing.