IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

NICK VINCENT FLOR,

     Plaintiff,

     v.                              No. 1:20-cv-00027-JAP-LF

THE BOARD OF REGENTS OF THE
UNIVERSITY OF NEW MEXICO, STEPHEN
BISHOP, LISA BROIDY, KEVIN GICK,
KARIN HIGH, ERIC LAU, individually and in
their official capacities, and EVA CHAVEZ,

     Defendants.

## SECOND AMENDED COMPLAINT

Plaintiff Nick Vincent Flor brings this Second Amended Complaint for Injunctive and Declaratory Relief and Damages against Defendants.  In support of his Complaint, Plaintiff states as follows:

1.     This action is for due process violations under the Fourteenth Amendment to the United States Constitution brought pursuant to 42 U.S.C. § 1983, for violations of Title IX, 20 U.S.C. §§ 1681 *et seq.*, and for a declaratory judgment according to 28 U.S.C. § 2201 and NMSA 1978, §§ 44-6-1 through 15.

### Jurisdiction and Venue

2.     Jurisdiction is proper in this Court because this Complaint presents claims raising a federal question under 28 U.S.C. § 1331, and because it raises state law and common law claims which fall within this Court's supplemental jurisdiction under 28 U.S.C. § 1367.

3.     Venue is proper in the District of New Mexico under 28 U.S.C. § 1391, because all defendants are residents of the State in which this judicial district is located and because a

substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this judicial district.

## Parties

4.      Plaintiff Nick Vincent Flor is an Associate Professor with the University of New Mexico's Anderson School of Management.  He is a resident of Bernalillo County in the State of New Mexico.

5.      Defendant Board of Regents of the University of New Mexico is the governing body of the University of New Mexico, a governmental entity, which provides education and educational services to students within the State of New Mexico, which for all actions relevant to this Complaint, occurred in Bernalillo County.  Defendant Board of Regents of the University of New Mexico is entitled to sue and be sued, and has the power and duty to enact laws, rules, and regulations for the governance of the University of New Mexico.  NMSA 1978, § 21-7-1, *et seq.*

6.      Defendant Board of Regents has general supervisory control of the University and of the actions and inactions of its employees, officers, and agents acting in their official capacity on behalf of the University of New Mexico.

7.      Defendant Stephen Bishop is, and was at all times relevant to this Complaint, the Chair of the Faculty Ethics & Advisory Committee. Defendant Bishop was responsible for arranging the faculty peer hearing at which Plaintiff, pursuant to university policy C07, challenged his suspension from the university. Upon information and belief, Defendant Bishop is a resident of the State of New Mexico. Defendant Bishop is being sued in both his official and individual capacities.

8.      Defendant Lisa Broidy is, and was at all times relevant to this Complaint, a professor of sociology and a member of the University's Faculty Ethics Committee. Defendant

Broidy was the Chair of the Peer Hearing Panel before which Plaintiff had a hearing to challenge his suspension. Upon information and belief, Defendant Broidy is a resident of the State of New Mexico. Defendant Broidy is being sued in both her official and individual capacities.

9.     Defendant Kevin Gick is, and was at all times relevant to this Complaint, Associate University Counsel within the University Counsel Office. Defendant Gick served as the legal advisor to the peer hearing panel before which Plaintiff challenged his suspension from the University. Upon information and belief, Defendant Gick is a resident of the State of New Mexico. Defendant Gick is being sued in both his official and individual capacities.

10.     Defendant Karin High is, and was at all times relevant to this Complaint, a professor of anesthesiology and a member of the Faculty Ethics Committee. Defendant High was a member of the Peer Hearing Panel before which Plaintiff had a hearing to challenge his suspension. Upon information and belief, Defendant High is a resident of the State of New Mexico. Defendant High is being sued in both her official and individual capacities.

11.     Defendant Eric Lau is, and was at all times relevant to this Complaint, a professor of music and a member of the Faculty Ethics Committee. Defendant Lau was a member of the Peer Hearing Panel before which Plaintiff had a hearing to challenge his suspension. Upon information and belief, Defendant Lau is a resident of the State of New Mexico. Defendant Lau is being sued in both his official and individual capacities.

12.     Defendant Eva Chavez is an individual, a graduate student at the University of New Mexico's Anderson School of Management, and a resident of the State of New Mexico.

**Factual Background**

13.     On May 9, 2018, Plaintiff had a brief, in-person interaction with Defendant Eva Chavez, a graduate student at the University of New Mexico.

14.     Defendant Chavez never took any classes with Plaintiff.

15.     Plaintiff had never met Defendant Chavez before this brief interaction.

16.     Plaintiff and Defendant Chavez did not work on any research projects together.

17.     Plaintiff did not serve as an academic advisor for Defendant Chavez.

18.     Therefore, Plaintiff and Defendant Chavez were never in a situation in which Plaintiff would have supervised, advised, graded, or otherwise interacted in any professional situation with Defendant Chavez.

19.     This brief in-person interaction, however, led to e-mail exchanges between Plaintiff and Defendant Chavez.

20.     Those e-mail exchanges eventually became flirtatious and explicit in nature.

21.     Nearly all of these e-mails were exchanged through Plaintiff's personal e-mail account rather than his University issued e-mail account.

22.     In addition to the flirtatious e-mail exchanges, Defendant Chavez had asked Plaintiff about possible paid research opportunities related to Plaintiff's research.

23.     Plaintiff informed Defendant Chavez that he had some research money remaining, but that it was limited.

24.     Plaintiff nevertheless inquired with his Department about any remaining grant money he had so that he could extend a paid research opportunity to Defendant Chavez.

25.     Plaintiff confirmed that he had a limited amount of grant money remaining, but nevertheless extended an offer to Defendant Chavez to perform a small number of hours of paid research work.  That research work equated to less than $800 worth of work, which was to be performed over the course of 4 weeks, during which Defendant Chavez would have worked only 8 hours a week.

26.     Defendant Chavez rejected the research opportunity because it did not offer a sufficient number of available paid hours.

27.     A few weeks later, Plaintiff decided to stop all e-mail communication with Defendant Chavez.  Plaintiff, who is married, did so because he believed the e-mail exchanges to be inappropriate for a married man.

28.     Defendant Chavez sent 3,258 messages, including 134 messages of an implicit or explicit sexual nature.

29.     Plaintiff sent 2,218 messages, including 69 messages of an implicit or explicit sexual nature.

30.     The messages including implicit or explicit sexual content sent by Plaintiff were limited to communications occurring over only six days.

31.     Not one e-mail or message was sent by either party stating that the sexual messages were unwanted or unwelcome.

32.     Not one e-mail message predicates the prospect of a job opportunity or work project on the sending or participation in sending sexually explicit e-mail messages.

33.     After Plaintiff cut off all e-mail communication with Defendant Chavez, Defendant Chavez began threatening Plaintiff, stating that she would share their e-mails with Plaintiff's Department Chair at the University and with members of the faculty and administration at the University.

34.     Defendant Chavez also began a series of harassing text messages, sending more than one hundred text messages on a single day.

35.     Those text messages demanded that Plaintiff respond otherwise Defendant Chavez would reveal the e-mails she exchanged with Plaintiff to the University community, including Plaintiff's supervisors and colleagues.

36.     This would have caused great embarrassment to Plaintiff.

37.     Plaintiff eventually determined that he had no choice but to disclose to a fellow faculty member, Mary Margaret Rogers, that he was receiving threatening and harassing text messages from a graduate student. Plaintiff also disclosed that he had exchanged flirtatious, explicit e-mails with Defendant Chavez.

38.     After disclosing the harassment and threats he was receiving from Defendant Chavez, Dr. Rogers reported the issues to the University's Office of Equal Opportunity.

39.     Dr. Rogers also filed a complaint against Defendant Chavez on behalf of Plaintiff with the Office of Equal Opportunity.

40.     When Defendant Chavez was informed that Plaintiff had filed a complaint against her, Defendant Chavez filed a separate complaint alleging that Plaintiff had engaged in quid pro quo sexual harassment because there was a power differential between them.

41.     Plaintiff fully cooperated in the investigation.

42.     Defendant Chavez, however, knowingly lied and presented false information to the University.

43.     The University then set out to investigate the complaints filed by Plaintiff and Defendant Chavez.

44.     The University initially appointed an independent investigator, Ben FitzSimons, who was not employed by the University.

45.     That independent investigator included the job title OEO investigator on all correspondence related to this matter.

46.     That independent investigator then prepared an investigation report.

47.     That investigation report was then sent to Plaintiff and Defendant Chavez on November 28, 2018, at which time Plaintiff and Defendant Chavez were allowed to prepare a response to the investigation report.

48.     That investigation report detailed testimony given to Mr. FitzSimons by witnesses who he interviewed, but he did not identify the names of those witnesses.

49.     The failure to identify witnesses deprived Plaintiff of the opportunity to fully respond to the testimony from those witnesses.

50.     Mr. FitzSimons was removed as the investigator after he had prepared that investigation report.

51.     Upon information and belief, Mr. FitzSimons was removed as the investigator because he intended to find that Plaintiff did not violate University policy.

52.     Nowhere in University policy does it state that the Office of Equal Opportunity may replace an investigator assigned to a case because of a disagreement regarding that investigator's findings.

53.     After the removal of Mr. FitzSimons, Sara Cliffe was appointed as the OEO investigator for those complaints.

54.     Ms. Cliffe then took the investigative findings prepared by Mr. FitzSimons and prepared a preliminary letter of determination.

55.     A preliminary letter of determination includes the results of the Office of Equal Opportunity investigation, including the University's proposed findings regarding potential policy violations.

56.     Those preliminary determinations included findings that Plaintiff's interactions with Defendant Chavez resulted in Plaintiff violating the University's sexual harassment policy and anti-retaliation policy, but that Defendant Chavez did not violate the University's sexual harassment policy or anti-retaliation policy.

57.     The preliminary letter of determination then gave Plaintiff five days to offer new evidence not previously submitted to the Office of Equal Opportunity throughout its investigation.

58.     Following the investigation report and preliminary letter of determination, Plaintiff asked that the Office of Equal Opportunity interview twelve witnesses.

59.     Three of those witness—James Cormier, Raj Mahto, and Harold Chang—had submitted complaints alleging that Defendant Chavez engaged in inappropriate and retaliatory behavior, including allegations of filing false complaints against individuals when she did not get what she wanted from those individuals, with various University offices and officials.

60.     Three of those witnesses—Tammy Cline, Vanessa Cline, and Robin Love—would have testified during their interviews that Defendant Chavez never had a job contract with the University that was taken away and that Defendant Chavez rejected Plaintiff's job offer.

61.     Six of those witnesses—Randi Silva, Adrienne Neff, Kim Huynh, Nicole Jaramillo-Martinez, Melinda Mesibov, and Erin Maestas—were expected to provide testimony regarding Plaintiff's interactions with students and other information germane to the allegations of sexual harassment.

62.     The Office of Equal Opportunity refused to interview any of Plaintiff's proposed witnesses.

63.     One of those witnesses, Raj Mahto, did submit a written statement to the Office of Equal Opportunity.   That statement offered to provide further written evidence supporting his statement.   The Office of Equal Opportunity refused to accept or review that further written evidence.

64.     The Office of Equal Opportunity later issued a final letter of determination, in which it found that Plaintiff had violated University policy.

65.     Plaintiff was not afforded a hearing before the Office of Equal Opportunity issued its findings that Plaintiff violated the University's sexual harassment and retaliation policies.

66.     Plaintiff was not afforded the opportunity to cross-examine any of the witnesses who were interviewed by the Office of Equal Opportunity before issuing its findings that Plaintiff violated the University's sexual harassment and retaliation policies.

67.     Plaintiff did not have the opportunity to present a full and complete defense regarding the allegations brought against him before the Office of Equal Opportunity issued its findings that Plaintiff violated the University's sexual harassment and retaliation policies.

68.     Plaintiff was not afforded a fair and equitable investigation before the Office of Equal Opportunity issued its findings that Plaintiff violated the University's sexual harassment and retaliation policies.

69.     Neither the Office of Equal Opportunity nor Defendant Board of Regents afforded Plaintiff a full and fair opportunity to respond to the allegations against him before issuing their findings that Plaintiff violated the University's sexual harassment and retaliation policies.

70.     Neither the Office of Equal Opportunity nor Defendant Board of Regents afforded Plaintiff the opportunity to see all evidence used against him before issuing their findings that Plaintiff violated the University's sexual harassment and retaliation policies.

71.     The Office of Equal Opportunity refused to consider, but instead excluded, exculpatory evidence before issuing its findings that Plaintiff violated the University's sexual harassment and retaliation policies.

72.     After the Office of Equal Opportunity issued its final letter of determination, Plaintiff appealed that determination to the President of the University.

73.     The President of the University denied Plaintiff's appeal.

74.     Plaintiff then appealed the determination to Defendant Board of Regents of the University of New Mexico.

75.     Defendant Board of Regents of the University of New Mexico denied his appeal.

76.     At no time during the appeal process was Plaintiff afforded a hearing, an opportunity to present a full and complete defense, an opportunity to cross-examine witnesses, an opportunity to have witnesses of his choice testify, an opportunity to present exculpatory evidence, or the opportunity to view all evidence collected against him.

77.     The University then commenced the process to sanction Plaintiff for violating University policy.

78.     The process for sanctioning tenured faculty members for violating University policy is contained in University Policy C07.

79.     University Policy C07 requires that, after the finding of a policy violation, an individual's Department Chair makes a sanctioning decision, and if that decision includes a

suspension, then an individual's Dean must review and approve the proposed sanction before it is imposed.

80.     According to this policy, Barbara Rodriguez, the University's Senior Vice Provost, appointed Plaintiff's Department Chair, Dr. Mary Margaret Rogers, to review the determinations of the Office of Equal Opportunity and decide what, if any sanction, should be imposed.

81.     Dr. Rogers reviewed the Office of Equal Opportunity's preliminary letter of determination and final letter of determination.

82.     After reviewing those documents, Dr. Rogers prepared a proposed sanction of training and other corrective measures. She did not recommend that Plaintiff be suspended.

83.     Dr. Rogers then sent her proposed sanction to Rodriguez and Angela Catena, the University's Title IX coordinator, who required Dr. Rogers to share her proposed sanction before imposing it even though University policy gives the Department Chair the sole responsibility for determining the proposed sanction, with review and approval only by the Dean of the individual to be sanctioned.

84.     Catena disagreed with the proposed sanction of Plaintiff.

85.     Catena believed that the sanction was not harsh enough and believed that Plaintiff should receive a more punitive sanction then the sanction proposed by Dr. Rogers.

86.     Catena then prepared a letter or memorandum to Rodriguez explaining her opinion that Dr. Rogers' proposed sanction was not severe enough.

87.     Rodriguez agreed with Catena that Dr. Rogers' proposed sanction was not harsh enough.

88.     In fact, at a later proceeding at the University, Rodriguez testified that she believed that Plaintiff should be terminated.

89.     Neither Catena nor Rodriguez possessed the ability to sanction Plaintiff for the alleged policy violations.

90.     Catena and Rodriguez then set out to deprive Plaintiff of the process guaranteed to him under University Policy C07 and remove Dr. Rogers as the sanctioning party by alleging that Dr. Rogers had a conflict of interest prohibiting her from serving as the sanctioning party.

91.     The alleged conflict of interest held by Dr. Rogers was based upon three facts: 1) that Dr. Rogers initially reported conduct that was part of the investigation to the Office of Equal Opportunity; 2) that Dr. Rogers was later sanctioned by the University for failing to report Plaintiff's alleged sexual misconduct earlier than she had reported it; and 3) that Dr. Rogers expressed an inability to be impartial in a separate investigation regarding Defendant Chavez.

92.     Those justifications were pretextual.

93.     Catena and Rodriguez did not in fact have any legitimate concern regarding any potential conflict of interest held by Dr. Rogers.

94.     First, Catena and Rodriguez knew, prior to tasking Dr. Rogers with sanctioning Plaintiff, that Dr. Rogers had reported alleged misconduct by Plaintiff and Defendant Chavez to the Office of Equal Opportunity.

95.     Neither Catena nor Rodriguez had any concern regarding those initial reports at the time Dr. Rogers was tasked with sanctioning Plaintiff.

96.     Moreover, while Dr. Rogers was sanctioned by the University for failing to report alleged misconduct by Plaintiff and Defendant Chavez earlier than she had done so, that sanction was not imposed until after Dr. Rogers had prepared and distributed her proposed sanction.

97.     And, Dr. Rogers comments regarding the inability to be impartial about a separate investigation regarding Plaintiff and Defendant Chavez were made after she was sanctioned by the University, and after Dr. Rogers had prepared and sent her proposed sanction of Plaintiff.

98.     Actions taken by the University after Dr. Rogers prepared and distributed her proposed sanction, and Dr. Rogers' reaction to actions which also occurred after she prepared and distributed her proposed sanction, cannot legitimately serve as the basis for an alleged conflict of interest.

99.     Nevertheless, Catena and Rodriguez determined that Dr. Rogers could no longer serve as the individual responsible for sanctioning Plaintiff.

100.    Rodriguez then refused to appoint as a substitute sanctioner any department chair associated with the Anderson School of Management, which is the school Plaintiff is affiliated with.

101.    Rodriguez later appointed Camille Carey, who is the Vice Dean of the Law School, as the sanctioning party.

102.    Dean Carey conferred with Catena after she was tasked with sanctioning Plaintiff.

103.    In that meeting, Catena gave Carey guidance regarding the review of the University's findings of policy violations.

104.    During that meeting, Catena provided Dean Carey with a handbook prepared by an organization called ATIXA, which related to the sanctioning of students for Title IX violations.

105.    That handbook did not include any guidance regarding sanctioning faculty members for alleged violations of a University's sexual harassment or retaliation policies.

106.    Catena and Rodriguez also provided Dean Carey with two previous sanctions of University professors for alleged violations of the same policies.

107.    Catena and Rodriguez provided those previous sanctions as comparators for Dean Carey to use when sanctioning Plaintiff. Those previous sanctions, however, were not comparable because they were based upon physical sexual relationships between faculty and students.  In contrast, Plaintiff was alleged to have violated policy based upon e-mail communications with a thirty-five-year-old woman who was neither his student, his employee, nor his advisee.

108.    Moreover, these materials were not provided by Catena and Rodriguez to Dr. Rogers.

109.    Dean Carey later decided to impose a one-year suspension, without pay.

110.    In addition to being suspended for one year from his position, Plaintiff is prohibited from working for more than 39 days for any employer other than the University, otherwise he would have to resign his employment.

111.    Dean Carey's sanction, therefore, requires Plaintiff, who is the sole wage earner for his family, to either not work for an entire year and earn no income, or to quit.

112.    Dean Carey's sanction also prohibits Plaintiff from stating that he is associated with the University of New Mexico if he publishes any of his research this year.

113.    This prohibition results in Plaintiff having to violate the terms of his research grants, which total more than $1 million, because those grants require him to publish his findings as associated with a University.

114.    Dean Carey imposed this sanction without affording Plaintiff the opportunity to have a hearing, to confront and cross-examine witnesses, to present a full and complete defense, to submit exculpatory evidence, or to review all of the evidence collected against him.

115.    Pursuant to policy C07, Dean Carey consulted with Plaintiff's Dean, Interim Dean Shawn Berman of the Anderson School of Management, before imposing her sanction.

116.   Interim Dean Berman was determined by Barbara Rodriguez to be a non-conflicted official capable of being objective when reviewing the sanction which Dean Carey wished to impose.

117.   This determination was made despite the fact that Dean Berman, like Dr. Rogers, had also reported alleged misconduct by Plaintiff and Defendant Chavez to the Office of Equal Opportunity.

118.   This determination was made despite the fact that Dean Berman, like Dr. Rogers, had been sanctioned by the University for failing to report that alleged misconduct earlier.

119.   In contrast to Dr. Rogers, however, Dean Berman was sanctioned for the failure to report *before* he was tasked with reviewing and approving Dean Carey's chosen sanction.

120.   If the University had a serious concern about potential conflicts of interest, then Dean Berman should have been precluded from reviewing and approving Dean Carey's chosen sanction.

121.   Rather, Dean Berman's participation in this process confirms that Catena and Rodriguez did not have a legitimate concern that Dr. Rogers possessed a conflict of interest.

122.   The University later informed organizations that had awarded research grants to Plaintiff that Plaintiff was found to have violated the University's quid pro quo sexual harassment and Title IX policies.

123.   These disclosures, which were made before Plaintiff had exhausted his appeals and without giving Plaintiff a hearing or the right to cross-examine his accuser, unlawfully disparage Plaintiff in a manner which prevents Plaintiff from obtaining similar research grants in the future.

124.   A news article was later published by Reason, which is an independent news organization, through which a reporter detailed the University's findings against Plaintiff.

125.   That article alleged that the University failed to afford Plaintiff due process.

126.   That article also discussed the Office of Equal Opportunity investigation into Plaintiff but did not identify Defendant Chavez as the individual that filed a complaint against Plaintiff.

127.   Rather, that article referred to Defendant Chavez as "Julia."

128.   The University's actions, as detailed in this lawsuit, were later the subject of a nationally syndicated column written by Diane Dimond.

129.   That column also discussed the allegations contained in this lawsuit.

130.   That column also did not identify Defendant Chavez as the individual that filed a complaint against Plaintiff.

131.   Plaintiff later filed a lawsuit challenging this suspension.

132.   That lawsuit was filed on December 31, 2019 in the Second Judicial District Court.

133.   At the same time, Plaintiff filed a motion for a temporary restraining order in an attempt to stop Dean Carey's proposed sanction from being imposed.

134.   That lawsuit and motion was then subject to news coverage by local news agencies, including the Albuquerque Journal.

135.   Neither the initial lawsuit nor the news coverage regarding the lawsuit identified Defendant Chavez as the individual who filed a complaint against Plaintiff.

136.   Despite the fact that Defendant Chavez was never publicly identified as the individual who filed a complaint against Plaintiff, Defendant Chavez filed a complaint with the Office of Equal Opportunity alleging that Plaintiff retaliated against her through the filing of this lawsuit and the related media coverage of this matter.

137.    Specifically, Defendant Chavez contended that the media coverage of this matter made it impossible for her to complete her coursework because the media coverage made it possible for individuals to identify her as the individual that filed a complaint against Plaintiff.

138.    These allegations were made despite the fact that no news coverage or public court filing submitted by Plaintiff identified Defendant Chavez as the complainant.

139.    Nevertheless, the University accepted jurisdiction of Defendant Chavez's retaliation complaint.

140.    Although the University ultimately did not find Plaintiff responsible for retaliation, the additional investigation was a source of considerable stress and additional expense to Plaintiff.

**Peer Committee Hearing to Review Plaintiff's Sanction**

141.    On February 21, 2020, Plaintiff underwent his final opportunity to appeal the sanction imposed upon him through a hearing with the University's Peer Review Committee, which was organized by Defendant Bishop, Chair of the Faculty Ethics Committee.

142.    As Defendant Bishop first informed Plaintiff on October 29, 2019, the faculty peer hearing took "the facts as they have been predetermined" by the Office of Equal Opportunity and only allowed Plaintiff to challenge the sanction imposed on him.

143.    In another e-mail communication, Defendant Bishop stated that Plaintiff could "cover questions of improper procedure in the OEO finding and in the sanctioning decision.  That means improper procedure in the sense that certain rules and/or processes were not followed, and does not mean questions of fact.  The peer hearing is neither equipped nor tasked with the skills to determine what did or did not happen.  The basic facts are taken as given; the way those facts were determined and/or the way that determination was turned into a sanction are what are potentially under appeal."

144.    That appeal did not allow Plaintiff to challenge the Office of Equal Opportunity's findings that Plaintiff violated the University's sexual harassment and retaliation policies. Defendant Broidy, chair of the faculty peer hearing panel, reiterated this to Plaintiff on December 18, 2019, when she informed him that despite his request, "the hearing will not re-weigh the evidence OEO gathered or considered, nor will it re-evaluate their process or determination."

145.    During that hearing, Plaintiff was prohibited from being represented by counsel.

146.    That prohibition existed despite the fact that the sanction was defended by Dean Carey, who is a law professor and practicing attorney.

147.    Because the University was being represented by a licensed and seasoned attorney, Plaintiff's attorney submitted a letter to Emma Rodriguez, an Associate University Counsel who advises the University regarding faculty disciplinary actions, stating his concern that "the University, who is effectively the Respondent in the proceeding because it is the entity imposing the sanction, will be represented by an attorney in the [Peer Hearing] while Dr. Flor will not.  The fact that the University will effectively be represented by counsel while Dr. Flor will be denied counsel is likely a violation of Dr. Flor's due process rights.  Therefore, Dr. Flor also requests that, because Vice Dean Carey is an attorney and experienced litigator, his counsel be able to engage in advocacy on his behalf during the peer hearing, including the ability to present evidence, present witnesses, and cross-examine any of Respondent's witnesses."

148.    Ms. Rodriguez then forwarded this request to Defendant Gick, an Associate University Counsel who was the legal advisor for the Peer Hearing panel.

149.    Defendants Broidy, High, and Lau then denied Plaintiff's request to be represented by counsel in an email dated December 9, 2019, stating that "You do not identify a sufficient reason for the Panel to grant your request for a deviation from standard procedure prohibiting

advisors from directly represent [sic] faculty during these types of administrative hearings. Your request for a deviation from this procedure is therefore denied."

150.    Upon information and belief, Defendants Broidy, High, and Lau were guided in their drafting of the email denying Plaintiff legal representation by Defendant Gick, who served as the panel's legal advisor.

151.    Despite Defendants Broidy, High, and Lau's determination that Plaintiff did not need representation because the peer hearing is a "faculty driven process," Defendants Broidy, High, and Lau permitted Dean Carey to submit formal legal motions, such as an 18-page Motion to Exclude evidence submitted by Plaintiff.

152.    The prohibition on Plaintiff having legal representation also existed despite the fact that Dean Carey sought to apply the New Mexico Rules of Evidence to that proceeding.

153.    The Peer Hearing panel later called for a pre-hearing meeting, during which the issues to be considered by the panel, witnesses, and documentary evidence were to be discussed.

154.    This meeting was to be held on December 17, 2019.

155.    The meeting was to be between Plaintiff, Dean Carey, Defendant Broidy, and other employees of the University Secretary's office.

156.    Plaintiff asked to have his counsel present at that meeting, but after asking that the meeting be rescheduled because his attorney had a scheduling conflict, Plaintiff was denied the opportunity to have his counsel present by Defendant Broidy because Defendant Broidy determined that no lawyers needed to be present at the meeting.

157.    The decision to deny Plaintiff the ability to be represented by his counsel at this meeting was made even though the meeting was designed to determine the scope of the Peer

Hearing, including whether the panel would consider any of the underlying findings reached by OEO, which was a matter of significant disagreement between the parties.

158.   The parties also spoke about potential witnesses at this pre-hearing meeting.  That discussion included instructions that Defendant Chavez would not be a witness, and the granting of a request to exclude "third parties named in the documents," such as other professors, staff members, and students who Plaintiff had previously identified as witnesses possessing exculpatory information regarding Defendant Chavez's history and practice of submitting false complaints, such as Professor Reilly White, Professor Mahto, James Cormier, and Harold Change.

159.   The Peer Hearing was then set for February 21, 2020.

160.   Plaintiff and Dean Carey were ordered to submit witness lists and exhibit lists prior to the peer hearing.

161.   As part of compiling his witness list, Plaintiff was informed that he was prohibited from calling Defendant Chavez as a witness.  This prohibition was based upon findings and instructions by Defendant Bishop, Defendant Broidy, Defendant High, and Defendant Lau that consistently and uniformly instructed Plaintiff that the facts and circumstances underlying the complaint were not relevant and were not to be considered at the Peer Hearing.

162.   Because of these instructions and findings, Plaintiff was not allowed to call Defendant Chavez as a witness, and was therefore deprived of the opportunity to confront and cross-examine his accuser.

163.   Plaintiff's witness list therefore did not include Defendant Chavez or key witnesses possessing exculpatory information.

164.    Defendants Broidy, High, and Lau also expressed concern regarding many of Plaintiff's exhibits, which included all of the reports and evidence gathered by OEO during the investigatory process.

165.    The hearing was later held on February 21, 2020.

166.    At that hearing, Plaintiff was prohibited from being represented by counsel, and counsel was instructed to not engage in any discussions during the peer hearing other than to privately advise Plaintiff.

167.    During the hearing, Plaintiff sought to introduce his proposed exhibits, including the exhibits from the OEO process that included all the of evidence gathered against him.

168.    After a conference amongst the members of the Peer Hearing panel, Defendants Broidy, Lau, and High allowed those exhibits to be entered into evidence, but stated that Plaintiff could only refer to those exhibits to inquire whether Dean Carey considered that evidence in making her sanctioning decision.

169.    In fact, Plaintiff was later prohibited from asking questions regarding the evidence gathered and collected by OEO because Defendants Broidy, High and Lau determined that his questions regarding that evidence were outside of the scope of the hearing.

170.    Later on in the peer hearing, Barbara Rodriguez testified regarding the process she used to conflict out Dr. Mary Margaret Rogers and appoint Dean Carey as the sanctioning authority.

171.    In that testimony, Dean Carey elicited testimony that Rodriguez conflicted out Dr. Rogers because of a second, unrelated complaint that the University was investigating against Plaintiff.

172.     Rodriguez testified that the complaint was regarding whether Plaintiff violated the University policy regarding the reporting of sexual relationships with students, which is Policy 2215.

173.     On cross-examination, Plaintiff sought to elicit testimony from Rodriguez regarding the results of that examination.

174.     Dean Carey objected to those questions, stating they were outside of the scope of the hearing.

175.     Defendants Broidy, High, and Lau agreed, preventing Plaintiff from asking questions regarding that separate investigation.

176.     This meant that Plaintiff was not able to present evidence to the Peer Hearing panel that he was found not to have violated that policy because he had never engaged in a sexual relationship with Defendant Chavez.

177.     This also meant that Plaintiff was prohibited from introducing evidence that Defendant Chavez stated as part of that investigation that her communications with Plaintiff were consensual.

178.     Defendants Broidy, High, and Lau's decision to prevent Plaintiff from asking questions regarding the results of that investigation resulted in the panel learning that Plaintiff was being investigated for violating the consensual sexual relationship policy, but not learning that Plaintiff was cleared of those allegations because Defendant Chavez stated that their relationship was consensual.  This created fundamental unfairness in the proceedings.

179.     On March 5, 2020, Defendants Broidy, High, and Lau issued their decision upholding the sanctions against Plaintiff.

**The Contractual Nature of Plaintiff's Employment with the University of New Mexico**

180.    Plaintiff is a tenured Associate Professor with the University of New Mexico.

181.    As a tenured Associate Professor, Plaintiff's employment is governed by rules and regulations contained in the University's faculty handbook, Board of Regents' policy manual, University Administrative Policies and Procedures Manual, and other policies.

182.    The preface to the faculty handbook states that the policies contained in the handbook are "unifying documents that describe academic principles, the reasoning behind the principles, and institutional procedures necessary for implementation," and that the handbook "contain[s] governing principles and procedures that mandate or constrain actions and apply to UNM faculty."

183.    The preface also states that while the Board of Regents Policy Manual is controlling if that manual conflicts with the faculty handbook, that the faculty handbook "shall be controlling in any faculty and academic matters" including when there is "an inconsistency between the Faculty Handbook and" other university policies and procedures.

184.    That handbook contains a large number of policies governing Plaintiff's employment relationship with the University.

185.    Those policies include policies addressing employment, faculty contracts, office hours, academic load and teaching assignments, outside employment, sabbatical leave, sick leave, parental leave, holidays, academic leave, jury and court duty, and leave without pay.

186.    Because the Regents Policy Manual is a superior controlling document in addition to the faculty handbook, a review of the policies in that manual is also necessary to determine the scope of the employment relationship.

187.    That manual includes Policy 5.4, which addresses employee leaves of absence.

188.     That manual includes Policy 5.6, which addresses extra compensation paid by the University.

189.     That manual includes Policy 5.8, which governs intellectual property created while working for the University.

190.     That manual includes Policy 6.4, which contains a code of conduct for all employees at the University.

191.     That manual includes Policy 6.5, which contains restrictions on political activities by employees of the University.

192.     Plaintiff's employment with the University is also governed by the University's Administrative Policies.

193.     Those policies include sections addressing equal opportunity and affirmative action, recruitment and hiring, employee classification, separation of employment, overtime, compensatory time, annual leave, holidays, sick leave, leave with pay, leave without pay, wage and salary information, retirement, and seniority.

194.     These policies, when all read together, govern nearly every aspect of the employment relationship.

195.     The mandatory language in this polices, specifically the language that they shall apply in proceedings, are sufficient for Plaintiff to reasonably expect and rely upon the representation that the policies are controlling and binding upon the University when those policies are being applied against Plaintiff.

196.     Notably, the faculty handbook and other governing policies do not affirmatively disavow that they create a contract between the University and the faculty member, nor do they have any language that would put a faculty member on notice that the policies and procedures

outlined in the handbook were not binding, or that those procedures did not have to be followed by the University or the faculty member.

197.    Plaintiff therefore reasonably believed that these policies created a contract regarding his employment with the University.

198.    As relevant to this complaint, the faculty handbook also included a policy regarding faculty disciplinary actions.

199.    That policy, which is University Policy C07, details the steps that must be taken before a faculty member can be disciplined.

200.    First, the policy states that a tenured faculty member can be disciplined in three ways: censure, suspension, or termination.

201.    Second, the policy states that the decision of what type of disciplinary action is to be taken is to be made by a faculty member's department chair.

202.    In this case, Plaintiff's department chair was Mary Margaret Rogers.

203.    Third, the policy states that if the sanctioning decision is to suspend an individual, then the department chair must also consult with the faculty member's dean before imposing the sanction.

204.    Nowhere in the policy, however, does it state that the sanctioning decision of a department chair must be approved by Angela Catena, who is the University's Title IX Coordinator.

205.    Nor does it state in the policy that the sanctioning decision of a department chair must be approved by Barbara Rodriguez, who is the University's Senior Associate Vice Provost.

206.    And nowhere in C07 does it state that if the sanctioning decision of a department chair is to censure the faculty member, that the sanctioning decision can be rejected by Rodriguez, Catena, or any other employee of the University.

207.    Despite the fact that Policy C07 states that the sole authority to make a sanctioning decision rests with Plaintiff's department chair, Catena and Rodriguez *ad hoc* created the additional requirement that Dr. Rogers submit her proposed disciplinary decision to them for their review and approval.

208.    That initial sanctioning decision was to censure Plaintiff.

209.    Rather than accept the sanction as required by university policy, Catena and Rodriguez disagreed with that decision, and set out on a course to remove Dr. Rogers as the sanctioning chair, appoint Dean Carey to decide disciplinary action, and sought to impose a harsher sanction.

210.    Such actions conflict with Policy C07, resulting in a breach of the contract between Plaintiff and University that he would be sanctioned according to Policy C07.

211.    That breach resulted in Plaintiff being suspended for one year from the University, without pay.

212.    If the University followed Policy C07, Plaintiff would have been censured rather than suspended.

213.    Plaintiff suffered damages as a result of the University's breach of his employment contract.

**Defendant Chavez's Actions**

214.    After Plaintiff was determined to have violated University policy, Defendant Chavez filed a petition in the Second Judicial District Court in New Mexico seeking a domestic violence restraining order against Plaintiff.

215.    Defendant Chavez's petition contended that she should be awarded a domestic violence restraining order prohibiting Plaintiff from contacting her because the University had found that Plaintiff violated the University's sexual harassment and retaliation policies.

216.    As part of those proceedings, Defendant Chavez attached significant portions of the record of the Office of Equal Opportunity's investigation into alleged misconduct by Defendant Chavez and Plaintiff.

217.    Defendant Chavez, however, selectively excluded portions of that investigation file which were exculpatory to Plaintiff.

218.    Plaintiff later filed a motion asking to seal those records from the public.

219.    Defendant Chavez opposed that motion to seal, stating that because Plaintiff was a professor at a public university, the public had a right to know that Plaintiff was found to have violated the University's sexual harassment and retaliation policies.

220.    The opposition to sealing those documents was a transparent attempt to publicly shame Plaintiff.

221.    The filing of the petition and the filing of Office of Equal Opportunity investigation documents as exhibits during those proceedings was an attempt by Defendant Chavez to skirt the Office of Equal Opportunity's confidentiality rules.

222.    Defendant Chavez took those actions because she knew that any other disclosure of the Office of Equal Opportunity record would be unlawful retaliation.

223.    The Second Judicial District Court later rejected that petition for a temporary restraining order, finding that the petition had no merit.

224.    Defendant Chavez therefore used the judicial process to embarrass and shame Plaintiff rather than to pursue meritorious claims for relief.

## COUNT I – VIOLATION OF DUE PROCESS FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION, AND 42 U.S.C. § 1983 AGAINST DEFENDANTS BISHOP, BROIDY, GICK, HIGH, AND LAU, IN THEIR INDIVIDUAL CAPACITIES

225.    Plaintiff incorporates the allegations contained in all preceding paragraphs as if set forth fully herein.

226.    The Fourteenth Amendment of the United States Constitution states that no state shall "deprive any person of life, liberty, or property, without due process of law."

227.    Plaintiff has a protected property right in his continued employment with the University of New Mexico, of which he cannot be deprived of by the state without due process.

228.    Plaintiff has a protected right to due process of law in any disciplinary proceedings related to that employment.

229.    Plaintiff has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived of by the state without due process.

230.    Plaintiff was entitled to process commensurate with the seriousness of the allegations and potential discipline, sanctions, and repercussion he was facing, especially when the allegations are of violations of the University's sexual harassment and sexual violence policies, which will result in a severe sanction that will have lifelong ramifications for Plaintiff.

231.    Plaintiff's employment with the University was suspended for one year without being afforded either pre- or post-deprivation due process, including, but not limited to, the following:

a.      Meaningful notice of the allegations, to include notice of the severity of the potential sanction, the alleged violation, and the limitations placed on sexual harassment findings and hearings;

b.      A meaningful opportunity to be heard, to include the opportunity to respond, explain, and defend against the allegations brought against him;

c.      The opportunity to confront witnesses, to include allowing Plaintiff the opportunity to hear, respond to, and question and cross-examine witnesses, including his accuser,

d.      Identification of all of the evidence and witnesses relied upon by Defendants;

e.      Meaningful and unbiased university policies and procedures;

f.      Affording UNM employees adequate and appropriate training of methods for investigating allegations of sexual misconduct;

g.      Unbiased investigators and decisionmakers;

h.      A prompt, thorough, and impartial investigation;

i.      Following policies and procedures regarding the investigation and sanctioning of faculty alleged to have engaged in sexual harassment;

j.      Meaningful representation by counsel throughout the investigative and sanctioning process, to include allowing Plaintiff's counsel to make argument, to examine witnesses, directly or by written questions, to speak on behalf of Plaintiff, or to take any other action as counsel for Plaintiff; and

k.      Instituting policies and procedures that protect the interests of both the accused faculty member and the accuser.

232.    If Defendants had utilized additional process and procedures, then there would have been a finding by Defendants that the alleged misconduct at issue had not occurred.

29

233.     Sara Cliffe, with the approval and supervision of Angela Catena, conducted an investigation that was reckless and grossly negligent.

234.     Cliffe was the investigator, fact-finder, and decision maker.

235.     Defendant Catena's interference with the investigation and sanctioning process deprived Plaintiff of due process.

236.     Defendant Carey's actions throughout the sanctioning process deprived Plaintiff of due process.

237.     Defendant Rodriguez was responsible for effectuating University Policy C07 by appointing Plaintiff's Department Chair, Dr. Rogers, to determine his sanction. In violation of Plaintiff's right to due process, Defendant Rodriguez removed Dr. Rogers from her role as sanctioner and substituted Defendant Carey.

238.     Defendant Bishop, in his role as the organizer of Plaintiff's faculty peer hearing, deprived Plaintiff of post-deprivation process, including but not limited to the opportunity to challenge the findings of Defendants Cliffe and Catena and the opportunity to be represented by counsel.

239.     Defendants Broidy, High, and Lau, in their role as peer hearing panelists, deprived Plaintiff of post-deprivation process, including but not limited to the opportunity to challenge the findings of Defendants Cliffe and Catena and the opportunity to be represented by counsel.

240.     Defendant Gick, in his role as legal advisor to the peer hearing panel, deprived Plaintiff of post-deprivation process, including but not limited to the opportunity to challenge the findings of Defendants Cliffe and Catena and the opportunity to be represented by counsel.

241.     Defendants created a policy, pattern, and practice that deprived Plaintiff of a fair and impartial investigation, an appeal, and further failed to ensure training in the legal and appropriate methods of investigating allegations of sexual harassment.

242.     Defendants agreed to, approved, and ratified this unconstitutional conduct.

243.     It would have been plainly obvious to a reasonable official that the actions and inactions complained of in this Complaint would deprive or lead to the deprivation of Plaintiff's federal constitutional rights.

244.     Defendants have a custom and practice of disregarding and violation faculty members' constitutional rights.

245.     Defendants have a custom and practice of failing to afford basic due process protections to faculty members accused of sexual harassment.

246.     Defendants' actions and inactions described above were fundamentally unfair to Plaintiff, unduly prone to false findings of sexual harassment and policy violations and were arbitrary and capricious.

247.     Defendants' conduct was so egregious as to shock the conscience.

248.     There is no rational relationship between Plaintiff's actual conduct and the discipline imposed on him by Defendants.

249.     In depriving Plaintiff of his protected due process rights, including his liberty interest in his good name, reputation, honor and integrity, the opportunity to pursue employment, and his protected property interest in his continued employment, Defendants violated Plaintiff's right to due process in violation of the Fourteenth Amendment to the United States Constitution.

250.     Defendants have no sufficient justification for abridging Plaintiff's due process rights.

251.   Defendants, acting under color of state law and in concert with one another, by their conduct, showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

252.   At all times relevant, Plaintiff had a clearly established right to due process of law which is a reasonable public official would have known.

253.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered injury and damages to include, but not limited to: suspension for one year from his employment with the University of New Mexico, denial of other employment opportunities because of University policy, loss of wages, loss of future employment opportunities, a permanent finding of sexual harassment and violation of the University's sexual violence policy on Plaintiff's personnel records, damage to Plaintiff's reputation and standing in the community, loss of career opportunities and earnings capacity, mental and emotional distress, humiliation and embarrassment, and loss of personal and professional reputation.

254.   Plaintiff is entitled to relief against Defendants as requested in this Complaint.

## COUNT II – INJUNCTIVE RELIEF AGAINST DEFENDANTS BOARD OF REGENTS, BISHOP, BROIDY, GICK, HIGH, AND LAU IN THEIR OFFICIAL CAPACITIES

255.   Plaintiff incorporates the allegations contained in all preceding paragraphs as if set forth fully herein.

256.   The allegations of sexual harassment and Defendants' erroneous finding of responsibility resulted in permanent, life-long sanctions against Plaintiff which are quasi-criminal in nature.  Plaintiff's reputation and good name, both personally and professionally, have been

tarnished—if not destroyed—due to UNM's biased and inadequate adjudication of the claims against him.

257.    As a result of these significant due process violations, Plaintiff suffered and continues to suffer ongoing harm and irreparable injury and damage to his employment and future employment prospections, and therefore is entitled to injunctive relief, including a reversal of the outcome and findings of the UNM investigation, expungement of Plaintiff's personnel file reflecting the improper findings, discipline, and sanction, production of verification of such expungement to Plaintiff, prohibiting UNM from disclosing Plaintiff's personnel files reflecting the finding of a policy violation and discipline, and lifting of the one-year suspension so that Plaintiff may return to work at UNM.

258.    As a result of the foregoing, Plaintiff is entitled to injunctive relief against Defendants as requested in this Complaint.

## COUNT III – REQUEST FOR DECLARATORY RELIEF ACCORDING TO 28 U.S.C. § 2201 AND NMSA 1978, § 44-6-1 AGAINST DEFENDANTS BOARD OF REGENTS, BISHOP, BROIDY, GICK, HIGH, AND LAU

259.    Plaintiff incorporates the allegations contained in all preceding paragraphs as if set forth fully herein

260.    An actual controversy exists between Plaintiff and Defendants regarding Defendants' investigative and sanctioning process of male students accused of sexual misconduct.

261.    Plaintiff seeks a judicial determination, according to the Declaratory Judgment Act and the New Mexico Declaratory Judgment Act, that the investigative and sanctioning process utilized by Defendants are unconstitutional, improper, and violative of Plaintiff's rights, and as such, inadequate and invalid as a matter of law.

262.     Plaintiff also seeks a judicial determination, according to the Declaratory Judgment Act and the New Mexico Declaratory Judgment Act, that the peer review appeal process is unconstitutional, improper, and violative of Plaintiff's rights, and as such, inadequate and invalid as a matter of law.

263.     Plaintiff also seeks a judicial determination, according to the Declaratory Judgment Act and the New Mexico Declaratory Judgment Act, that the Office of University Counsel's representation of the University in the sanctioning and review process that Plaintiff has undergone presents such a clear conflict of interest that results in the process being unconstitutional, improper, and violative of Plaintiff's rights, and as such, inadequate and invalid as a matter of law.

264.     A judicial determination resolving this actual controversy is necessary and appropriate at this time.

265.     Due to Defendants' actions and inactions as alleged herein, Plaintiff has suffered, and will continue to suffer, irreparable injury.

266.     Plaintiff does not have an adequate remedy at law.

267.     As a result of the foregoing, Plaintiff is entitled to declaratory relief against Defendants as requested in this Complaint.

## COUNT IV – BREACH OF CONTRACT BY DEFENDANT BOARD OF REGENTS

268.     Plaintiff incorporates the allegations contained in all preceding paragraphs as if set forth fully herein

269.     The University, acting through its Board of Regents and employees, created express contracts when Plaintiff accepted an offer of employment at UNM as a faculty member and when Plaintiff was granted tenure as an Associate Professor at UNM.

270.     Plaintiff did so in reliance on the understanding and reasonable expectation that UNM would fairly and without bias implement and enforce the provisions and policies set forth in its official publications.

271.     Defendant Board of Regents committed several breaches of its express agreements with Plaintiff. A non-exhaustive list of UNM's breaches include the following:

l.       Failing to abide by its policies and procedures;

m.       Failing to conduct a fair and impartial investigation and hearing;

n.       Failing to provide fair and impartial sanctioning process;

o.       Failing to provide adequate due process, to include the right to a hearing, to confront witness, and to confront one's accuser;

p.       Failing to adequately and properly consider and weigh evidence; and

q.       Failing to allow adequate representation during the investigative, sanctioning, and appeals processes.

272.     As a direct and proximate result of the above conduct, Plaintiff sustained significant damages, including, without limitation, emotional distress, loss of educational, professional and career opportunities, injuries, and other direct and consequential damages.

273.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, and costs.

## COUNT V – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING BY DEFENDANT BOARD OF REGENTS

274.     Plaintiff incorporates the allegations contained in all preceding paragraphs as if set forth fully herein

275.    The University's express contracts with Plaintiff included an implied covenant of good faith and fair dealing which implicitly guaranteed that any investigatory and disciplinary proceedings would be conducted with basic fairness.

276.    The University, acting through Defendant Board of Regents, acted in bad faith when it failed to provide adequate due process to safeguard Plaintiff's interests in his continued employment at the University.

277.    As a direct and proximate result of the above conduct, Plaintiff sustained significant damages, including, without limitation, emotional distress, loss of professional and career opportunities, injuries, and other direct and consequential damages.

278.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, costs, and disbursements.

## COUNT VI – VIOLATION OF TITLE IX BY DEFENDANT BOARD OF REGENTS

279.    Plaintiff incorporates the allegations contained in all preceding paragraphs as if set forth fully therein.

280.    Title IX of the Education Amendments of 1972 provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any education program or activity receiving Federal financial assistance."

281.    Defendant University of New Mexico is an institution of higher education that receives federal funding.

282.    The University, acting through Defendant Board of Regents, has promulgated its Title IX Policy, as well as its related sexual harassment, retaliation, and Office of Equal Opportunity policies, among others, to comply with Title IX and its implementing regulations, 34

C.F.R. 106.1 *et seq.*, and with the Clery Act and its implementing regulations. 34 C.F.R. 668.1 *et seq.*

283.    Challenges against university disciplinary proceedings for sex discrimination against faculty members fall into two categories: (1) "erroneous outcome" cases, in which the claim is that a plaintiff was innocent and wrongly found responsible for an offense because of gender bias as a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim asserts that, regardless of the outcome or the faculty member's guilt or innocence, the severity of the penalty and/or conduct of the proceeding was affected by the faculty member's gender.

284.    In Plaintiff's case, the "erroneous outcome" of his case is demonstrated by Defendants' actions depriving Plaintiff of his rights, without limitation to submit written statements from witnesses in his own defense, to a fair and equitable investigation and decision, to see all evidence use against him during the investigation, to present exculpatory evidence in his favor, to have a hearing, to present a full and complete defense, and to not be prejudged guilty and suspending in violation of University policy.

285.    Bias is demonstrated in this case because both Plaintiff and Defendant Chavez sent sexually explicit communications, yet only Plaintiff was found to have violated University policy.

286.    Bias is demonstrated in this case because Plaintiff was found to have improperly retaliated against Defendant Chavez, even though Defendant Chavez threatened to disclose all of her communications with Plaintiff.

287.    Bias is demonstrated in this case because Plaintiff was denied the opportunity to file a retaliation complaint against Defendant Chavez when she filed a petition for a temporary

restraining order, yet the University accepted jurisdiction of a retaliation complaint filed by Defendant Chavez based upon the filing of this lawsuit.

288.    Bias is demonstrated by the fact that the Office of Equal Opportunity refused to interview or talk with any of Plaintiff's proposed witnesses, while interviewing and talking with Defendant Chavez's proposed witnesses.

289.    Bias is demonstrated because the Office of Equal Opportunity only excluded exculpatory evidence submitted by Plaintiff.

290.    Bias is demonstrated because the only witnesses to be found to not have credible or relevant information were those witnesses identified by Plaintiff.

291.    The University has promoted and fostered an atmosphere of public pressure within the student body and has acquiesced to public pressure in the media and from federal and state government demanding more swift and severe reaction to female complaints of sexual harassment at the expensed of male accused faculty members.

292.    The University has also selectively enforced its Title IX and sexual harassment policies against Plaintiff as a male faculty member.

293.    Here, Defendants labored mightily in their judgment to credit Defendant Chavez's statements and evidence, to find that Plaintiff violated policy while Defendant Chavez did not even though both engaged in the same or similar conduct, and the fact that the Defendants found Plaintiff's conduct to be a policy violation even though there is no evidence that the communications in this matter were unwelcome.

294.    Plaintiff will also be able to show that the University has engaged in a pattern and practice of selectively enforcing Title IX.  On information and belief, the University has initiated complaints against male faculty members while not initiating similar complaints against female

faculty members.  In fact, only three faculty members have been disciplined for violations of the University's sexual harassment policy other than Plaintiff, and all of those faculty members are men.

295.    In addition, Plaintiff has a retaliation claim.  The University retaliated against Plaintiff for the filing of this complaint by bringing an additional investigation against him because of the press coverage related to the filing of this lawsuit.

296.    Plaintiff has been irreparably harmed by having his employment effectively terminated.

297.    Plaintiff has suffered reputational harm, been threatened with further retaliatory action by Defendant Chavez, and will suffer diminished income and future career opportunities due to the University's findings and sanction.

298.    Defendant Board of Regents is therefore liable to Plaintiff under Title IX.

## COUNT VII – MALICIOUS ABUSE OF PROCESS BY DEFENDANT CHAVEZ

299.    Plaintiff incorporates the allegations contained in all preceding paragraphs as if set forth fully therein.

300.    Defendant Chavez initiated judicial proceeding against Plaintiff when she filed a petition seeking a domestic violence restraining order.

301.    Defendant Chavez filed that action for the improper purposes of humiliating, embarrassing, and shaming Plaintiff.

302.    Defendant Chavez filed that petition to achieve an illegitimate end, namely the public disclosure of documents related to a confidential proceeding and retaliation against Plaintiff taken under the guise of a judicial proceeding so that she could not be disciplined for retaliating against Plaintiff.

303.     That petition was without merit.

304.     Defendant Chavez's petition for a domestic violence restraining order was denied.

305.     Plaintiff suffered damages as a result of Defendant Chavez's actions in the form of attorneys' fees, reputational harm, and other damages.

**Prayer for Relief**

Plaintiff respectfully requests:

A.     Injunctive relief to redress the injuries proximately and directly caused by Defendants' conduct as stated in this Complaint, including the issuance of an order (1) enjoining Defendants from disclosing Plaintiff's employment records reflecting the finding of a policy violation and/or reflecting discipline during the pendency of this action; (2) requiring Defendants to expunge the improper finding of a policy violation and improper imposition of a sanction from Plaintiff's employment records and providing Plaintiff with confirmation of such expungement; and (3) requiring Defendants to allow Plaintiff to return to his work as an Associate Professor with the University's Anderson School of Management.

B.     Declaratory relief, including a declaration that the investigative and sanctioning process used by Defendants are unconstitutional, improper, and violative of Plaintiff's rights;

C.     Damages in an amount to be determined at trial;

D.     An award of Plaintiff's attorneys' fees and costs;

E.     An award of Plaintiff's attorneys' fees and costs according to 42 U.S.C. § 1988;

F.     And any other and further relief as the Court deems just and proper.


Respectfully submitted,

**HARRISON & HART, LLC**

By: */s/ Nicholas T. Hart*
Carter B. Harrison, IV
Nicholas T. Hart
1001 Luna Circle NW
Albuquerque, NM 87102
T: (505) 295-3261
F: (505) 341-9340
carter@harrisonhartlaw.com
nick@harrisonhartlaw.com

**MUDRICK & ZUCKER, P.C.**

By: /s/ Samantha Harris
325 Sentry Parkway
Building 5 West, Suite 320
Blue Bell, PA 19422
T: (610) 832-0100
F: (610) 279-3900
*samantha@mudrickzucker.com*

*Attorneys for Plaintiff*