# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

NICK VINCENT FLOR,

     Plaintiff,

v.                                                                  Civ. No. 20-27 JAP/LF

THE BOARD OF REGENTS OF THE
UNIVERSITY OF NEW MEXICO *et al.*,

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Nick Flor, a tenured professor at the University of New Mexico ("UNM"), was suspended without pay for one year after he was found to have violated university policies against quid pro quo sexual harassment and retaliation. In this lawsuit, Plaintiff alleges, *inter alia*, that various university employees violated his right to procedural due process, and he seeks damages, as well as injunctive and declaratory relief.

Defendants Stephen Bishop, Lisa Broidy, Kevin Gick, Karin High, and Eric Lau (collectively "Individual Defendants")—the UNM employees who were involved in the hearing process through which Plaintiff challenged his suspension—move for summary judgment on Counts I (42 U.S.C. § 1983), II (injunctive relief), and III (declaratory judgment) of Plaintiff's SECOND AMENDED COMPLAINT ("SAC"), Doc. 68.[1] Plaintiff opposes the Motion and asks the Court to defer ruling on it to allow him an opportunity to take discovery under Federal Rule of Civil Procedure ("Rule") 56(d).[2] Individual Defendants filed a reply in support of their Motion.[3]

---

[1] *See* INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING PLAINTIFF'S SECOND AMENDED COMPLAINT AND MOTION TO STAY DISCOVERY ("Motion"), Doc. 79.
[2] *See* PLAINTIFF'S RESPONSE IN OPPOSITION TO INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ("Response"), Doc. 85.

[3] *See* INDIVIDUAL DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT ("Reply"), Doc. 91.

Having reviewed the briefs, the record, and the applicable law, the Court concludes that the Motion should be GRANTED IN PART AND DENIED IN PART and that Plaintiff's Rule 56(d) request for limited discovery should be DENIED.

## BACKGROUND

The facts of this case, viewed in the light most favorable to Plaintiff, are as follows.

This lawsuit stems from UNM's one-year suspension of Plaintiff, an Associate Professor in UNM's Anderson School of Management, after the UNM Office of Equal Opportunity ("OEO") determined that Plaintiff violated university policies against sexual harassment and retaliation.[4] In early 2019, the OEO concluded that Plaintiff (1) engaged in quid pro quo sexual harassment of Defendant Eva Chavez ("Ms. Chavez"), a graduate student in the Anderson School of Management, in violation of Administrative Policies and Procedures Manual - Policy 2740: Sexual Misconduct (2018)[5] ("Policy 2740"), and (2) retaliated against Ms. Chavez in violation of Administrative Policies and Procedures Manual - Policy 2720: Prohibited Discrimination and Equal Opportunity (2018)[6] ("Policy 2720") when she threatened to report to UNM administrators

---

[4] *See* COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES ("Complaint"), Doc. 1 at 5–22.

[5] Policy 2740 was amended in August 2020 and differs from the 2018 version. The conduct at issue in this case is controlled by the 2018 version of Policy 2740. The Court takes judicial notice of Policy 2740 (2018), available at https://perma.cc/6U34-HGD9, and Administrative Policies and Procedures Manual - Policy 2740: Sexual Harassment Including Sexual Assault (Interim) (2020), available at https://policy.unm.edu/university-policies/2000/2740.html. *See* Fed. R. Evid. 201(b) (providing that courts "may judicially notice a[n adjudicative] fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (explaining that "[t]he scope and reach of the doctrine of judicial notice has been enlarged over the years until today it includes those matters that are verifiable with certainty").

[6] Policy 2720 was also amended in August 2020 and differs from the 2018 version. The conduct at issue in this case is controlled by the 2018 version of Policy 2720. The Court takes judicial notice of Policy 2720 (2018), available at https://web.archive.org/web/20180504215338/http://policy.unm.edu:80/university-policies/2000/2720.html, and Administrative Policies and Procedures Manual - Policy 2720: Prohibited Discrimination and Equal Opportunity (Interim) (2020), available at https://policy.unm.edu/university-policies/2000/2720.html.

the sexual communications she and Plaintiff had exchanged via email and text messages between May and July 2018. *See* Resp., Ex. O at 20–22[7]; Resp., Ex. P. Plaintiff appealed the OEO's determination to the President of UNM, who denied Plaintiff's appeal, and then to the Board of Regents, which likewise denied his appeal. *See* SAC at ¶¶ 72–75.

In October 2019, UNM School of Law Vice Dean Camille Carey, who had been tasked with recommending an appropriate sanction, informed Plaintiff that he was being suspended without pay for twelve months, beginning January 1, 2020 and ending December 31, 2020. *See* TRO Mot., Ex. K. In accordance with the procedures set forth in Faculty Handbook C07: Faculty Disciplinary Policy ("Policy C07"), Plaintiff requested a faculty peer hearing to challenge his suspension. *See* Resp., Ex. E; Resp., Ex. J at §§ 10–11. Defendant Stephen Bishop, an Associate Professor of French at UNM and Chair of UNM's Faculty Ethics and Advisory Committee, coordinated the hearing process, including securing two of the three members for the hearing panel, but did not serve on the panel that reviewed Plaintiff's suspension. *See* Mot. at 5 (Individual Defendants' Undisputed Material Facts ("Defs.' UMF") 1–4); Mot., Ex. A at ¶¶ 2–4, 6, 7, 10. Defendant Lisa Broidy, a UNM Professor of Sociology and member of the Faculty Ethics and Advisory Committee, and Defendant Karin High, a UNM Professor of Anesthesiology and member of the Faculty Ethics and Advisory Committee, agreed to serve on the panel, with Defendant Broidy agreeing to serve as the panel's chairperson. *See* Defs.' UMF 5–6; Mot., Ex. B

---

[7] The Court notes that the version of the OEO's Preliminary Letter of Decision ("PLOD") attached to Plaintiff's Response as Exhibit O is missing page 22 of 23. This is a recurring problem in Plaintiff's filings. *See* PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST DEFENDANTS THE UNIVERSITY OF NEW MEXICO, CAMILLE CAREY, ANGELA CATENA, AND SARA M. CLIFFE ("TRO Motion"), Doc. 22, Ex. A (Doc. 22-1). However, the missing page of the PLOD can be found elsewhere in the record, specifically in Defendants' response to Plaintiff's TRO Motion. *See* DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, Doc. 30 at 25.

at ¶¶ 2–3[8]; Mot., Ex. C at ¶¶ 2–3. In accordance with Policy C07, the UNM Provost selected the panel's third member, Defendant Eric Lau, Chair of the Music Department. *See* Defs.' UMF 7; Mot., Ex. D at ¶¶ 2–3. Defendant Kevin Gick, Associate University Counsel, consulted with and advised the panel about process and procedure in conducting the hearing. *See* Defs.' UMF 8; Mot., Ex. E at ¶¶ 2–4.

Although Defendant Bishop did not serve on the panel, he communicated with Plaintiff at the beginning of the process regarding the scope of the peer hearing and what evidence Plaintiff would be allowed to submit. *See* Mot., Ex. A at ¶ 4; Resp., Ex. E at ¶ 9. Defendant Bishop "advised" Plaintiff that the hearing panel "would be tasked to review the sanction against [Plaintiff] and would not review the investigation of the Office of Equal Opportunity and its findings and determinations with respect to Professor Flor." Mot., Ex. A at ¶¶ 4–5; *see also* Resp., Ex. E at ¶ 11. He did so based on his understanding that "[t]his scope of review was consistent with Policy C07, which tasked the panel with 'uphold[ing] or revers[ing] the proposal to suspend the faculty member without pay.'" Mot., Ex. A at ¶ 5 (alterations in original) (quoting Policy C07).

On December 3, 2019, the panel sent an email to Plaintiff and Vice Dean Carey, the respondent in the hearing, introducing the panel's members, explaining the hearing process, and notifying the parties that the panel would hold a pre-hearing meeting with the parties on December 17, 2019. *See* Resp., Ex. B at 1. On December 4, 2019, the panel met with Defendant Gick and discussed "general hearing related matters as well as a request from the [sic] Dr. Flor that they reschedule the pre-hearing meeting so that his lawyer could be there." *Id.*

---

[8] The Court notes that Individual Defendants filed a NOTICE OF ERRATA, Doc. 80, correcting Exhibit B to the Motion. For simplicity, and because the portions of Defendant Broidy's Declaration cited were not affected by the correction, the Court references the original Exhibit B rather than the corrected Exhibit B at Doc. 80-1.

On December 9, 2019, the panel informed the parties via email that "[t]he underlying nature of this hearing procedure is that it is a faculty driven process" and that the panel "will not deviate from standard practice and allow [Plaintiff's] attorney to directly represent [Plaintiff] during the hearing." Resp., Ex. R at 1. The panel stated that it was unpersuaded that the "mere fact" that Vice Dean Carey, a faculty member in the School of Law, is an attorney and "trained in the field to which her faculty appointment pertains" warranted a departure from standard practice. *See* Resp., Ex. R at 1. Reiterating that "the hearing is a faculty driven process[,]" the panel also denied Plaintiff's request to reschedule the December 17 pre-hearing meeting. *Id.* at 2. The panel explained that the purpose of the pre-hearing meeting was to "discuss logistics such as scheduling" and allow the parties to "present statement(s) of the issue(s) they would like the Panel to decide" and indicated that "[n]o substantive decisions will be made at the meeting." *Id.* Finding that "the presence of advisors is not strictly necessary at the meeting[,]" the panel informed the parties that participation in the pre-hearing meeting would be limited to the panel chairperson and the parties. *Id.*

At the pre-hearing meeting, Plaintiff argued that "the hearing cannot consider the fairness of the sanctioning process and outcome without consideration of the fairness of the OEO process and decision underlying the sanction" and asked the panel to consider three issues: (1) "[w]hether OEO followed appropriate policy and process in arriving at their decision;" (2) "[w]hether the process that led to the sanction followed policy;" and (3) "[t]he appropriateness of the sanction." Resp., Ex. D at 12. Vice Dean Carey "rejected" the first and second issues as being "outside . . . the intended scope of the hearing" but agreed that the scope of the hearing should include the appropriateness of the sanction. *Id.*

Following the pre-hearing meeting, Defendant Broidy conferred with the full panel regarding what issues should be included in the scope of the panel's review and what evidence would be admissible. *See id.* at 12, 13. The panel determined that it would "NOT consider whether OEO followed appropriate policy and process in arriving at their decision" but would consider (1) whether the process that led to the sanction followed Policy C07, and (2) the appropriateness of the sanction. *Id.* at 13 (emphasis in original). In discussing the panel's decision not to consider anything related to the OEO's process and decision, Defendant Broidy explained that it was the panel's "understanding that the process for appealing the OEO process and determination has already been exhausted via appropriate channels (appeal to the President and Board of Regents). As such the hearing will not re-weigh the evidence OEO gathered or considered, nor will it re-evaluate their process or determination." *Id.* Commensurate with its decision to limit the scope of the hearing to the sanctioning process and the sanction itself, the panel agreed to allow the introduction of evidence related to the underlying OEO complaint only "to the extent that evidence considered by OEO has bearing on our determination of whether the C07 sanctioning process was followed appropriately and whether the sanction was fair[.]" *Id.* The panel "reserve[d] the right to exclude or ignore evidence submitted or presented if we determine it is irrelevant to our determination of the appropriateness of the sanctioning process or outcome." *Id.*

On January 13, 2020, Defendant Broidy sent a letter to Plaintiff and Vice Dean Carey, informing them that the hearing had been set for February 21, 2020 and detailing the hearing process, including deadlines for submitting exhibits and witness lists and procedures to be followed during the hearing. *See* Resp., Ex. C. After the parties submitted their witness lists and exhibits, Vice Dean Carey moved to exclude certain exhibits submitted by Plaintiff, as well as one of his witnesses. *See* Resp., Ex. D at 1–7. Vice Dean Carey noted that Plaintiff had submitted

"1,018 pages of exhibits[,]" most of which, she contended, "were the basis for the underlying OEO findings of sexual harassment and retaliation." *Id.* at 3. She argued that Plaintiff was "attempting to circumvent the Panel's decision that it will only consider the sanction and not re-weigh the evidence OEO gathered or considered[,]" *id.* at 3–4 (quotation marks omitted), and asked the panel to exclude many of Plaintiff's exhibits as either irrelevant, inflammatory and prejudicial, or untimely. *See id.* at 3–6.

The panel reserved ruling on Vice Dean Carey's motion and took up her requests as a preliminary matter at the hearing. *See* Resp., Ex. N at 2; *see also* Resp., Ex. B at 3. Plaintiff voluntarily agreed to strike the witness Vice Dean Carey sought to exclude, and the panel decided "not to exclude any of the evidence submitted by Dr. Flor[.]" Resp., Ex. B at 3. The panel, however, "clarified that the onus is on Dr. Flor to testify as to why or how the evidence he has submitted to the panel (particularly numerous emails and text messages between himself and the graduate student involved in the initial OEO complaint/violations that le[d] to the sanction under appeal) is relevant to his appeal of the sanction." *Id.* During the hearing, Plaintiff called four witnesses but did not testify himself. *See id.* Vice Dean Carey also called four witnesses, three of whom were witnesses also called by Plaintiff. *See id.* Each party had the opportunity to make an opening and closing statement, introduce evidence, and question and cross-examine witnesses. *See id.* at 3–8.[9] After the hearing concluded, the panel met to discuss the testimony and evidence and prepare for a planned follow-up meeting. *See id.* at 3. At the follow-up meeting on February 26, 2020, the panel reached consensus on the two issues presented and, in March 2020, issued its decision. *See id.* at 1, 3, 8.

---

[9] The record does not contain a recording or transcript of the hearing. The Court's understanding of what transpired at the hearing is based on the panel's written decision, which summarizes those aspects of the testimony, evidence, and arguments relevant to the panel's analysis.

The panel found "no process irregularities or procedural flaws" in the sanctioning process "that would invalidate the process on procedural grounds." *Id.* at 4–5. The panel also rejected each of Plaintiff's arguments as to why the sanction was too harsh. *See id.* at 5–7. In explaining its conclusion, the panel "note[d] that Dr. Flor submitted a great deal of evidence with no clear link to the panel's task—to determine the fairness and proportionality of the sanction he received." *Id.* at 8. The panel observed that Plaintiff "did not testify on his own behalf, despite the panel's notification that it would rely on his testimony to guide [its] determination of whether and how to weight the evidence he submitted." *Id.* at 3. Noting that "the burden was on Dr. Flor to guide the panel towards a preponderance of evidence in support of his arguments regarding procedural irregularities and substantive disproportionality that would suggest the sanction he received was flawed or unfair[,]" the panel concluded that he "did not do so" and upheld Plaintiff's one-year suspension without pay. *Id.* at 8.

## PROCEDURAL HISTORY

On December 31, 2019, Plaintiff filed suit in New Mexico state court against UNM, the Board of Regents, and seven named defendants: UNM President Garnett Stokes, Vice Dean Carey, then-OEO Director Francie Cordova, Title IX Coordinator Angela Catena, OEO Investigator Sara Cliffe, Associate University Counsel Emma Rodriguez, who advised Vice Dean Carey during the sanctioning process and at the peer review hearing, and Defendant Gick. *See* NOTICE OF REMOVAL, Doc. 1 at 5, 6–8. After the case was removed to this Court, Plaintiff filed a FIRST AMENDED COMPLAINT, Doc. 17, in which he named as defendants UNM, Vice Dean Carey, Angela Catena, Sara Cliffe, and Ms. Chavez.[10] Defendants UNM, Carey, Catena, and Cliffe

---

[10] The other defendants named in the original Complaint—i.e., the Board of Regents, Garnett Stokes, Francie Cordova, Emma Rodriguez, and Defendant Gick—were removed as parties in the FAC. *See id.* at 1.

("University Defendants") moved to dismiss certain claims brought in the First Amended Complaint. *See* DEFENDANTS UNIVERSITY OF NEW MEXICO, CAMILLE CAREY, ANGELA CATENA, AND SARA CLIFFE'S MOTION TO PARTIALLY DISMISS FIRST AMENDED COMPLAINT, Doc. 40. The Court granted University Defendants' motion to partially dismiss the First Amended Complaint and granted Plaintiff leave to amend. *See* MEMORANDUM OPINION AND ORDER, Doc. 64.

On August 31, 2020, Plaintiff filed his SAC, naming as defendants the Board of Regents of UNM, Individual Defendants, and Ms. Chavez[11], and bringing multiple counts against various defendants, including: a claim against Individual Defendants for civil damages under 42 U.S.C. § 1983 based on alleged due process violations (Count I); a request for injunctive relief against the Board of Regents and Individual Defendants (Count II); and a request for declaratory relief under the federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the New Mexico Declaratory Judgment Act, N.M. Stat. Ann. § 44-6-1 *et seq.*, brought against the Board of Regents and Individual Defendants (Count III).[12] SAC at 28–34.

Individual Defendants move for summary judgment on Counts I, II, and III. *See* Mot. They argue that they are entitled to judgment as a matter of law on Count I "under the doctrines of absolute immunity and qualified immunity" and on Counts II and III because they "are unable and have no authority to provide Plaintiff with the type of injunctive or declaratory relief sought." *Id.* at 1.

---

[11] Ms. Chavez has not appeared in this matter.

[12] Plaintiff also brings claims for breach of contract (Count IV), breach of the covenant of good faith and fair dealing (Count V), and violation of Title IX (Count VI) against the Board of Regents, as well of a claim for malicious abuse of process against Ms. Chavez (Count VII), none of which are a subject of the Motion. *See* SAC at 34–40.

**STANDARD**

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When presented with motions for summary judgment, courts "review the evidence and draw inferences in the light most favorable to the nonmoving party." *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1239 (10th Cir. 2001). "The party moving for summary judgment has the burden to show that he is entitled to judgment under established principles; and if he does not discharge that burden, he is not entitled to judgment." *Sec. Nat. Bank v. Belleville Livestock Comm'n Co.*, 619 F.2d 840, 848 (10th Cir. 1979).

The standard for reviewing a motion for summary judgment is different when a § 1983 defendant raises qualified immunity as a defense. "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018) (quotation marks and citation omitted). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment[.]" *Id.* (quotation marks and citation omitted).

**DISCUSSION**

I. **Individual Defendants are Entitled to Summary Judgment on Count I Based on Qualified Immunity**

Individual Defendants contend that summary judgment on Plaintiff's § 1983 claim is proper for two reasons: (1) because they have absolute immunity from suit, or, alternatively, (2) because they are entitled to qualified immunity. *See* Mot. at 9–21. Although the Court concludes that Individual Defendants have not met their burden of demonstrating that they are entitled to

absolute immunity, the Court agrees with Individual Defendants that qualified immunity shields them from liability.

## A. Individual Defendants Have Not Established That They Are Entitled to Absolute Immunity

"Absolute immunity, which affords complete protection from liability for damages, defeats suit at the outset." *Horwitz v. State Bd. of Med. Exam'rs*, 822 F.2d 1508, 1512 (10th Cir. 1987). "On the other hand, 'qualified immunity' is an affirmative defense to be asserted by a government official performing discretionary functions." *Id.* "[T]he line between absolute immunity and qualified immunity often is not an easy one to perceive and structure." *Cleavinger v. Saxner*, 474 U.S. 193, 206 (1985). "The problem of defining the appropriate scope of immunity becomes more perplexing in the context of officials who perform hybrid functions." *Mee v. Ortega*, 967 F.2d 423, 426 (10th Cir. 1992). Government officials are entitled to absolute immunity only if (1) their functions are "similar to those involved in the judicial process," (2) their actions are "likely to result in damages lawsuits by disappointed parties," *and* (3) there are "sufficient safeguards in the regulatory framework to control unconstitutional conduct." *Horwitz*, 822 F.2d at 1513. "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed*, 500 U.S. 478, 486–87 (1991). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Id.* at 486; *see Robinson v. Volkswagenwerk AG*, 940 F.2d 1369, 1370 (10th Cir. 1991) ("Given the sparing recognition of absolute immunity by both the Supreme Court and this court, one claiming such immunity must demonstrate clear entitlement.").

Individual Defendants argue that the functions they performed "relative to the Peer Hearing demonstrate that the conduct at issue satisfies each of the *Horwitz* factors." Mot. at 13. Specifically, they contend that (1) they "were acting in a quasi-judicial role in their review of the sanction and

the sanctioning process[,]" *id.*; (2) "the present lawsuit is 'ample proof' that the Peer Hearing panel's decision has and would likely result in other damage lawsuits by disappointed parties[,]" *id.* at 14 (quoting *Gressley v. Deutsch*, 890 F. Supp. 1474, 1491 (D. Wyo. 1994)); and (3) the hearing "was conducted with procedural safeguards in place and conducted on the record[,]" Mot. at 14.  Regarding the specific "procedural safeguards" that were in place, they point to the fact that the hearing panel utilized UNM's Model Hearing Procedures in conducting the hearing, considered all evidence submitted and excluded no witnesses from testifying, allowed Plaintiff's attorney to be present for the hearing, and allowed Plaintiff to cross-examine all adverse witnesses. *See id.* at 12–13. They also note that while the panel's decision "was not subject to judicial review, it was subject to additional review by the Provost/Chancellor, and the President of the Board of Regents[,]" which Plaintiff did not seek. *Id.* at 14.

Although the Court agrees that the *Horwitz* framework applies, the Court finds that the analysis governing whether Individual Defendants are entitled to absolute immunity is more nuanced than presented by Individual Defendants. Factors courts must consider in evaluating a claim to absolute quasi-judicial immunity include

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger*, 474 U.S. at 202; *see Moore v. Gunnison Valley Hosp.*, 310 F.3d 1315, 1317–19 (10th Cir. 2002) (applying the *Cleavinger* factors in determining whether a hospital peer-review committee was entitled to absolute immunity); *Mee*, 967 F.2d at 426–29 (explaining that "[c]onsideration of the factors outlined in *Cleavinger* necessarily informs our decision" regarding whether a parole officer was entitled to absolute or qualified immunity). Under a more nuanced

consideration, particularly of the procedural-safeguard factors, the Court concludes that Individual Defendants have failed to establish that they are entitled to absolute immunity. Indeed, a close reading of the cases cited by Individual Defendants in support of their absolute immunity argument counsels *against* finding absolute immunity in this case because there are insufficient safeguards in the regulatory framework to prevent unconstitutional conduct.

*Horwitz* involved a claim of absolute immunity by members of the Colorado State Board of Medical Examiners—a statutorily created board whose members are appointed by the governor and who enjoy "[b]road judicial and prosecutorial powers"—who were sued by a podiatrist whose license the Board had summarily suspended. *Id.*, 822 F.2d at 1509–10, 1511. The regulatory framework governing disciplinary proceedings before the Board was set forth in statute and provided, *inter alia*, that a person against whom disciplinary charges were brought had the "opportunity to respond and appear in his own defense with counsel" at an evidentiary hearing. *Id.* at 1511. Fifteen days after the Board suspended his license, Dr. Horwitz had "a full evidentiary hearing before a qualified hearing officer" at which he "was represented by counsel and was afforded a full opportunity to present evidence, express his positions and to fully cross-examine all witnesses." *Id.* at 1510. Although the Board disagreed with the hearing officer's recommendation that Dr. Horwitz's license be immediately reinstated, it placed Dr. Horwitz on a one-year probation, subject to supervision and complying with certain requirements. *Id.* After Dr. Horwitz appealed the Board's decision to the Colorado Court of Appeals, which affirmed the Board's decision except for one of the requirements it imposed, he brought a § 1983 claim against the members of the Board for violation of his Fourteenth Amendment due process rights. *Id.* On the foregoing facts, the Tenth Circuit affirmed the district court's determination that the Board members were entitled to absolute immunity, reasoning that (1) the Board members "performed

statutory functions both adjudicatory and prosecutorial in nature" and that their "duties are 'functionally comparable' to a court of law[,]" and (2) "[t]here exist adequate procedural safeguards under Colorado law to protect against unconstitutional conduct without reliance upon private damages lawsuits." *Id.* at 1515.

Next, in *Saavedra v. City of Albuquerque*, 859 F. Supp. 526 (D.N.M. 1994), a firefighter who was fired after testing positive for marijuana sued, among others, the personnel hearing officer who conducted a post-termination hearing and recommended affirming the termination, and the City of Albuquerque Personnel Board, which conducted an on-record review of the hearing officer's findings and upheld the termination. *See id.* at 528. At his post-termination hearing, the firefighter "had a right to the benefit of counsel and the opportunity to present evidence, elicit testimony and cross-examine witnesses." *Id.* And under City Ordinance, he had the opportunity to appeal the Personnel Board's decision to state district court. *See id.* In concluding that the hearing officer and Personnel Board were entitled to absolute immunity, the district court emphasized the importance of the existence of particular procedural safeguards to protect against unconstitutional conduct without having to resort to a private action for damages. *See id.* at 532. Specifically, the district court noted that the hearing officer "is a professional hearing officer" who, under City ordinance, was required to be a licensed attorney or experienced in labor arbitration and "is not considered an employee of the City." *See id.* at 528, 530. It further noted that "constitutional violations can be corrected on appeal in the state district court." *Id.* at 530. Stating that "[t]he best bulwarks against . . . unconstitutional conduct are a neutral and detached decisionmaker and adequate judicial review[,]" the district court found both of the critical safeguards not only present but also "buttressed by additional protections, such as the adversary nature of the process, a right

to counsel, and a right to cross-examine witnesses" and, therefore, concluded the hearing officer and Personnel Board were entitled to absolute immunity. *Id.* at 532–33.

Finally, in *Gressley*, a tenured university professor was dismissed for cause after a two-week hearing conducted by a faculty hearing committee. *See id.*, 890 F. Supp. at 1481. The professor appealed the committee's decision to the university's Board of Trustees, which, after reviewing the record and the committee's findings and hearing oral arguments, sustained the professor's termination. *See id.* at 1481–82. When the professor sued the Board of Trustees and others under § 1983, the Board of Trustees argued that it was entitled to absolute immunity because it "acted exclusively in an appellate capacity, reviewing a record of a de novo hearing at which [the professor] enjoyed a full panoply of rights; reviewed briefings by [the professor's] counsel; and heard argument by [the professor's] counsel." *Id.* at 1489 (quotation marks and record citation omitted). The district court agreed, finding that the Board of Trustees was functioning in an adjudicatory capacity in hearing the professor's appeal and that "sufficient safeguards" existed in the regulatory framework governing the professor's appeal. *See id.* at 1491. The district court specifically noted that the Board of Trustees' review was "limited to the record" of the faculty hearing committee's proceedings, which were required to consist of "verbatim recordings" under university policy, *and* that judicial review of the termination was available under the Wyoming Administrative Procedure Act. *Id.*

Critical procedural safeguards that were present as part of the regulatory framework in *Horwitz*, *Saavedra*, and *Gressley*—specifically, the right to representation by counsel and judicial review—are absent here. The regulatory framework at issue in this case in fact states that the "standard practice" in proceedings challenging a suspension is to *not* allow representation by counsel during the review process. *See* Resp., Ex. A at § 3.3 ("Parties may consult freely with their

advisors throughout the hearing, but advisors may not speak for the parties unless the panel determines that one or both parties are unable fairly to present their case except through their advisor."); Resp. at Ex. R (explaining that Plaintiff's panel "will not deviate from standard practice and allow [Plaintiff's] attorney to directly represent [Plaintiff] during the hearing"). It is undisputed that Plaintiff's attorney was not allowed to represent him during the peer review process. The panel repeatedly emphasized to Plaintiff that its review of his sanction was a "faculty driven process" and relied on that fact to deny Plaintiff's requests to have his attorney present his case. Indeed, the emphasis on the nature of the proceedings as a "faculty driven process" tends to minimize the "adversary" nature of the process, which further weighs against according absolute immunity here. *See Cleavinger*, 474 U.S. at 202.

Moreover, Plaintiff did not have the opportunity to seek judicial review of his suspension, an important safeguard that allows for correctability on appeal. Individual Defendants rely on *Saavedra* in arguing that "[t]he procedural safeguards at issue for purposes of applying absolute immunity do not mandate a rigorous constitutional due process analysis" and that the lack of an opportunity for judicial review should not be dispositive here. *See* Mot. at 14. Their reliance is misplaced and ignores the fact that the district court in *Saavedra* expressly found that one of the "best bulwarks against . . . unconstitutional conduct" is "adequate judicial review[,]" a safeguard that is not present here. *Saavedra*, 859 F. Supp. at 532. The Court is not convinced that Plaintiff's ability to seek review of the panel's decision by the Provost/Chancellor and the President or Board of Regents is a meaningful substitute for independent judicial review or supports a finding that the regulatory framework had adequate safeguards to protect against unconstitutional conduct. Given the language of Policy C07 that "[t]he panel's decision may be reviewed on the record by the Provost/Chancellor, but the panel's decision *shall not be reversed or modified* except in the case

of clear error" and that review by the President or Board of Regents is "discretionary[,]" Resp., Ex. J at 3 (emphasis added), the Court fails to see how the internal university review process as set forth in Policy C07—a process in which there is a presumption of validity of the panel's decision—weighs in favor of finding that there existed adequate procedural safeguards entitling Individual Defendants to absolute immunity.

Two additional aspects of the peer review framework weigh against according absolute immunity to Individual Defendants. First, it appears that UNM faculty peer review panels lack the authority to subpoena witnesses and compel testimony under penalty of perjury, which are important safeguards that help ensure that an accused has the ability to fully confront and cross-examine witnesses. *See* Resp., Ex. A at § 2.1.2 (if a party "is having difficulty getting cooperation from a potential witness or source of evidence" and requests assistance, the panel "shall assist the party in gaining the necessary cooperation within the [institutional] community" but offering no guarantee of an opportunity to confront one's accusers). And second, regarding independence and insulation from political influence, the Court finds it significant that Individual Defendants are university professors who are temporarily diverted from their primary teaching and research functions when they serve, on an ad hoc basis, on a peer review panel. *See Cleavinger*, 474 U.S. at 203–4 (finding that the fact that members of a prison disciplinary committee "are not professional hearing officers" but rather are prison officials who are "temporarily diverted from their usual duties" weighed against affording them absolute immunity). They are not, as in *Saavedra*, professional hearing officers, or, as in *Horwitz*, governor-appointed members of a board with standing disciplinary review panels. The Court does not mean to suggest that officials may never be entitled to absolute immunity unless they are professional hearing officers or serving in a term-appointed position. However, the facts that (1) the panel's members were selected *after*

Plaintiff sought review, i.e., were not already sitting when the need for review arose, (2) one of the panel's members was selected by the Provost, who could be called upon to review the panel's decision, and (3) all of the panel members are employed by UNM tend to weigh against finding that there existed sufficient independence and insulation from political influence built into the regulatory framework to warrant extending absolute immunity to Individual Defendants. *See Moore v. Gunnison Valley Hosp.*, 170 F. Supp. 2d 1080, 1087 (D. Colo. 2001) (stating that "*ad hoc* appointments are less satisfactory than the use of committees created to serve for a time certain and which are already sitting when the need for review arises" and finding that the "*ad hoc* nature" of the hospital peer review committee in that case made it "less comparable to any established judiciary because there exists a risk that the appointing officer may select predisposed individuals" and weighed against granting absolute immunity); *cf. Horwitz*, 822 F.2d at 1511, 1515 (affirming the district court's grant of absolute immunity to members of a statutorily created board of medical examiners comprised of both licensed physicians and members of the public at large, all appointed by the governor and serving in predesignated panels).

In sum, the Court concludes that Individual Defendants have failed to meet their burden of establishing that they are entitled to absolute immunity from Plaintiff's § 1983 claim. As the Court next discusses, qualified immunity is sufficient to protect Individual Defendants in this case.

**B.  Individual Defendants are Entitled to Qualified Immunity**

Individual Defendants alternatively argue that they are entitled to qualified immunity on Count I because it was not clearly established in February 2020 that Plaintiff was entitled to a post-deprivation hearing different in scope and procedure than the hearing he received. *See* Mot. at 17–22. Plaintiff counters that Individual Defendants' actions—specifically, (1) denying him the right to be represented by counsel at the hearing despite that the respondent in the proceeding, Vice

Dean Carey, is an attorney, and (2) limiting the scope of the hearing, which prevented him from being able to confront and cross-examine his accuser, Ms. Chavez, and challenge the OEO's underlying findings of policy violations—violated his clearly established right to due process. *See* Resp. at 14–19. The Court agrees with Individual Defendants that Plaintiff has failed to meet his burden of showing that the alleged deprivations violated constitutional rights of which every reasonable official would have known, i.e., were clearly established constitutional violations for which Individual Defendants should be subjected to monetary damages. *See* Reply at 9–12.

### 1. Qualified Immunity Analysis

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quotation marks and citations omitted). "Where the law is not clearly established, courts do not require officials to anticipate its future developments, and qualified immunity is therefore appropriate." *Lawrence v. Reed*, 406 F.3d 1224, 1230 (10th Cir. 2005). "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." *Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011) (quotation marks and citation omitted). When a defendant invokes qualified immunity, the plaintiff bears a "heavy two-part burden" of establishing (1) that "the defendant's actions violated a federal constitutional or statutory right" *and* (2) that "the right at issue was clearly established at the time of the defendant's unlawful conduct." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (quotation marks and citation omitted). The plaintiff bears the burden of establishing both elements, and failure on either "is fatal to the plaintiff's cause." *Kerns*, 663 F.3d at 1180.

Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). One circumstance in which courts should proceed directly to the second prong of the analysis is when "tackling the first element 'may create a risk of bad decisionmaking' due to inadequate briefing." *Kerns*, 902 F.3d at 1181 (quoting *Pearson*, 555 U.S. at 239). The Court elects to proceed directly to step two of the qualified immunity analysis because it finds that the parties have inadequately briefed the issue of whether Individual Defendants' actions violated Plaintiff's right to due process.

### 2. Plaintiff Fails to Meet His Burden of Showing that Individual Defendants Violated a Clearly Established Right

To overcome Individual Defendants' assertion of qualified immunity, Plaintiff must demonstrate that every reasonable official in Individual Defendants' positions would have known that (1) denying Plaintiff's request to have his attorney present his case, and/or (2) limiting the scope of the hearing and refusing to reconsider the OEO's findings violated Plaintiff's right to due process. *See Mullenix*, 577 U.S. at 11, 12 (explaining that "[a] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right" and reminding courts that "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established" and that the "inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition" (quotation marks and citation omitted)). To do this, Plaintiff must show that "Supreme Court or Tenth Circuit case law exists on point" or that "the clearly established weight of authority from other circuits found a constitutional violation from similar actions." *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1251 (10th Cir. 1999) (quotation marks and citation omitted). He has not so much as attempted to do so.

Instead, Plaintiff first argues that the Court should defer ruling on the Motion and allow him to conduct limited discovery under Rule 56(d) because he cannot fully and fairly contest Individual Defendants' statement of undisputed facts without the opportunity to conduct discovery. *See* Doc. 85 at 11–14. He next argues—without adequate citation to authority, as the Court discusses below—that Individual Defendants are not entitled to qualified immunity because their actions violated Plaintiff's clearly established constitutional rights. *See id.* at 14–19. Finally, Plaintiff asks the Court to "revisit the doctrine of qualified immunity" and "begin [its] abolishment[.]" *See id.* at 19–22. For the reasons that follow, the Court concludes that Plaintiff's arguments fail to overcome Individual Defendants' assertion of qualified immunity.

> **a. Deferral or Denial of the Motion Under Rule 56(d) to Allow Plaintiff to Conduct Limited Discovery is not Warranted**

Under Rule 56(d), courts may defer consideration of or deny a motion for summary judgment and allow the nonmovant time to take discovery if the nonmovant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition[.]" Fed. R. Civ. P. 56(d)(1), (2). The protections of Rule 56(d) "can be applied only if a party satisfies certain requirements." *Price ex rel. Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000). The plain language of the rule makes clear that a nonmovant seeking relief under Rule 56(d) must meet both procedural and substantive requirements. Formally, the nonmovant must furnish either an affidavit or declaration. *See* Rule 56(d); *Pierce*, 232 F.3d at 783 ("A prerequisite to granting relief . . . is an affidavit furnished by the nonmovant." (quotation marks and citation omitted)). Substantively, "a non-movant requesting additional discovery under Rule 56(d) must specify (1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time will enable the party to obtain those facts and rebut the motion for summary judgment." *Gutierrez v. Cobos*, 841 F.3d 895, 908

21

(10th Cir. 2016) (brackets, quotation marks, and citation omitted). The nonmovant's burden is to "demonstrate *precisely* how additional discovery will lead to a genuine issue of material fact." *Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980, 987 (10th Cir. 2000) (emphasis added).

Although district courts have discretion to grant Rule 56(d) discovery requests, which "should be treated liberally unless dilatory or lacking in merit[,]" that discretion "is not without bounds, particularly when the summary judgment motion is grounded on a claim of qualified immunity[.]" *Lewis v. City of Ft. Collins*, 903 F.2d 752, 758 (10th Cir. 1990) (quotation marks and citation omitted). "When the summary judgment motion is based on qualified immunity, the non-movant's Rule 56(d) affidavit must also demonstrate a connection between the information he would seek in discovery and the validity of the defendant's qualified immunity assertion." *Gutierrez*, 841 F.3d at 908 (brackets, quotation marks, and citation omitted). "[I]t is insufficient for the party opposing the motion to merely assert that additional discovery is required to demonstrate a factual dispute or that evidence supporting a party's allegation is in the opposing party's hands." *Id.* (quotation marks and citation omitted).

Plaintiff has satisfied the procedural requirement of Rule 56(d). Plaintiff attached to his Response the declaration of his attorney, Nicholas T. Hart, in which Mr. Hart sets forth an explanation in support of Plaintiff's request to take discovery under Rule 56(d). *See* Resp., Ex. S.[13]

---

[13] In their Reply, Individual Defendants state that Mr. Hart's declaration "was not attached to the Response brief" and argue that the Court should deny Plaintiff's request for limited discovery because he failed to comply with Rule 56(d)'s procedural requirement. *See* Reply at 7–8. The Court's docket shows that Mr. Hart's declaration, referred to as Exhibit S to Plaintiff's Response, was docketed at Doc. 85-19 on November 11, 2020, the day the Response was filed. The docket contains no notations indicating that any modifications were made to docket entry 85 after the Response and exhibits attached thereto were filed. It is unclear to the Court why Individual Defendants believe they did not have access to Mr. Hart's declaration in preparing their Reply.

However, regarding Rule 56(d)'s substantive requirement—i.e., what facts Plaintiff wants to discover and to what end—Plaintiff has not met his burden.

Although Mr. Hart identifies with relative clarity and specificity what *documents* Plaintiff would like to discover and the discovery (e.g., depositions) Plaintiff would like to take,[14] he fails to address, in either his declaration or Plaintiff's Response, the critical question of how discovery of particular *facts* will help Plaintiff rebut Individual Defendants' claim to qualified immunity. Mr. Hart states that if allowed to conduct limited discovery, "Plaintiff believes that he will be able to uncover communications and records which demonstrate that the University manipulated its policies and procedures to deprive Plaintiff of his constitutional rights." *Id.* at ¶ 30. Setting aside the general, speculative nature of what Plaintiff indicates he hopes to discover, he offers no explanation of how uncovering evidence that *the University* "manipulated its policies and procedures" can help him show that *Individual Defendants'* conduct violated a clearly established due process right. Plaintiff has not, for example, alleged a due process violation based on a biased-tribunal theory, in which case evidence of intentional manipulation of policies by certain defendants may arguably be relevant to defeating those defendants' claim of qualified immunity claim. Plaintiff's vague, unspecific identification of what he hopes to uncover through limited discovery fails to provide the requisite connection between the discovery sought and the validity of Individual Defendants' qualified immunity assertion. *See Lewis*, 903 F.2d at 758–59 (concluding that a plaintiff's unspecific assertions that "she 'will be able to show' certain facts relative to her claims of discriminatory animus on the part of City officials" were "simply

---

[14] For example, Mr. Hart specifies that Plaintiff seeks to "obtain communications and documents between witnesses and parties to his peer hearing" as well as the recordings of his pre-hearing meeting and the hearing itself. *See* Resp., Ex. S at ¶¶ 20, 24, 25. He also seeks "the notes that the panel members and Vice Dean Carey took during the proceeding[,]" the notes taken by staff at the hearing, and to depose Individual Defendants as well as non-party Barbara Rodriguez, UNM Senior Vice Provost. *See id.* at ¶¶ 26, 27, 35.

insufficient to meet Rule 56([d]) muster when defendants' claim of qualified immunity is at issue").

Mr. Hart also states in his declaration that additional discovery will allow Plaintiff to "rebut Defendants' assertion that Plaintiff was allowed to, but chose not to, call Defendant Chavez as a witness at the hearing, and Defendants' assertion that the peer hearing panel could review 'any procedural irregularities' that could invalidate the sanctioning outcome[,]" and will also allow him to "fully rebut the assertion that [Plaintiff] had the ability, but failed[,] to present[] exculpatory evidence through testimony from peer hearing witnesses." Resp., Ex. S at ¶ 31. These explanations miss the point and, again, fail to demonstrate how the discovery sought bears upon the dispositive question here: whether Individual Defendants are entitled to qualified immunity, a question that turns not on whether Plaintiff can demonstrate that Individual Defendants prevented him from calling Ms. Chavez and improperly limited the scope of the hearing but rather on whether it was clearly established that doing so violated Plaintiff's right to due process. Because Plaintiff has not met his burden under Rule 56(d) of showing how the facts he hopes to discover are essential to his opposition to Individual Defendants' assertion of qualified immunity, the Court will deny his request for limited discovery.

### b. Plaintiff Has Not Demonstrated That the Law Was Clearly Established That the Alleged Procedural Deficiencies Violated Plaintiff's Right to Due Process

Plaintiff next argues that Individual Defendants "are not entitled to qualified immunity because their actions violated Plaintiff's clearly established constitutional rights." Resp. at 14. According to Plaintiff, "the Tenth Circuit has announced, in several factually similar cases, general constitutional principles that apply to the Individual Defendants' actions in this case, which amount to deliberate and egregious violations of Plaintiff's constitutional rights." *Id.* at 15. But Plaintiff neither directs the Court's attention to any of the "several factually similar cases" nor

specifies which "general constitutional principles" purportedly "apply" in resolving the question of qualified immunity presented here. *See id.* at 14–19. Plaintiff also argues, tellingly, that the Court "should not permit the Individual Defendants to escape liability for their knowing violation of Plaintiff's due process rights even in the absence of a case with this precise fact pattern." *Id.* at 19. Plaintiff's arguments are unavailing.

The Supreme Court has described the standard for determining whether officials have violated a clearly established right as "exacting" and repeatedly stated that qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments' by 'protecting all but the plainly incompetent or those who knowingly violate the law.'" *City and Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1774 (2015) (brackets omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). While it is true that "general statements of the law are not inherently incapable of giving fair and clear warning" to government officials that certain conduct is unconstitutional, "in the light of pre-existing law the unlawfulness must be apparent." *White v. Pauly*, — U.S. —, 137 S. Ct. 548, 552 (2017) (per curiam) (quotation marks and citations omitted). If the plaintiff cannot point to a case directly on point, the standard by which courts must judge whether the law was clearly established is that "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

Here, Plaintiff asserts that "[a]ny reasonable official in the Individual Defendants' position would have known that allowing an experienced attorney to proceed as though this were a formal legal proceeding complete with rules of evidence, while denying Plaintiff, a non-lawyer, the right to legal representation, was a violation of Plaintiff's due process rights." Resp. at 17. He also contends that it was a "clear violation of his right to due process" that he "was never given a hearing or the opportunity to question witnesses in a context that would have allowed him to

exonerate himself of the university's charges against him[.]" *Id.* at 18. But he neither cites a Supreme Court or Tenth Circuit case directly on point nor identifies precedent placing the question of the unconstitutionality of the alleged conduct beyond debate. *See id.* And while true that factual identicality is not required where a general statement of law is capable of giving fair and clear warning of the unconstitutionality of particular conduct, *see Hope v. Pelzer*, 536 U.S. 730, 741 (2002), Plaintiff fails to convince the Court that this is a case in which "a general constitutional rule already identified in decisional law [applies] with obvious clarity to the conduct in question," *id.* (quotation marks and citation omitted), thereby alleviating Plaintiff of his burden of identifying a case where the very action in question has been previously held unconstitutional.

Importantly, when it comes to the question of what process is constitutionally due, it is well-established that "not all situations calling for procedural safeguards call for the same kind of procedure." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation marks and citation omitted). Beyond that, "the process due in any given instance is determined by weighing 'the private interest that will be affected by the official action' against the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (quoting *Mathews*, 424 U.S. at 335). A person's right to due process is not necessarily violated simply because he or she is not afforded certain procedures that may be provided, even required, in other contexts. *See, e.g.*, *West v. Grand Cty.*, 967 F.2d 362, 369 (10th Cir. 1992) (explaining that "confrontation and cross-examination are not rights universally applicable to all hearings" and that "whether the Due Process Clause requires that the terminated employee be offered the right to cross-examine or confront witnesses depends upon the

significance and nature of the factual disputes at issue" (alteration, quotation marks, and citation omitted)). Moreover, when both pre-deprivation and post-deprivation process are provided, the adequacy, in a constitutional sense, of either depends on the safeguards provided in the other. *See Benavidez v. City of Albuquerque*, 101 F.3d 620, 626 (10th Cir. 1996) (explaining that "[w]hen the pre-termination process offers little or no opportunity for the employee to present his side of the case, the procedures in the post-termination hearing become much more important" but that "when the employee has had a meaningful opportunity to explain his position and challenge his dismissal in pre-termination proceedings, the importance of the procedures in the post-termination hearing is not as great").

Given the inherently flexible nature of due process, *see Mathews*, 424 U.S. at 332 (explaining that due process, "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances"), it is all the more important that a § 1983 plaintiff alleging violations of procedural due process demonstrate—through citation to relevant authority—that it was clearly established that the specific procedural safeguard at issue was due to the plaintiff. *Cf. Cummings v. Dean*, 913 F.3d 1227, 1240–41 (10th Cir. 2019) (explaining that in the context of substantive due process challenges, courts must be "especially sensitive to whether existing relevant precedents . . . squarely governed the *particular* circumstances the [defendant] faced" because "the standard for liability for a violation of a person's substantive due-process rights is broad and general" and because "consideration of whether a person's substantive due-process rights have been infringed requires a balancing of the person's constitutionally protected interests against the relevant state interests" (brackets, quotation marks, and citations omitted)). Plaintiff simply has not done so as to either of the specific safeguards he argues were due to him by Individual Defendants.

### i.   The Right to Counsel

In support of his argument that Individual Defendants' denial of his request to have his attorney represent him during the hearing process violated a clearly established due process right, Plaintiff cites a single case: *Workman v. Jordan*, 32 F.3d 475 (10th Cir. 1994). *See* Resp. at 16–17. In *Workman*, the Tenth Circuit indeed stated that "[a] 'full posttermination hearing' is understood to include the right to representation by an attorney and the right to cross-examine adverse witnesses." *Id.*, 32 F.3d at 480 (citing *Melton v. City of Okla. City*, 928 F.2d 920, 939 (10th Cir. 1991) (Logan, J., dissenting)). But neither that statement nor anything about *Workman* can be said to have put Individual Defendants on notice that disallowing Plaintiff's attorney from representing him during the hearing process constituted a deprivation of Plaintiff's right to due process.

In *Workman*, the plaintiff, a captain in the sheriff's department, was fired after being accused of sexual harassment. *See id.*, 32 F.3d at 477. At his post-termination hearing, he was represented by an attorney, who had the opportunity to present evidence, make arguments, and examine and cross-examine witnesses. *See id.* at 477–78. After being reinstated and awarded backpay, the captain brought § 1983 claims alleging due process[15] and First Amendment violations. *See id.* at 477–78. In addition to alleging "a long list of procedural errors during his investigation and pretermination hearing," he alleged that the "posttermination hearing was inadequate" because the sheriff and an undersheriff refused to comply with his requests for documents and encouraged witnesses not to participate in the hearing, and because the hearing

---

[15] The plaintiff in *Workman* brought two separate procedural due process claims: one based on the alleged deprivation of his property interest in continued employment, and the other based on the alleged deprivation of his liberty interest in his good name and reputation as it affected his protected property interest in continued employment. *See id.* at 479–80. The Court's discussion of *Workman* relates only to the Tenth Circuit's analysis of the property-interest due process claim, which is the only section of the Tenth Circuit's opinion that Plaintiff cites.

officer lacked authority to issue subpoenas, rule on motions in limine, and grant prehearing motions to dismiss. *Id.* at 480. In reversing the district court's denial of the defendants' motion to dismiss the plaintiff's due process claim, the Tenth Circuit first stated that it found it "difficult to evaluate any grievance procedure as inadequate when the employee was reinstated and given full back pay." *Id.* The court then offered its observation that "[a] 'full posttermination hearing' is understood to include the right to representation by an attorney and the right to cross-examine adverse witnesses." *Id.* Explaining that "[w]hen a procedure produces full protection, we need not examine the procedure for error[,]" the court concluded that the plaintiff failed to show that the alleged procedural deficiencies violated any clearly established constitutional right and dismissed his due process claim. *Id.*

Not only is *Workman* factually distinguishable, but even on the general question of what process is due in depriving a person of a property interest in continued employment, *Workman* does not stand for the proposition that a terminated (or, as here, suspended) public employee is necessarily denied due process unless he or she is afforded the opportunity to be represented by counsel in a post-termination hearing. The *Workman* court was not even presented with the question of whether prohibiting representation by counsel at a post-deprivation hearing violated due process, making its statement regarding that "right" dictum. *See McClure v. Indep. Sch. Dist. No. 16*, 228 F.3d 1205, 1211 (10th Cir. 2000) (referring to the subject statement from *Workman* as "dicta"); *Thompson v. Weyerhaeuser Co.*, 582 F.3d 1125, 1129 (10th Cir. 2009) ("Dicta are statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand." (quotation marks and citation omitted)). Plainly, *Workman* is of no aid to Plaintiff in demonstrating that Individual Defendants violated a clearly established right by refusing to allow his attorney to present his case.

While relying on dictum in *Workman*, Plaintiff also attempts to distinguish that case, arguing that in his case, "the unfairness went beyond simply denying Plaintiff the right to be actively represented by counsel." Resp. at 16. Specifically, he takes issue with the fact that Individual Defendants, while at the same time denying him the right to representation by counsel, "permitted [Vice] Dean Carey – the respondent in the hearing and an experienced litigator – to treat the hearing like a judicial proceeding, accepting formal motions from her such as an 18-page Motion to Exclude Plaintiff's evidence." *Id.* This, he argues, was so fundamentally unfair that it would have been obvious to any reasonable person in Individual Defendants' position that it violated Plaintiff's right to due process not to allow his attorney to present his case. *See id.* at 17. The Court disagrees, particularly given the facts in this case.

It bears clarifying that although Plaintiff emphasizes that Vice Dean Carey is a trained attorney with experience practicing law, the record is clear that she was not functioning as an attorney in the faculty peer hearing process. Not only is Vice Dean Carey, who has been a member of UNM's faculty since 2009 and was involved in legal education prior to joining UNM, not admitted to practice law in New Mexico, *see* Resp., Ex. M, she, like Plaintiff, had counsel who "accompanied" her to the hearing but who was not allowed to actively present her case to the panel, *see* Resp., Ex. B at 2. To the extent Vice Dean Carey's educational background arguably gave her some sort of advantage in the hearing process, nothing in the record—let alone caselaw—supports concluding that it should have been obvious to Individual Defendants that denying Plaintiff's request to have his attorney present his case rendered the hearing constitutionally unfair and denied Plaintiff due process. Notably, despite "accepting" and considering Vice Dean Carey's motion, Individual Defendants effectively denied it when they decided not to exclude any of the evidence Plaintiff submitted. *See* Resp., Ex. B at 3. Plaintiff ignores this critical fact and points to

no other example of how Vice Dean Carey's legal training or her conduct during the proceedings even arguably disadvantaged Plaintiff such that Individual Defendants' refusal to allow his lawyer to present his case constituted a clear and obvious denial of due process. The record contains no indication, for example, that Plaintiff was prevented from consulting freely with his attorney during the hearing and indeed reflects that Plaintiff intelligibly, albeit unavailingly, advanced arguments, presented evidence, and developed witness testimony during his hearing, either with or without the assistance of his attorney. *See generally id.* Plaintiff has identified nothing even tending to suggest that his hearing before Individual Defendants was rendered fundamentally unfair by the fact that he was required to present his own case while another faculty member, who happened to be trained as a lawyer, presented the opposing case.

The Court concludes that Plaintiff has failed to meet his burden to show that his right to counsel in the specific context of this case was clearly established such that Individual Defendants' deprivation of that right should subject them to civil liability.

### ii. The Right to Challenge the OEO's Findings

The other procedural safeguard that Plaintiff contends Individual Defendants unconstitutionally deprived him of was "the opportunity to challenge the findings of" the OEO that Plaintiff's conduct violated university policies. SAC at ¶¶ 238–40. Plaintiff does not dispute that under Policy C07, "the scope of review of the Peer Hearing was to 'uphold or reverse the proposal to suspend the faculty member without pay.'" Defs.' UMF 12; *see* Resp. at 1 ("Plaintiff does not dispute Defendants' undisputed material facts numbers . . . 10 – *12*" (emphasis added)). He does, however, dispute Individual Defendants' assertion that the panel members "did not have discretion to deviate from the scope of review[,]" Defs.' UMF 13, and argues that Policy C07 "does not itself prohibit the hearing panel from taking account of the underlying factual disputes

when making [its] determination" about the propriety of the sanction. Resp. at 2. Plaintiff is correct that Policy C07 contains no express prohibition against reconsidering the OEO's factual determinations under the facts of this case.[16] But even accepting that Individual Defendants had discretion to reconsider the OEO's findings, that fact is neither here nor there in determining whether the then-extant state of the law gave Individual Defendants fair warning that refusing to exercise that discretion would violate Plaintiff's right to due process. As to this critical inquiry, Plaintiff offers no argument or citation to any authority at all. *See* Resp. at 17–19.

Instead, Plaintiff shifts the focus of his challenge and argues, specifically, that by limiting the scope of the hearing, Individual Defendants deprived him of the opportunity to cross-examine Ms. Chavez, which, in turn, deprived him of the opportunity to exonerate himself of the underlying charges, all of which he contends deprived him of a clearly established right. *See id.* at 17–18. According to Plaintiff, given the nature of the allegations against him and the importance of credibility determinations in deciding whether his conduct violated university policies, he was denied due process because he was never given an opportunity to cross-examine his accuser before a factfinder.[17] *See id.* In support of this contention, Plaintiff argues that "[i]t is clearly established

---

[16] Policy C07 only prohibits reconsideration of factual determinations by faculty peer review where a separate procedure for investigation of particular types of allegations, including allegations of sexual harassment, "involved a hearing before a faculty committee[.]" Resp., Ex. J at § 4. It is clear from the record that the OEO investigation and decision-making process in Plaintiff's case did not involve a hearing before a faculty committee.

[17] Plaintiff continues to insist that he should have had an opportunity to confront Ms. Chavez because there is a factual dispute regarding "whether Defendant Chavez actually interpreted [Plaintiff's] communications as making a job offer contingent on participation in sexual communications, or whether she lied about interpreting them that way in order to retaliate against Plaintiff for ending their sexual correspondence." Resp. at 17, 18. The Court has already concluded that Ms. Chavez's claim that she interpreted Plaintiff's job offer as being contingent on submission to his sexual advances need not be subjected to cross-examination because the documentary evidence independently supported finding that those particular elements of a quid pro quo claim—(1) a job offer that was (2) contingent on submission to sexual conduct—had been met. *See* MEMORANDUM OPINION AND ORDER, Doc. 55 at 11–13. Indeed, regardless of how Ms. Chavez subjectively interpreted Plaintiff's communications—and even if she had denied from the outset or recanted under cross-examination her statement to the OEO that she interpreted Plaintiff as conditioning a job offer on submission to sexual advances—a factfinder could still conclude from the documentary evidence that Plaintiff implicitly conditioned an offer of employment on submission to his sexual advances.
The Court notes that Policy 2740 (2018) defines "sexual harassment" as "*unwelcome* conduct of a sexual nature" and specifies that quid pro quo sexual harassment occurs when either "submission to such conduct is made either

that 'in almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses[.]'" Resp. at 18 (quoting *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) (brackets in quoted material omitted)). That may be, but Plaintiff fails to demonstrate how this general proposition—itself qualified (i.e., "in *almost* every setting") and made in a factually distinguishable case[18]—put Individual Defendants on notice that they would be violating Plaintiff's right to due process by refusing to reconsider the OEO's factual findings.[19]

---

explicitly or implicitly a term or condition of an individual's employment or academic advancement" or "submission to or rejection of such conduct by an individual is used as a basis for employment decisions or academic decision affecting such individual[.]" Policy 2740 (2018), available at https://perma.cc/6U34-HGD9 (emphasis added). To the extent an argument could be made that Ms. Chavez's credibility was central to a determination of whether Plaintiff's sexual advances were "unwelcome"—thereby potentially implicating Plaintiff's due process right to confront Ms. Chavez—no such argument has been made in these proceedings. *Cf. Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) (stating that "[t]he gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome'" and explaining that "the question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact").

[18] *Goldberg* involved a challenge by welfare recipients whose benefits the state and city of New York terminated without affording the recipients a hearing. *Id.* at 255–56. The "question for decision" before the Supreme Court was "whether a State that terminates public assistance payments to a particular recipient without affording him the opportunity for an evidentiary hearing prior to termination denies the recipient procedural due process in violation of the Due Process Clause of the Fourteenth Amendment." *Id.* at 255. The Supreme Court answered that "narrow" question affirmatively, concluding that a post-termination hearing was insufficient to comport with due process when welfare benefits are at stake because such benefits provide for the necessities of life. *See id.* at 260–66. The *Goldberg* Court then proceeded to discuss what "form" the required pre-termination hearing must take to satisfy due process, concluding that "it need not take the form of a judicial or quasi-judicial trial" and required only "minimum procedural safeguards, *adapted to the particular circumstances of welfare recipients, and to the limited nature of the controversies to be resolved.*" *Id.* at 266–67 (emphasis added). Noting that "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses[,]" it held, *inter alia*, that "[w]*elfare recipients* must . . . be given an opportunity to confront and cross-examine the witnesses relied upon by the" government in termination-of-benefits proceedings. *Id.* at 269–70 (emphasis added). The Court has little difficulty concluding that neither the general rule cited in *Goldberg* nor its specific holding regarding a welfare recipient's right to cross-examine witnesses at a pre-termination hearing put Individual Defendants on notice that limiting the scope of the post-deprivation hearing as they did constituted a denial of due process.

[19] Indeed, the more applicable rule, here, is that "confrontation and cross-examination are not rights universally applicable to all hearings." *West*, 967 F.2d at 369 (alteration, quotation marks, and citation omitted). "[W]hether the Due Process Clause requires that the terminated employee be offered the right to cross-examine or confront witnesses depends upon the significance and nature of the factual disputes at issue." *Id.* The "factual disputes" at issue in Plaintiff's peer review hearing before Individual Defendants involved whether there were any procedural irregularities in the sanctioning process and whether the sanction Plaintiff received was appropriate and proportionate to the violations found, *not* whether Plaintiff had committed policy violations. The record undisputedly establishes that as to the factual disputes before the panel, Plaintiff was afforded the opportunity to confront witnesses whose testimony was relevant to those disputes. *See* Resp., Ex. B. Plaintiff does not argue otherwise.

Moreover, even assuming, *arguendo*, that Plaintiff was denied due process because he was suspended without having had an opportunity to confront his accuser, he fails to establish, in the first instance, that it was Individual Defendants who owed him that opportunity and, more importantly for purposes of defending against Individual Defendants' assertion of qualified immunity, that every reasonable person in Individual Defendants' position would have known that denying Plaintiff that opportunity was a violation of due process. It must be remembered that Individual Defendants are university professors temporarily diverted from their teaching and research responsibilities to serve—at the tail end of a bifurcated process that separated factfinding and sanctioning functions—on a faculty review panel to hear a challenge to a decision to suspend another faculty member. By the time Plaintiff's case arrived before Individual Defendants, it had already been through an extensive process, comprised of: (1) the OEO's investigation of the allegations against Plaintiff, which included an opportunity for Plaintiff to give a statement to the investigator in response to the allegations; (2) the OEO's issuance of its investigative report, to which Plaintiff had the opportunity to respond prior to the OEO rendering a decision in the case; (3) the OEO's issuance of its preliminary decision, to which Plaintiff had an opportunity to respond prior to the issuance of a final decision; (4) the OEO's issuance of its final decision, which Plaintiff had the opportunity to appeal; (5) Plaintiff's appeal of the OEO's decision to the President of UNM, who affirmed the OEO's conclusions; (6) Plaintiff's appeal to the Board of Regents, which declined to accept the appeal; (7) a sanction-determination process, in which Plaintiff had the opportunity to submit a written statement to Vice Dean Carey; and (8) imposition of a one-year suspension approved by Plaintiff's dean. The Court cannot say, on this record, that Individual Defendants' decision to limit the scope of the hearing—even if it effectively denied Plaintiff an

opportunity to confront his accuser—deprived Plaintiff of a constitutional right of which every reasonable person in Individual Defendants' position would have known.

Although Plaintiff need not identify a case holding that the "very action in question has previously been held unlawful," *Anderson*, 483 U.S. at 640, he had to do more than he has done here. Plaintiff has identified—and the Court has found—no case that would have even arguably made it apparent to Individual Defendants that their refusal to reconsider the OEO's determination of policy violations and engage in de novo factfinding was unlawful. The Court thus concludes that Plaintiff has failed to meet his burden of demonstrating that Individual Defendants violated any clearly established right by limiting the scope of the peer review hearing. Individual Defendants have qualified immunity from Plaintiff's claim for damages, and summary judgment as to Count I will be entered in their favor.[20]

## II.     Individual Defendants are Not Entitled to Summary Judgment on Counts II and III

Individual Defendants seek summary judgment in their favor on Counts II (injunctive relief) and III (declaratory judgment) of the SAC. *See* Mot. at 22–23. For the following reasons, the Court concludes that Individual Defendants have not established that they are entitled to summary judgment on either Count II or Count III. However, the Court agrees with Individual Defendants insofar as they argue that Count II does not state a standalone cause of action and will, therefore, dismiss Count II from the SAC.

### A.  Count II is not a "Claim" on Which Summary Judgment Can Be Granted, but the Court Will Dismiss Count II Because it is Not a Proper Standalone Cause of Action

---

[20] The Court finds it unnecessary to address Plaintiff's remaining argument that the Court should "revisit the doctrine of qualified immunity" and begin its "abolishment." Resp. at 19–20. The Court not only is without authority to ignore binding precedent governing how it must undertake a qualified immunity analysis but also notes that even if the Court focused exclusively on the first prong of the analysis as Plaintiff urges, Plaintiff still would not prevail on the pending Motion. As the Court noted at the outset of its qualified immunity discussion, Plaintiff did not even attempt to meet his burden of demonstrating that the complained-of deprivations indeed violated Plaintiff's right to due process.

In Count II of the SAC, Plaintiff seeks injunctive relief against Individual Defendants and the Board of Regents and specifically requests the following: (1) "reversal of the outcome and findings of the UNM investigation," (2) "expungement of Plaintiff's personnel file reflecting the improper findings, discipline, and sanction," (3) "production of verification of such expungement to Plaintiff," (4) a prohibition against UNM "disclosing Plaintiff's personnel file reflecting the finding of a policy violation and discipline," and (5) "lifting of the one-year suspension so that Plaintiff may return to work at UNM." SAC at ¶ 257. In his Prayer for Relief, Plaintiff reiterates, in consolidated form, his requests for injunctive relief and specifically seeks an order:

> (1) enjoining Defendants from disclosing Plaintiff's employment records reflecting the finding of a policy violation and/or reflecting discipline during the pendency of this action; (2) requiring Defendants to expunge the improper finding of a policy violation and improper imposition of a sanction from Plaintiff's employment records and providing Plaintiff with confirmation of such expungement; and (3) requiring Defendants to allow Plaintiff to return to his work as an Associate Professor with the University's Anderson School of Management.

Doc. 68 at 40.

Individual Defendants argue that they are entitled to summary judgment as to Count II because Plaintiff cannot demonstrate that Individual Defendants have the authority to provide Plaintiff with the injunctive relief he seeks in that count. *See* Mot. at 23. Individual Defendants also argue that injunctive relief is a remedy, not a cause of action, and therefore entitles them to judgment in their favor on Count II. *See id.* at 24.

The Court agrees with Individual Defendants that injunctive relief is a form of remedy, not a standalone claim. *See Madej v. Maiden*, 951 F.3d 364, 369 (6th Cir. 2020) (stating that "an injunction is a remedy, not a claim" and explaining that if parties seeking an injunction "cannot show 'actual success' on their claims, they cannot obtain a permanent injunction"); *Knutson v. Village of Lakemoor*, 932 F.3d 572, 576 n.4 (7th Cir. 2019) ("With respect to injunctive relief, that

is a remedy, not a cause of action, and thus should not be pleaded as a separate count."); *Surgenex, LLC v. Predictive Therapeutics, LLC*, 462 F. Supp. 3d 1160, 1180 and n.148 (D. Utah 2020) (dismissing the plaintiff's "final count" in which it sought injunctive relief and noting that "[d]ismissal of this claim does not preclude [the plaintiff] from obtaining injunctive relief as a remedy should it prevail on one of its other claims"). However, because summary judgment is proper as to claims and defenses, *see* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying *each claim or defense*—or the part of each claim or defense—on which summary judgment is sought." (emphasis added)), the Court concludes that granting summary judgment in favor of Individual Defendants on Count II is incompatible with the conclusion that Count II is not, in fact, a "claim." Rather, the Court will dismiss Count II from the SAC but notes that Plaintiff is not precluded from obtaining injunctive relief as a remedy should he prevail on a claim for which injunctive relief is available.

## B. Individual Defendants Have Not Established That They Are Entitled to Summary Judgment on Count III

While not entirely clear, Individual Defendants appear to argue that they are entitled to summary judgment on Count III—Plaintiff's request for declaratory relief—for either of two reasons: (1) because Plaintiff "has not alleged—nor could he truthfully allege—that any of the named Individual Defendants have the authority to provide the . . . declaratory relief that [Plaintiff] seeks[,]" Mot. at 23–24; *see also* Reply at 12 (asserting that Individual Defendants "have no authority to afford Plaintiff any of the . . . declaratory relief sought"); or (2) "[b]ecause there is no viable cause of action against the Individual Defendants[,]" Mot. at 24. Neither of Individual Defendants' contentions is availing.

First, the authority to declare legal rights and obligations between parties as Plaintiff requests in Count III is vested in the courts and the courts alone, which explains why Plaintiff did

not allege that Individual Defendants have the authority to provide the declaratory relief he seeks.[21] *See* 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction, . . . *any court* of the United States, upon the filing of an appropriate pleading, *may declare* the rights and other legal obligations of any interested party seeking such declaration, whether or not relief is or could be sought." (emphasis added)); N.M. Stat. Ann. § 44-6-2 ("In cases of actual controversy, *district courts* within their respective jurisdictions *shall have power to declare* rights, status and other legal relations whether or not further relief is or could be claimed." (emphasis added)).

Second, Individual Defendants neither elaborate on their conclusory assertion that "there is no viable cause of action against Individual Defendants" nor otherwise explain why summary judgment should be granted in their favor on Count III on that basis. *See* Mot. at 22–24. Individual Defendants appear to believe that summary judgment against Plaintiff on his § 1983 claim necessarily precludes his requests for injunctive and declaratory relief. *See* Mot. at 24.[22] But that is not the case, here, because Count III is not premised on the viability of Plaintiff's § 1983 claim.

In Count III, Plaintiff seeks declarations that (1) "the investigative and sanctioning process utilized by Defendants are unconstitutional, improper, and violative of Plaintiff's rights," Doc. 68 at ¶ 261, (2) "the peer review appeal process is unconstitutional, improper, and violative of Plaintiff's rights," *id.* at ¶ 262, and (3) "the Office of University Counsel's representation of the

---

[21] It appears that Individual Defendants' assertion that Plaintiff failed to allege that they can provide him with declaratory relief is a result of inartful drafting that conflated Individual Defendants' argument regarding Plaintiff's request for declaratory relief with their argument regarding Plaintiff's request for injunctive relief.

[22] Individual Defendants cite a Utah case, *Leon v. Summit Cty.*, 2017 WL 5891771 (D. Utah 2017), where the district court concluded that "[b]ecause [the plaintiff's] two Section 1983 claims fail, so too does her request for injunctive relief." Mot. at 24 (quoting *Leon*, 2017 WL 5891771, at *5). *Leon* is clearly distinguishable. In that case, the plaintiff brought two claims under § 1983 and a "demand for injunctive relief." *Id.* at *2. She did not seek declaratory relief. Once the court dismissed the plaintiff's § 1983 claims under Rule 12(b)(6) based on the court's conclusion that the plaintiff's complaint failed to state a claim for either a Fourth Amendment violation or malicious abuse of process, it commensurately concluded that she could not obtain injunctive relief where both of her claims had been dismissed. *See id.* at *3–5. The *Leon* court was not presented with—and did not address—the question presented here regarding the ongoing viability of a declaratory judgment action following a finding that a plaintiff's § 1983 claim fails under the second prong of the qualified immunity analysis.

University in the sanctioning and review process that Plaintiff has undergone presents such a clear conflict of interest that results in the process being unconstitutional, improper, and violative of Plaintiff's rights," *id.* at ¶ 263. Construed in light of the SAC in its totality, the Court understands Plaintiff to seek declarations that three separate aspects of the proceedings that led to his suspension—including Individual Defendants' actions in the peer review process—resulted in deprivations of Plaintiff's protected property and liberty interests without due process of law.

Individual Defendants have not argued—as did other, now-dismissed defendants with respect to Plaintiff's First Amended Complaint—that the SAC fails to state a procedural due process claim against Individual Defendants. Nor have they, in the instant Motion, shown that Plaintiff cannot—as a matter of law and on the undisputed facts—prevail on his claim that Individual Defendants violated his right to due process. As noted earlier, neither party briefed— and the Court has consequently refused to address—the first prong of the qualified immunity analysis, i.e., whether Individual Defendants' alleged conduct violated Plaintiff's right to due process. Because the Court concludes that Individual Defendants have not met their burden of showing they are entitled to summary judgment on Count III, the Court will deny the Motion in that regard.

**IT IS ORDERED THAT:**

1. Individual Defendants' MOTION FOR SUMMARY JUDGMENT REGARDING PLAINTIFF'S SECOND AMENDED COMPLAINT AND MOTION TO STAY DISCOVERY, Doc. 79, is GRANTED IN PART AND DENIED IN PART as follows:

   a. Summary judgment as to Count I of Plaintiff's SECOND AMENDED COMPLAINT, Doc. 68, is GRANTED in Individual Defendants' favor, and Count I is DISMISSED WITH PREJUDICE.

b.  Count II of Plaintiff's SECOND AMENDED COMPLAINT, Doc. 68, is DISMISSED WITH PREJUDICE.

c.  Summary judgment as to Count III is DENIED.

d.  Individual Defendants' request to stay discovery is DENIED AS MOOT.

2.  Plaintiff's Rule 56(d) request for limited discovery is DENIED.

_____
SENIOR UNITED STATES DISTRICT JUDGE