**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

_____

NICK VINCENT FLOR,

     Plaintiff,

v.                                           Case No. 1:20-cv-00027-MLG-LF

THE BOARD OF REGENTS OF THE
UNIVERSITY OF NEW MEXICO,
STEPHEN BISHOP, LISA BROIDY,
KEVIN GICK, KARIN HIGH, ERIC LAU,
individually and in their official capacities,
and EVA CHAVEZ,

     Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

     Plaintiff Nick Flor, a tenured professor at the University of New Mexico ("University"), received a one-year suspension for having inappropriate communications with a former graduate student (Defendant Eva Chavez). *See generally* Doc. 68. Flor claims that this disciplinary action was disproportionate and based on flawed investigatory processes fraught with procedural irregularities, which he views as evidence of gender discrimination in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88 (1988). *Id.* at 36-39 ¶¶ 279-98. Flor further alleges the University breached a contract with him as well as the covenant of good faith and fair dealing. *Id.* at 34-36 ¶¶ 268-78. He also seeks a declaration that the University's disciplinary process violated his constitutional rights.[1] *Id.* at 33-34 ¶¶ 259-67. The University Defendants— which include the Board of Regents of the University of New Mexico ("the Board"), Stephen

_____

[1] Flor's pleading further alleged constitutional due process violations. Doc. 68 at 28-32 ¶¶ 225-54. The Honorable James A. Parker dismissed this claim. *See* Doc. 94 at 39.

Bishop, Lisa Broidy, Kevin Gick, Karin High, and Eric Lau—seek summary judgment on each of these causes of action. Doc. 191 ("Motion"). Having reviewed the parties' briefing, the factual record, and the relevant legal authority, the Court grants the Motion in full. The Court's rationale is set out below.

## BACKGROUND[2]

### I.    Factual Background

#### A.    Conduct Leading to the University's Investigation

Flor was (and is) a professor at the Anderson School of Management ("Anderson"). UMF 18. Chavez was a graduate student in the same school during the pendency of the events material to this litigation. Doc. 191-3 at 1; *see* Doc. 191 at 29; Doc. 198 at 8. Over the course of about six days, Flor and Chavez exchanged text messages and more than 5,000 e-mails, some of which were overtly flirtatious and sexual while others addressed academic and professional matters, including Flor's offer of a paid graduate assistantship position. UMFs 10-13, 15; *see* Doc. 191-3 at 6-20 (summarizing the pair's correspondence). Shortly thereafter, Flor began to have reservations about the inappropriate nature of his exchanges with Chavez, and he attempted to cut off communication with her. *See* UMFs 14, 16. Predictably, their relationship soured, and Chavez threatened to share their messages and emails with University administrators. *Id.*; *see e.g.*, Doc. 191-3 at 19-20. Flor opted to preemptively address the issue by sending the messages to his department chair, Dr. Mary Margaret Rogers. UMF 17.

Rogers reported the situation to the University Office of Equal Opportunity's ("OEO") on Flor's behalf ("Flor Complaint"). *Id.* Chavez learned of that filing and subsequently lodged her

---

[2] The Court has previously summarized the facts in this case. *See* Docs. 36, 55, 94. The Court recites the pertinent facts—as determined by the parties' submissions—while omitting arguments and facts not supported by the record. The undisputed material facts ("UMFs") are drawn from those contained in University Defendants' Motion, Doc. 191 at 2-10.

own grievance against Flor ("Chavez Complaint"). UMF 20. An investigation into both complaints ensued.

### B.    The OEO Investigation and Complaints

The OEO opened an inquiry[3] and subsequently issued a Preliminary Letter of Determination ("PLOD") addressing the Chavez Complaint.[4] *See* UMF 25; *see generally* Doc. 191-3. As set out in the PLOD, the OEO considered the conduct at issue against the backdrop of documentary evidence and applicable University policies including Administrative Policy 2740, which details the University's Anti-Sexual Harassment and Sexual Assault policies.[5] UMFs 7, 26-27; *see* Doc. 191-3 at 1-20; Doc. 191-1 at 10-23. That guideline broadly defines "sexual harassment" as "*unwelcome* conduct of a sexual nature" including either quid pro quo exchanges or actions giving rise to a hostile environment Doc. 191-1 at 10-11 (emphasis added). Policy 2740 goes on to identify behaviors that "may constitute sexual harassment – (either quid pro quo or

---

[3] Initially, Ben FitzSimons was appointed as the independent investigator on the Chavez Complaint. UMF 21. After his investigation wound down, he prepared a draft report, which was later provided to Flor. UMF 23. That document memorialized FitzSimons's findings but offered no conclusions. Id. Later, due to staffing considerations, Sara Cliffe replaced FitzSimons as the OEO's lead investigator. UMF 24.

[4] The OEO simultaneously issued a Preliminary Letter of Determination addressing the Flor Complaint ("Flor Complaint PLOD"), concluding that there was insufficient evidence to establish Chavez's behavior constituted sexual harassment. *See generally* Doc. 22-3. That determination was based on the same objective evidence reviewed in the PLOD. *See id.* at 1-15.

[5] The University has amended Policy 2740 since Flor's investigation. *See* University of New Mexico Policy Office, *Administrative Policies and Procedures Manual – Policy 2740: Sex Harassment Including Sexual Assault (Interim)*, https://policy.unm.edu/university-policies/2000/2740.html (noting an origination date of May 15, 2015, with the most recent revision occurring on April 25, 2025) (last visited Aug. 26, 2025). The 2018 version of Policy 2740, which was in effect during these events, controlled the conduct in this case. *See* Doc. 191-1 at 10-23. The Court has already taken judicial notice of the relevant version of Policy 2740. Doc. 94 at 2 n.5.

hostile environment sexual harassment . . .), depending on particular circumstances[.]" *Id.* at 11.

For example, Policy 2740 defines actionable quid pro quo sexual harassment as occurring when:

- submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or academic advancement [or]

- submission to or rejection of such conduct by an individual is used as the basis for employment decisions or academic decisions affecting such individual[.]

*Id.* at 10-11. Policy 2740 also provides that a hostile environment is created when

> unwanted conduct of a sexual nature is sufficiently serious . . . and objectively offensive as to deny or limit a person's ability to participate in or benefit from the University's programs . . .; or when such conduct has the purpose or effect of unreasonably interfering with an individual's employment[.]

*Id.* at 11. To further determine whether sexual harassment created a hostile environment, the OEO considers a two-part test— "whether the conduct was *unwelcome* to the person who feels harassed" and whether a reasonable person would be offended—alongside four other factors. *Id.* (emphasis added).

Based on the foregoing, the OEO preliminarily found that Chavez did not violate Policy 2740—specifically, that Chavez had not sexually harassed Flor by creating a hostile environment. *See generally* Doc. 22-3 at 1. In making this determination, the OEO considered factors such as whether the conduct was sexual in nature, whether the conduct was subjectively and objectively unwelcome, the frequency and severity of the conduct, and whether the conduct unreasonably interfered with an employee's work performance or a student's academic performance. *Id.* at 15. The OEO noted that Chavez's communications with Flor "that were sexual in nature were both subjectively and objectively welcomed by [Flor]." *Id.* at 16. It emphasized this point, stating, "In fact, [Chavez]'s sexual communications were solicited by [Flor]." *Id.* The OEO also noted that most of the complained-of-communications between the pair were not sexual, and it could not "be said that they were objectively unwelcome or that a reasonable person would have known the

4

volume of communications was unwelcome." *Id.* For this reason, the OEO concluded they were not disruptive to Flor's work or environment such that it created a hostile environment. *Id.* No party provided further documentation of this complaint.

As to the Chavez Complaint, the OEO explained (through the PLOD) that it was prepared to find that Flor had committed quid pro quo sexual harassment. UMF 27; Doc. 191-3 at 1, 20-23. In reaching its decision, the OEO considered two questions:

1. Whether submission to sexual conduct was made either explicitly or implicitly a term or condition of an individual's employment or academic advancement; or

2. Whether submission to or rejection of sexual conduct by an individual was used as the basis for employment decisions or academic decisions affecting the affected party.

Doc. 191-3 at 20. Answering both queries in the affirmative, the OEO found compelling (1) the "'inherent power differential' between a faculty member and a student which can render consent difficult to assess or construe it to be coercive;" (2) how the chronology of the communications established that Chavez's "receptiveness and reciprocation of [Flor's] sexual overtures was an implied term or condition of her hire by [Flor] as a graduate or project assistant;" and (3) that "[a]n employment relationship remained possible throughout all of the sexual communications until [Flor] first withdrew his romantic and sexual interest in [Chavez] and then, the assistantship opportunity." *Id.* at 21; *see* UMF 27. The OEO further indicated it was prepared to find that Flor retaliated against Chavez in violation of Policy 2740. Doc. 191-3 at 22; UMF 25. Flor was given five business days to submit additional information for the OEO to consider prior to issuance of its final determinations. UMF 28; *see* Doc. 191-3 at 22. Both Flor and Chavez submitted supplemental evidence, but the OEO did not credit those materials. UMF 29. It determined that

"none of the requested evidence would suggest (let alone compel) a different result[.]" Doc. 191-4 at 1; *see* UMF 30.

The OEO ultimately issued its Final Letter of Determination ("FLOD") regarding the Chavez Complaint. UMFs 29-30; *see generally* Doc. 191-4. It definitively concluded Flor violated Policy 2740 by engaging in quid pro quo sexual harassment and retaliation. UMF 31; Doc. 191-4 at 1, 4. Flor exercised his right to appeal the decision to the University President—who denied the request—and then to the Board of Regents, who also declined to consider the matter. UMFs 33-34; Doc. 191-5.

### C.    Policy 2215 Investigation

Because the OEO found Flor violated Policy 2740, the University administration began a separate investigation of Flor for potential violations of University Policy 2215, which governs consensual relationships and conflicts of interest of all faculty, staff and students.[6] UMFs 5, 41; *see* Doc. 191-1 at 7-9. Initially, Rogers was assigned as the investigator, UMF 41, but she was later removed from that role after Chavez sent the University administration an email accusing Rogers of failing to report Flor's actions on Chavez's behalf.[7] UMFs 47-48; *see* Doc. 191-1 at 8 ¶ 4 (outlining third-party reports regarding these relationships). Michelle Arthur, the Department

---

[6] Under Policy 2215, the University explains that it pays extra attention to romantic or sexual relationships when they "occur in educational or supervisory contexts" because "they can present serious ethical concerns and compromise the University's academic and work environment, in part due to an inherent power differential between the parties." Doc. 191-1 at 7 ¶ 1. Disclosure of these relationships is mandated "in order to manage the actual or perceived conflicts of interest" and "to mitigate adverse effects on third parties." *Id.* If a superior party fails to disclose an ongoing, consensual relationship, "they may be subject to disciplinary actions" under the Faculty Handbook and other University policies. *Id.* at 8 ¶ 3; *see id.* at 7 ¶ 2 (defining "superior" as one party "to a consensual relationship in which the superior exercises authority over the subordinate, such as teaching (including teaching assistants), supervising, evaluating, or advising").

[7] The parties have neither submitted a copy of that e-mail nor clarified when it was sent.

Chair of Organizational Studies, took over the investigation. *See* Doc. 198-2 at 1. Ultimately, Arthur found Flor did not violate Policy 2215 because no superior and subordinate relationship existed between the pair. *Id.* at 2. The record does not show that the University took any further disciplinary action under that complaint. [8]

### D.    Discipline and Sanctioning under Policy C07

University Policy C07 provides the disciplinary processes and procedures for sanctioning tenured faculty, including a "warning, censure, suspension without pay, or dismissal."[9] UMF 4; Doc. 191-1 at 3 ¶ 2; *see id.* at 3-6, 18. A faculty member's chair or dean typically initiates the disciplinary process, Doc. 191-1 at 4 ¶ 4, so Senior Vice Provost Barbara Rodriguez assigned Rogers (Flor's department chair) to determine the appropriate discipline. UMF 17, 37.

Rogers drafted a sanction requiring Flor to discontinue personal communications with students through his personal cell phone or e-mail account. Doc. 198-11 at 3 (87:8-14). Rogers shared this plan with the University's Title IX coordinator, Angela Catena.[10] UMFs 38-39, 43-44; Doc. 191-11 at 5 (87:4-14). Catena had some concerns about Rogers's proposal. Doc. 191-12 at 5 (87:15-88:3). Specifically, she was worried the contemplated discipline would be ineffective, was

---

[8]As explained below, the Policy 2215 investigation is relevant here because it contributed to Rogers's removal from Flor's concurrent disciplinary proceedings.

[9] Flor repeatedly references the subsequent changes to University policy as a basis for his factual disputes. *See, e.g.*, Doc. 198 at 7, 9, 11 (discussing amendments of Policy C07). Flor cites no legal proposition that requires the Court to consider these changes as evidence when evaluating the parties' arguments. The University's disciplinary processes were bound by the policies in effect at the time of the investigation, discipline, and sanction. UMFs 3-8.

[10] In her role as Title IX coordinator, Catena "overs[aw] institutional compliance with [University] policy related to sex discrimination (including sexual misconduct)," Doc. 191-1 at 10, and could "make decisions related to interim measures in allegations of sexual misconduct and . . . inform the appropriate office of the recommended interim measures." *Id.* at 16 ¶ 10.

inconsistent with prior sanctions handed out for similar policy violations, and did not comply with Title IX requirements. *Id.*; UMF 45.

Around the same time, questions about Rogers's impartiality began to surface. This was due, in part, because Rogers initiated the Flor Complaint and challenged the accuracy and validity of the OEO's conclusions in the Chavez Complaint. *See* UMFs 17, 50-51. Moreover, Chavez had voiced concern that Rogers's participation was a conflict of interest. *See* UMF 51; Doc. 191-11 at 4 (9:5-20). Based on these issues, Rodriguez determined Rogers had a conflict of interest that prevented her from fairly sanctioning Flor. UMF 49. So, just as she had been removed from the Policy 2215 investigation, Rogers was relieved of her duty as the sanctioning officer under Policy C07. UMFs 47, 51.

Policy C07 does not provide guidance in the case where the relevant chair or dean has a conflict of interest. *See generally* Doc. 191-1 at 3-6. The policy does, however, expressly permit a program director, associate dean, or vice dean in a "non-departmentalized school or college" to act as the sanctioning party. *Id.* at 4 ¶ 5. Accordingly, Rodriguez began considering other University faculty to replace Rogers. Vice Dean Camille Carey (now Dean) of the University's School of Law was ultimately selected to serve as the sanctioning official.[11] UMF 53.

In that capacity, and prior to reaching a final conclusion, Carey permitted Flor to submit an impact statement. UMF 54. Carey also shared a draft of her proposed sanctions with Rodriguez and Catena for review.[12] UMF 56. Following some revisions, which reduced the severity of the

---

[11] Several other candidates reported personal conflicts preventing them from serving. UMF 52; *see* Doc. 191-1 at 4 ¶ 5.

[12] The proposed sanctions were more severe than the discipline Flor ultimately received. UMF 57; Doc. 191-13 at 6 (46:17-21).

sanctions Carey had initially proposed, Flor was given a one-year suspension without pay, beginning January 1, 2020, and ending on December 31, 2020. UMF 58.

### E.    Flor's Media Articles and Chavez's OEO Retaliation Complaint

After learning of his suspension, Flor contacted the Foundation for Individual Rights in Education ("FIRE") and shared information about the OEO investigation. UMFs 76-78; *see* Doc. 198-20 (e-mails sharing OEO documents). Flor also contacted *Reason*, a self-described libertarian online magazine, to further circulate information regarding purported due process violations. UMFs 80, 81. *Reason* then published an article about Flor and Chavez's relationship (without identifying Chavez) and the University's disciplinary process. UMF 82. Chavez filed a complaint for retaliation with the OEO against Flor regarding this media coverage. *Id.* The OEO found that Flor had not violated any University policies by contacting the media. UMF 83; *see* Doc. 198-21 at 2-3.

### F.    Flor's Appeal of Carey's One-Year Sanction

Flor appealed his suspension and related discipline to the University's Peer Hearing Panel ("the Panel"). *See* UMFs 65, 70; Doc. 198-18 at 1. Pursuant to Policy C07, Defendant Stephen Bishop, Chair of the Faculty Ethics Committee, selected two faculty volunteers from the Faculty Ethics Committee and one person appointed by the University Provost's office to serve on the Panel. UMFs 65, 67; Doc. 191-1 at 5 ¶ 11. Defendants Broidy, Lau, and High served as the Panel members. Doc. 191-7 at 1. They were tasked with upholding or reversing the suspension. UMF 67. Flor understood the Panel would not consider the correctness of the OEO's factual findings and conclusions nor would the Panel reopen the OEO investigation. UMF 68; *see* Doc. 191-1 at 5-6. Instead, consistent with Policy C07, the Panel addressed the following issues: "1) Procedural Questions – Was the sanctioning process consistent with relevant University policy? Were there

any procedural irregularities that should invalidate the sanctioning outcome?; and 2) Substantive Questions – Was the sanction appropriate and proportionate given the OEO violations for which the sanction was issued?" UMF 71 (quoting Doc. 191-7 at 3).

At the hearing, Flor was accompanied by his attorney. UMF 70. While his counsel was precluded from intervening, Flor was permitted to consult with him during the proceedings. *Id.*; Doc. 198-17 at 2 (44:11-45:8). Flor was afforded the opportunity to present evidence and witnesses testimony at the hearing—including evidence from the OEO investigative file—but he was required to demonstrate how those proffers were relevant. UMF 72; Doc. 198-18 at 3-4. He did not do so. UMFs 74-75. Consequently, the Panel did not examine the OEO allegations and investigations, and that evidence did not form a basis for the Panel's decision. UMF 73. The Panel also did not consider the University's investigation under Policy 2215. *Id.* Ultimately, the Panel upheld Flor's sanction. UMF 69; Doc. 191-7 at 8.

## II.    Procedural Background

Flor filed his first complaint in the Second Judicial District Court of the State of New Mexico, which was subsequently removed to this Court. UMFs 84-85; Docs. 1, 1-1. His suit initially named the University, the Board of Regents, University President Garnett Stokes, Carey, then-OEO Director Francie Cordova, Catena, Cliffe, Associate University Counsel Emma Rodriguez, and Gick as defendants. Doc. 1 at 5-8. These defendants removed to this Court based on federal question jurisdiction. *Id.* at 2 ¶ 3 (citing 28 U.S.C. § 1331).

Shortly thereafter, Flor filed his First Amended Complaint ("FAC"). *See generally* Doc. 17. He removed Stokes, Cordova, and Rodriguez as defendants and named the Board of Regents, Carey, Catena, Cliffe, and Chavez instead. *See generally id.* The University, Carey, Catena, and Cliffe moved to dismiss Flor's claims regarding procedural due process, breach of contract, and

breach of the covenant of good faith and fair dealing. *See generally* Doc. 40. The Court granted their requests, dismissed all but two counts of the FAC without prejudice, and granted Flor leave to amend. Doc. 64 at 20-21.

Flor complied and filed his Second Amended Complaint ("SAC"), naming the Board of Regents alongside Bishop, Broidy, Gick, High, Lau (collectively "Employee Defendants"), and Chavez. *See* Doc. 68. The new pleading included additional causes of action: (I) violation of the Due Process Clause and 42 U.S.C. § 1983 by Employee Defendants in their individual capacities; (II) injunctive relief against the Board of Regents and Employee Defendants in their official capacities; (III) declaratory judgment under both the Declaratory Judgment Act, 28 U.S.C. § 2201, and the New Mexico Declaratory Judgment Act, NMSA 1978, §§ 44-6-1 to 44-6-15, against all Defendants; (IV) breach of contract by the Board of Regents; (V) breach of the covenant of good faith and fair dealing by the Board of Regents; (VI) violations of Title IX by the Board of Regents; and (VII) malicious abuse of process by Chavez. *Id.* at 28-40.

Subsequently, Employee Defendants, acting in their individual capacities, moved for summary judgment on Counts I, II, and III. UMF 95; *see generally* Doc. 79. United States District Judge James A. Parker granted that motion in part and denied it in part. *See generally* Doc. 94. Specifically, he granted summary judgment as to Count I—concluding qualified immunity precluded suit—and dismissed Flor's Section 1983 claim without prejudice. *Id.* at 35, 39; UMF 96. As to Count II, the Court held that Flor's claim for injunctive relief was "a form of remedy, not a standalone claim," granted dismissal with prejudice, and noted Flor was "not precluded from obtaining injunctive relief as a remedy should he prevail on a claim for which injunctive relief is available." Doc. 94 at 35, 37, 40. Lastly, Judge Parker denied Employee Defendants' arguments

for dismissal of Count III because they failed to meet their burden to show they were entitled to summary judgment. *Id.* at 39; UMF 96.

Now, as detailed below, Defendants' Motion seeks summary judgment on Counts III-VI. Doc. 191. The Court ordered the parties to file supplemental briefing to clarify their positions on Title IX in light of the Tenth Circuit's decision in *Doe v. University of Denver* (*Doe II*), 1 F.4th 822, 829 (10th Cir. 2021), and how that holding bears on the issues raised in the parties' summary judgment briefs. Doc. 217. Both parties complied. Docs. 221, 222.

## LEGAL STANDARD

"Summary judgment is a drastic remedy and should be granted only with caution." *McGill v. Am. Land & Expl. Co.*, 776 F.2d 923, 926 n.5 (10th Cir. 1985) (citation modified). To that end, the Court examines the factual record and draws all reasonable inferences in the light most favorable to the nonmoving party. *EFLO Energy v. Devon Energy Corp.*, 66 F.4th 775, 787 (10th Cir. 2023). "Where different ultimate inferences may properly be drawn, the case is not one for a summary judgment." *Seamons v. Snow* (*Seamons II*), 206 F.3d 1021, 1026 (10th Cir. 2000) (quotation omitted). "[T]he movant is entitled to judgment as a matter of law" only when "there is no genuine dispute as to any material fact[.]" *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (quotation omitted); *see* Fed. R. Civ. P. 56(a). Yet, "summary judgment may not be avoided by mere disagreement with factual contentions that are supported with competent evidence." *Mayer Botz Enters. LLC v. Cent. Mut. Ins. Co.*, 720 F. Supp. 3d 1081, 1082 (D.N.M. 2024).

> [A] party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute.

*Congress v. Gruenberg*, 643 F. Supp. 3d 203, 215 (D.D.C. 2022). "And where 'a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c),' the Court may 'consider the fact undisputed for purposes of the motion.'" *Mayer Botz*, 720 F. Supp. at 1082 (citing Fed. R. Civ. P. 56(e)(2)).

## DISCUSSION

University Defendants seek summary judgment on Flor's declaratory judgment (Count III), state law (Counts IV & V), and Title IX (Count VI) claims. *See* Doc. 191 at 1. Because the Title IX claims implicate the breadth of the factual and legal analysis required in this case, the Court begins its analysis there. The Court then turns to Flor's remaining state law claims for breach of contract and breach of the covenant of good faith and fair dealing. Finally, the Court disposes of Flor's remaining claim for declaratory relief.[13]

## I.    Count VI: Gender discrimination and retaliation under Title IX

Title IX requires that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). This provision broadly prohibits gender-based discrimination in university disciplinary proceedings,

---

[13] Flor contends the Court's prior dismissal of his standalone claim for injunctive relief (Count II) did not apply to the Board, and instead only relieved Employee Defendants of liability for that claim. *See* Doc. 198 at 19-21. Flor is wrong. The Court dismissed Count II in its entirety because "injunctive relief is a form of remedy," not an independent cause of action. Doc. 94 at 36; *see Leon v. Summit Cnty.*, No. 2:17-cv-00165, 2017 U.S. Dist. LEXIS 195999, at *11 (D. Utah Nov. 28, 2017) ("Injunctive relief is a remedy, not an independent cause of action. Injunctive relief is available as a remedy only where a party prevails on a separate legal theory."); *Knutson v. Vill. of Lakemoor*, 932 F.3d 572, 576 n.4 (7th Cir. 2019) ("With respect to injunctive relief, that is a remedy, not a cause of action, and thus should be not pleaded as a separate count."). The Court expressly "dismiss[ed] Count II from the SAC" without regard to particular defendants, noting that Flor could obtain injunctive relief should he prevail on an appropriate claim. Doc. 94 at 37; *see also id.* at 40 ("Count II of Plaintiff's [SAC] is DISMISSED WITH PREJUDICE." (emphasis in original)).

including those carried out against university employees. *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535-36 (1982) (including a prohibition on employment discrimination "on the basis of sex" in educational programs receiving federal funding). Title IX also prohibits retaliation against individuals who complain of sex discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (expressly approving Title IX retaliation claims).

Flor bases his Title IX claims on these discrimination and retaliation standards. *See* Doc. 68 at 36-39. To prevail, Flor must establish that he was "excluded from participation in, denied the benefits of, or subjected to discrimination in an educational program" that receives federal funding and "the exclusion from the program was on the basis of gender." *Doe v. Univ. of Denver* (*Doe I*), 952 F.3d 1182, 1190 (10th Cir. 2020) (quoting *Seamons v. Snow* (*Seamons I*), 84 F.3d 1226, 1232 (10th Cir. 1996)). There is no dispute that Flor's suspension excluded him from participating in the University's educational programs and that the University receives federal funding. UMF 2. The relevant question is whether Flor has created a factual dispute that the University's investigation and decision to suspend him were motivated by gender bias.

"Where a Title IX plaintiff relies on indirect proof of discrimination, [the Court applies] the three-part burden-shifting framework announced in *McDonnell Douglas*." *Doe II*, 1 F.4th at 829 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). The first step requires a plaintiff establish a prima facie case of discrimination or retaliation by showing the plaintiff's sex was a motivating factor in the university's disciplinary action. *Id.* at 829 (sex discrimination claim); *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1225 (10th Cir. 2008) (retaliation claim). The burden then shifts to the defendant "to articulate a legitimate, nondiscriminatory [or nonretaliatory] reason for the adverse action." *Bird*, 832 F.3d at 1200 (quotation omitted). If the defendant satisfies

that standard, the burden shifts back to the plaintiff to show the "proffered reasons are pretextual." *Id.* (quotation omitted).

### A.    Flor's Prima Facie Gender Discrimination Claim

At the summary judgment phase, the central inquiry for a Title IX discrimination claim is: "Could a reasonable jury—presented with the facts alleged—find that sex was a motivating factor in the University's disciplinary decision?" *Doe II*, 1 F.4th at 830. A plaintiff may establish a prima facie discrimination case under that question alone but may also use the "erroneous outcome" and "selective enforcement" frameworks to demonstrate that sex was a motivating factor in the school's decisions.[14] *Id.* The erroneous outcome theory requires a plaintiff to show facts that cast doubt on the outcome of the disciplinary proceedings and "a particularized causal connection" between that outcome and the school's gender bias. *Id.* (citing *Yusuf*, 35 F.3d at 715). In contrast, the selective enforcement theory focuses on disparate application—Flor must show "that a similarly-situated member of the opposite sex was treated more favorably" on the basis of her gender. *Id.* (quoting *Doe v. Univ. of Dayton*, 766 F. App'x 275, 284 (6th Cir. 2019)). To satisfy *Doe II*'s more holistic inquiry, Flor may rely on external factors, including statistical evidence of systematic discriminatory conduct giving rise to "a fair inference of anti-male bias." *Id.* at 834-35.

---

[14] Flor argues that the holistic inquiry in *Doe II* requires a general application of the *McDonnell Douglas* framework with an eye towards broad gender bias, rather than an examination of the erroneous outcome and selective enforcement tests. *See* Doc. 198 at 30-31. True enough, *Doe II* announced a new framework in evaluating Title IX claims in the Tenth Circuit. *See* 1 F. 4th at 829-30. But that case did not do away with the erroneous outcome and selective enforcement tests. Instead, *Doe II* observed that these categories "simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's [disciplinary decision]." *Id.* at 830 (quoting *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019)).

Such evidence, however, must provide "something more" than gender-based discrepancies in disciplinary outcomes. *Doe I*, 952 F.3d at 1193, 1195.

Ultimately, a plaintiff's goal is to prove a plausible inference of sex discrimination. *See Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019). The Tenth Circuit recognizes that procedural irregularities in university disciplinary proceedings can raise a colorable inference of gender bias. *See Doe II*, 1 F.4th at 831 (collecting cases). These irregularities can include the length of the investigatory and sanctioning period compared to those contemplated by policy, the failure of hearing panels to review contradicting evidence, failure to apprise the plaintiff of the allegations or present a defense, and disproportionately harsh punishments. *See*, *e.g.*, *Doe v. Oberlin Coll.*, 963 F.3d 580, 586-88 (6th Cir. 2020) (finding "clear procedural irregularities" including a 120-day investigation, failure to inform the plaintiff of the allegations against him, and the panel reaching a decision 180 days longer than contemplated by policy); *Doe I*, 952 F.3d at 1197-1199 (looking to university policy for expulsion data, types of violations of non-consensual sexual contact on record, and whether investigators only evaluated the complainant's evidence); *Holmstrom v. Univ. of Tulsa*, No. 22-CV-0408, 2023 U.S. Dist. LEXIS 79478, at *3 (N.D. Okla. May 8, 2023) (detailing the plaintiff's allegations of procedural irregularities); *Brown-Smith v. Bd. of Trs. of the Univ. of N. Colo.*, No. 20-CV-03271, 2021 U.S. Dist. LEXIS 125056, at *21-22 (D. Colo. July 6, 2021) (evaluating plaintiff's allegations of admissions and inconsistencies in sexual assault complaint and anti-male bias). But while dubious disciplinary proceedings should be countenanced, Title IX should not be construed "to impair the independence of universities" in meting out discipline. *See Yusuf*, 35 F.3d at 715. The Tenth Circuit recognizes that "[a] few procedural irregularities . . . are not necessarily uncommon or even all that troubling. After all, sexual-misconduct investigations and proceedings will not be perfect." *Doe I*, 952 F.3d at 1201

n.18. It is only when "benign, stochastic explanations for the errors become implausible" that a colorable inference of bias arises. *Id.* (observing that in these circumstances a disciplinary proceeding "looks more like a railroading").

For purposes of summary judgment, University Defendants must establish the undisputed facts negate these theories and the overarching framework adopted in *Doe II*. Given that Flor expressly pled erroneous outcome and selective enforcement claims in his SAC and analyzes *Doe II*'s holistic inquiry in his summary judgment briefing, the Court analyzes his claims through the lens of applicable case law to determine whether a reasonable jury could find a prima facie case of discrimination in his favor. *See* Doc. 68 at 37 ¶ 284 (erroneous outcome), 39 ¶ 294 (selective enforcement); Doc. 198 at 31; *see generally* Docs. 221, 222 (evaluating *Doe II*'s application to this case).

### 1. Erroneous Outcome

The two-prong erroneous outcome theory requires Flor to set forth facts (1) casting "some articulable doubt on the accuracy of the disciplinary outcome," and (2) demonstrating "a particularized causal connection between the flawed outcome and gender bias." *Doe II*, 1 F.4th at 830 (quoting *Yusuf*, 35 F.3d at 715). Procedural irregularities bear on the first prong of the erroneous outcome test because the results of a proceeding depend on the proper application of disciplinary procedures. *See Ruff v. Bd. of Regents of the Univ. of N.M.*, 272 F. Supp. 3d 1289, 1298 (D.N.M. 2017) (noting evidentiary weaknesses like "motive to lie," "strengths of the defense," "procedural flaws affecting the proof," or "reason to doubt the veracity of the charge" are evidence of erroneous outcome). Once an inference of gender bias arises (e.g., through procedural irregularities), the plaintiff may establish a causal link to gender bias by showing that "statements by members of the disciplinary tribunal, statements by pertinent university officials,

or patterns of decision-making . . . tend to show the influence of gender." *Id.* at 1299 (quoting *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016)). This causal link requires that the plaintiff demonstrate that gender bias was a motivating factor rather than a but-for cause in the outcome of the disciplinary proceedings. *Id.* (citing *Yusuf*, 35 F.3d at 715).[15]

University Defendants argue Flor cannot show that different procedures would have led to a more favorable outcome or establish the requisite causal link. Doc. 191 at 22. They note that Flor received adequate due process in the disciplinary proceedings and thus cannot show actionable deficiencies or gender bias. *See id.* at 24-27. Flor disputes that reasoning, arguing that there were significant procedural irregularities which arose due to gender bias, and tainted the investigatory, disciplinary, and sanctioning processes. *See* Doc. 198 at 31-34.

The Court looks first to the various University policies and procedures that governed Flor's sexual harassment investigatory and disciplinary proceedings. Broadly, Flor was subject to the Faculty Handbook. UMF 3; *see* UNM Faculty Handbook, UNM, available at https://handbook.unm.edu/policies/ (last accessed August 26, 2025). Policy C07 of the Handbook sets out the procedures for addressing faculty misconduct. UMF 4; Doc. 191-1 at 3-6. Also relevant is the University's Administrative Procedures Manual, which prohibits sexual misconduct and defines the role of the University's Title IX Coordinator at Policy 2740. UMF 8; Doc. 191-1 at 10-11. Policy 2740 overlaps with Policy C07: sexual harassment allegations against a faculty member are investigated in accordance with Section 13 of Policy 2740, and if the investigation results in a finding that the faculty member committed any form of sexual harassment, disciplinary action

---

[15] As observed in *Ruff*, neither the United States Supreme Court nor the Tenth Circuit has definitively established the causal standard applicable in Title IX claims. *See* 272 F. Supp. 3d at 1299. The Court is not aware of—and the parties have not provided—any intervening authority settling the question. So, the Court will follow *Ruff*'s lead and, where appropriate, apply the motivating factor causation standard.

proceeds under Policy C07. Doc. 191-1 at 18. Flor must show procedural irregularities sufficient to create an erroneous outcome arose within that framework.

To meet that standard, Flor points to procedural defects that, in his view, render his disciplinary outcome erroneous. He first contends that the University failed to perform a "welcomeness analysis" during its investigation of the Chavez Complaint. Doc. 198 at 32. This argument springs from Policy 2740's definition of sexual harassment as "unwelcome conduct of a sexual nature[.]" Doc. 191-1 at 10 ¶ 1. Flor contends that the University's investigation discounted the fact that Chavez welcomed and reciprocated Flor's lascivious communications and reached an erroneous conclusion that Flor engaged in "unwelcome" sexual conduct. *See* Doc. 198 at 31-32. The initial problem for Flor is his briefing does not adequately explain what "welcomeness analysis" the OEO purportedly did not conduct, nor does he show (by citation to the record) how the OEO should have conducted that analysis.[16] *See, e.g.*, *id.* at 16 (Additional Fact F complaining of lack of "welcomeness analysis" without further explanation). Flor's guidance on this subject is crucial because Policy 2740 repeatedly uses "unwelcome" to define whether conduct constitutes sexual harassment. As outlined above in Section I.A., the applicable version of Policy 2740 broadly defined "sexual harassment" as "*unwelcome* conduct of a sexual nature."[17] Doc. 191-1 at 10 ¶ 1 (emphasis added). That section then bisects sexual harassment into either quid pro quo or

---

[16] The 2018 version of Policy 2740, which was in effect during these events, governs the conduct in this case. Flor suggests that the University relied on policies that were updated after his investigation and sanction. Doc. 198 at 16. Despite this assertion, he does not present any evidence that University Defendants relied on updated portions of the policies to his detriment. Rather, the OEO issued the relevant PLODs before the changes were made.

[17] Flor argues that subsequent amendments to Policy 2740 demonstrate that quid pro quo sexual harassment could not—and now cannot—occur when sexual conduct was welcome. Doc. 198 at 32. Flor cites no authority in support of this assertion, and the Court declines to apply post hoc definitional changes to the circumstances of Flor's case.

hostile environment claims, which can be created by a number of behaviors. *Id.* at 11 (including "[u]nwelcome sexual jokes or comments" as examples of sexual harassment). While the definitions provided by Policy 2740 are not a paragon of clarity or cohesiveness, Flor provides no evidence showing that the OEO deviated from the policy's operative language. *See Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1183 (10th Cir. 1995) (holding that summary judgment is appropriate where the non-moving party does not provide evidence that substantiates its claims). The Court has independently found no evidence the OEO diverged from the policy.

Notwithstanding the lack of support in Flor's briefing, the Court looks to the merits of the two complaints. The Flor Complaint centered on Chavez's alleged creation of a hostile work environment. Doc. 22-3 at 15. The Chavez Complaint concerned quid pro quo sexual harassment and retaliation. Doc. 191-3 at 20-21. This difference is key and leads to another issue for Flor: the OEO investigator *did* conduct a welcomeness analysis when reviewing Flor's complaint. It did so by analyzing the power differential inherent in student-faculty relationships. *See* UMF 32. And there is nothing unusual about the OEO's approach. University policy explicitly recognizes that sexual relationships between superiors and subordinates in the educational context "can lead to charges of sexual harassment and exploitation[.]" Doc. 191-1 at 7 ¶ 1.[18] Accordingly, a

---

[18] This language is drawn from Policy 2215, which governs consensual relationships and conflicts of interest in the educational setting. *See* Doc. 191-1 at 7-9. Flor argues that referring to this policy was erroneous. Doc. 198 at 5-6. Cliffe, the OEO investigator, testified that a violation of Policy 2215 was not the basis for her ultimate conclusion that Flor violated Policy 2740, but instead she used the policy to contextualize her analysis of the power dynamics between the two individuals. *See* UMF 32; Doc. 191-9 at 2-3 (portions of Cliffe's deposition testimony). Flor's response does not refute this testimony.

welcomeness analysis in a quid pro quo harassment investigation must take into account faculty-student or superior-subordinate power imbalances.[19]

In the Chavez Complaint PLOD, the OEO recognizes the "inherent power differential" between Flor and Chavez which made it difficult to determine whether Chavez consented to Flor's communications. Doc. 191-3 at 21. The PLOD acknowledged that while Chavez was never Flor's student, Flor "possessed considerable authority" in Chavez's graduate program and had offered Chavez a potential employment opportunity. *Id.* This power imbalance was the key factor in finding that Flor violated Policy 2740 and informed the PLOD's consent-based analysis. *Id.* As a tenured faculty member, Flor had significant authority in his department and "inherent power . . . to affect [Chavez's] employment (existing and potential) and possibly, her education at UNM." *Id.*; *see also* UMFs 27, 32. Chavez, as a graduate student, had comparatively little. *See* UMFs 27, 32. That dynamic supports the PLOD's conclusion that "[a] reasonable college student in [Chavez's] position would feel pressure to please a person in [Flor]'s professional position." Doc. 191-3 at 21. Put differently, the power imbalance raised reasonable doubts about the welcomeness of Flor's conduct. Accordingly, the OEO's investigation undertook a "welcomeness analysis" and determined that Flor's conduct violated the prohibition on unwelcome sexual conduct. Flor's argument to the contrary is unavailing and unsupported by citations to the record.

Next, Flor disputes the integrity of the sanctioning process under Policy C07. *See* Doc. 198 at 32-33. He points to the following: (1) Catena's review of Rogers's proposed draft sanction, (2) Rodriguez's removal of Rogers as the sanctioning party due to a purported conflict of interest, and

---

[19] This illustrates the difficulty in evaluating consent (i.e., welcomeness) between professors and students given the power dynamics at play.

(3) tasking Anderson Interim Dean Shawn Berman with reviewing and approving Flor's sanction despite Chavez's 2018 OEO complaints against Berman. *Id.*

Regarding Catena's review of Rogers's draft sanction, Flor has not identified any policy provision that prohibited such review. Flor states that Policy C07 makes no mention of the Title IX Coordinator but has not provided evidence that Catena's review and disapproval of Rogers's proposed sanction was impermissible under Policy C07 or any other applicable procedure.[20] *Id.* at 7.

As to the removal of Rogers as the sanctioning officer, Policy C07 does not outline any means for resolving a conflict-of-interest and Flor does not identify any provisions providing clarity on the matter. *See* Doc. 191-1 at 3-6. To the contrary, he admits Policy C07 contained "no provision regarding recusal or remand of a department chair" when imposing a sanction. Doc. 198 at 9. Moreover, the parties agree Rodriguez removed Rogers for legitimate reasons, including her direct involvement with the Flor Complaint, her skepticism of the OEO investigation and decision, and Chavez's concerns about Rogers. UMFs 49-51; *see* Doc. 191-11 at 4 (9:5-20). Thus, replacing Rogers as the sanctioning officer is not a procedural irregularity, nor does it cast doubt on the accuracy of the disciplinary outcome in such a way that would support Flor's prima facie case of discrimination.

Lastly, Flor does not point to a policy that would prohibit Berman from ratifying Flor's sanction nor does he otherwise identify a procedural irregularity. Doc. 198 at 32-33. He refers to a prior complaint Chavez filed against Berman, but Flor has neither supplied the contents of that complaint nor explained how it affected the ratification of his sanction. *Id*. Further, he does not connect Berman's actions with a deviation in the University's policies or procedures.

---

[20] Flor raises no concerns regarding Catena's review of Carey's draft sanction. *See* UMF 56.

In short, Flor has failed to establish any issue of material fact evidencing the purported substantial procedural irregularities in the investigation, disciplinary, and sanctioning processes. *See Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) (stating the plaintiff must "make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment"); *Rohrbaugh*, 53 F.3d at 1183 ("Summary judgment is appropriate if the non-moving party cannot adduce probative evidence on an element of its claim upon which it bears the burden of proof."). To the extent there were irregularities, they were not substantial enough to meet the first prong of the erroneous outcome test—that being, raise an "articulable doubt on the accuracy" of the disciplinary outcome. *Doe II*, 1 F.4th at 830. That deficiency is dispositive; University Defendants are entitled to summary judgment on the matter.[21]

### 2.  Selective Enforcement

To prove his selective enforcement theory, Flor must show that the University treated a similarly situated member of the opposite sex more favorably based on her gender. *See id.* Flor claims the OEO treated Chavez more favorably when investigating their respective complaints. Doc. 198 at 31-33. Initially, Flor argues that OEO conducted a welcomeness analysis when evaluating the Chavez Complaint and failed to do so for him. *Id.* at 32. University Defendants contend that Flor's position is meritless because the two complaints are incomparable, Doc. 208

---

[21] Because the Court has found that Flor failed to cast "some articulable doubt on the accuracy of the disciplinary outcome," it will not consider whether he has met the second element of the inquiry—i.e., "a particularized causal connection between the flawed outcome and gender bias." *Doe II*, 1 F.4th at 830.

at 9, and he fails to provide evidence of this disparity or any indication that the investigation was biased on account of his gender. *Id.* at 22-23.

As already discussed, Flor's argument that the University failed to conduct a welcomeness analysis in its investigation of his conduct is unsupported by the record. Even assuming otherwise, Flor cannot demonstrate that the two investigations establish selective enforcement. Flor and Chavez had different roles in the university system and were not similarly situated: Flor was (and is) a tenured professor while Chavez was a graduate student. *See* UMF 18. The University would understandably treat the two differently because faculty and students are subject to different university standards and policies. For instance, Flor's sanctioning process was controlled by Policy C07 of the Faculty Handbook, UMF 4, Doc. 191-1 at 3-6; whereas Chavez was subject to discipline under the University's Student Code of Conduct. Doc. 191-1 at 18. Flor cannot establish that he and Chavez were similarly situated individuals, as is required to prevail on a Title IX selective enforcement claim. On this ground alone, Flor's argument fails.

Further, Flor and Chavez alleged different kinds of sexual harassment, thereby necessitating the application of different investigative standards. The Chavez Complaint asserted Flor engaged in quid pro quo sexual harassment and retaliation. Doc. 191-3 at 20-21. This claim focused on the inherent power imbalance between the two. *See id.*; UMF 27. In contrast, the Flor Complaint concerned whether Chavez sexually harassed Flor by creating a hostile work environment. *See* Doc. 22-3 at 15. In assessing this claim, and per policy, the OEO considered the effect of the conduct on the victim (i.e., the welcomeness of the conduct), whether a reasonable person would find the conduct objectively offensive, and four specific factors related to the nature of the conduct and the parties involved. Doc. 191-1 at 11. In other words, while Flor and Chavez's complaints were based on the same basic facts, their resolution required application of different

standards. There is no indication the OEO diverged from Policy 2740 in the process evidencing gender bias. So, Flor cannot prove selective enforcement on this second theory.

### 3. *Doe II*'s Holistic Inquiry

The undisputed facts establish that Flor cannot prevail on his erroneous outcome and selective enforcement theories. The Court's inquiry, however, does not end there. As Flor notes, the Tenth Circuit applies a holistic approach in evaluating Title IX claims—that being, whether a reasonable jury could find that sex was a motivating factor in the disciplinary outcome. Doc. 198 at 30 (citing *Doe II*, 1 F.4th at 830); Doc. 221 at 2-4. Flor attempts to answer that question in the affirmative. The Court is again unpersuaded.

Alongside the asserted procedural irregularities, Flor argues the University was under "significant pressure to appear tough on gender discrimination because the United States Department of Justice" was monitoring the University's compliance with Title IX which, in turn, affected the investigatory and sanctioning processes. Doc. 198 at 33-34. [22] The contention is partially true. Beginning in late 2016, the United States Department of Justice ("DOJ") initiated oversight of the University because it "failed to properly respond to, investigate, and carry out its responsibilities under Title IX." Doc. 198 at 18-19; *see generally Agreement between the United States Department of Justice and the Board of Regents of the University of New Mexico*, https://www.justice.gov/opa/file/903306/download (Oct. 17, 2016) (last accessed Aug. 26, 2025). But external pressure does not, by itself, establish bias against male respondents. *See*, *e.g.*, *Doe I*,

---

[22] The Court does not evaluate Flor's assertions that Chavez placed "enormous pressure" on the University to find that male faculty members violated sexual harassment policies. Doc. 198 at 17-18, 33 (referencing Docs. 198-28, 198-29). Flor has not cited any law requiring the Court consider evidence of an individual's attempts to pressure university officials to act in that person's favor in determining purported gender biases. Flor's argument that certain officials' academic interest in feminism demonstrates gender bias is also without merit. *Id.* at 15.

952 F.3d at 1192-93 ("[E]vidence that a school felt pressured to conform with [the Department of Education's] guidance cannot satisfy Title IX's fundamental requirement that the challenged action be 'on the basis of [gender].'"); *Doe II*, 1 F.4th at 831 ("[E]xternal pressure alone is not enough to state a claim that the university acted with bias in this particular case. Rather, it provides a factor that, when combined with other circumstantial evidence of bias in [the plaintiff's] specific proceeding, gives rise to a plausible claim." (parenthetically quoting *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018))); *see also Lee v. Univ. of N.M.*, 449 F. Supp. 3d 1071, 1143 (D.N.M. 2020) ("The Court agrees that, standing alone, the 'Dear Colleague' letter is insufficient to demonstrate that UNM adopted anti-male bias in its disciplinary proceedings."). Accordingly, the DOJ's investigation is an insufficient independent basis for a jury to infer that the University was motivated to discipline Flor due to his gender.

Flor also references statistical evidence to support his claims of gender bias. He posits that the University disproportionately punished men when conducting multiple investigations for allegations of Title IX violations from 2016 until the time of the University's interrogatory responses. Doc. 198 at 14 (citing Doc. 198-22). He points to prior investigations and his personal interpretation of the results of those inquiries. *Id.*

While statistical patterns may provide useful context in ferreting out biases, the Tenth Circuit has "declined to infer anti-male bias from disparities in the gender makeup of sexual-misconduct complainants and sexual-misconduct respondents[,]" where the disparity may be explained by "alternative nondiscriminatory possibilities." *Doe II*, 1 F.4th at 834 (citing *Purdue Univ.*, 928 F.3d at 669). The statistical evidence must provide a clear causal link—a "particularized 'something more'"—to support an inference of gender bias. *See Doe I*, 952 F.3d at 1193, 1194 ("[A]t least in the discrimination context, the extent to which a discriminatory motive may be

reasonably inferred from evidence of statistical disparity often depends on the evidence's ability to eliminate obvious nondiscriminatory explanations for the disparity.").

*Doe I* and *Doe II* provide a useful contrast in defining the "something more" required in this context. In *Doe I*, statistical evidence showing that the vast majority of sexual assault complainants at a university were women did not establish systematic bias because the university had no control over the gender makeup of complainants and respondents. *Id.* at 1194. In *Doe II*, the plaintiff produced evidence that the university investigated complaints brought by women at much higher rates than those filed by men. *See* 1 F.4th at 835. This disparity suggested an anti-male bias because the choice to investigate a case was a "highly discretionary" decision within the university's control. *Id.* Taken together, *Doe I* and *Doe II* suggest that when evaluating statistical evidence, the salient consideration is whether gender-based discrepancies arise from the discretionary actions of university officials as opposed to disparate treatment in addressing sexual assault complaints.

Here, Flor provides nine cases that were reported by women, two by men, and one by an "unspecified source." Doc. 198-22 at 1-4. In five of the cases reported by women, no policy violation was found. *Id.* These statistics are insufficient to establish the particularized evidence of gender bias required to support a Title IX claim under *Doe I* and *Doe II*. Flor does not show that the discrepancies in outcomes of the investigations resulted from conscious choices by University officials, nor does he explain how these statistics "eliminate obvious nondiscriminatory explanations for the disparity." *Doe I*, 952 F.3d at 1194.

Based on the foregoing, the Court finds that Flor has not shown substantial procedural irregularities in the investigative, disciplinary, or sanctioning processes that, when paired with external pressure or statistical evidence, raise a colorable inference the University discriminated

against him on the basis of gender. Even if he could rely on the DOJ investigation or statistics alone, that evidence would be insufficient. Accordingly, a reasonable jury could not find that Flor proved an inference of anti-male bias, let alone unlawful gender-based discrimination.

Similarly, when viewing the facts in the light most favorable to Flor, a reasonable jury could not find that his gender was a motivating factor in the University's investigatory or disciplinary process. Therefore, he cannot establish a prima facie case for gender discrimination under these three Title IX frameworks. Because Flor's case does not survive the prima facie analysis, the Court does not evaluate the second and third *McDonnell Douglas* factors. The Court will enter summary judgment in favor of the Board and dismiss Flor's claim for gender discrimination under Title IX with prejudice.

### B.    Flor's Prima Facie Retaliation Claim

University Defendants argue the evidence does not support Flor's Title IX retaliation claim and it fails as a matter of law. Doc. 191 at 30-31. Specifically, they maintain there were valid, nondiscriminatory reasons for the OEO to investigate Flor's decision to disclose information regarding the investigatory process with media sources. *Id.* The Court agrees.

To prove a Title IX retaliation claim, the plaintiff must establish facts showing the defendants took adverse action against him because of complaints of sex discrimination. *Jackson*, 544 U.S. at 184 (stating a plaintiff would "have to prove that the [defendant] retaliated against him *because* he complained of sex discrimination"); *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017) ("Title IX . . . prohibits retaliation against individuals because they have complained of sex discrimination."). The Tenth Circuit has not considered whether a person accused of sexual misconduct may state a Title IX retaliation claim, but other courts have expressed doubts. *See, e.g.*, *DuBois v. Bd. of Regents of Univ. of Minn.*, 987 F.3d 1199, 1205 (8th

Cir. 2021) ("No part of Title IX designates participation in a sexual harassment investigation on the side of the accused as protected activity."); *Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 757 (M.D. Tenn. 2019) ("[M]erely defending an allegation of misconduct is as different from actively opposing or complaining of unlawful discrimination as day is to night; the former involves affirming that one has not committed wrongdoing, while the latter rests on the notion, real or perceived, that one has been on the receiving end of or has opposed wrongdoing in the form of illegal discrimination.").

Flor alleges that after he filed this case, the University retaliated against him by launching an additional OEO investigation of him due to the press coverage of this lawsuit. Doc. 68 at 39 ¶ 295. Despite this allegation in the SAC, Flor does not respond to University Defendants' arguments for summary judgment nor provides additional facts to rebut their contentions. *See generally* Doc. 198. Specifically, as the University Defendants note, it was Chavez—not the University Defendants—who initiated the second OEO complaint after Flor contacted both FIRE and *Reason*. UMF 82. Further, the OEO investigated and ultimately absolved Flor of any wrongdoing. UMF 83. Flor points to no evidence demonstrating that this process resulted from unlawful retaliatory motives. It is therefore undisputed that University Defendants did not retaliate against Flor and judgement will be entered in favor of the Board. *See Rohrbaugh*, 53 F.3d at 1183.

## II.    Count IV: Breach of Contract[23]

The Board argues the University (acting through its employees and agents) complied with its policies, particularly Policy C07, and it is that directive which governs faculty discipline.[24] Doc. 191 at 19; *see* Doc. 191-1 at 3-6; Doc. 68 at 25 ¶¶ 198-99 (alleging violations of Policy C07). Flor sees it differently, arguing the University breached paragraph 5 of Policy C07 when Rodriguez (1) removed Rogers as his sanctioning authority; and (2) appointed Carey in Rogers's place, instead of another department head within Anderson. Doc. 198 at 26-27 (citing Doc. 191-1 at 4 ¶ 5).[25] But Flor misreads Policy C07's terms.

It provides, in relevant part:

References to the department chair in this policy also include the program director or associate or vice dean in a non-departmentalized school or college. If allegations are made against a department chair or other administrator, the next higher academic authority shall perform the functions assigned in this Policy to the chair, and the provisions shall be modified as appropriate.

---

[23] Flor alleges he and the University created express contracts when he first accepted employment and then became a tenured professor. Doc. 68 at 34 ¶ 269. Flor claims the Board breached those contracts by failing to (1) abide by the University's Faculty Handbook and Administrative Policies, (2) conduct fair and impartial investigatory and sanctioning processes, and (3) provide due process and adequate representation. *Id.* at 34-35 ¶¶ 269, 271. The Court assumes for purpose of this decision that a contract existed between Flor and the University.

[24] University Defendants also contends that the Board is immune from Flor's contract claims because the University's Faculty Handbook and Administrative Policies do not create an express or implied written contract of employment. Doc. 191 at 15 (citing NMSA 1978, § 37-1-23(A) (1976) ("Governmental entities are granted immunity from actions based on contract, except actions based on a valid written contract.")). Flor disputes this assertion. Doc. 198 at 24-25. Assuming without deciding the University's policies form an actionable employment contract, the Court declines to resolve the immunity question because the record shows Flor cannot establish that the University breached Policy C07.

[25] Flor invokes New Mexico law to support his contract claims. *See* Doc. 198 at 23, 27-28. Accordingly, the Court applies state precedents in analyzing these causes of action. *See Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 886 (10th Cir. 2011).

Doc. 191-1 at 4 ¶ 5. The first sentence expressly allows a program director, associate dean, or vice dean from another school or college within the University to step into the role of the department chair. Flor does not dispute that Policy C07 lacks a provision regarding recusal or removal of a department chair and no provision concerning conflict-of-interest criteria. *See* UMFs 60, 64; Doc. 198 at 9. He instead advocates for a strict reading of the policy's plain language, asserting it permits replacement of a department chair only "[i]f allegations are made against a department chair or other administrator." Doc. 198 at 26 (quoting Doc. 191-1 at 4 ¶ 5). This approach is at odds with other policy language providing that that the at-issue provisions "shall be modified as appropriate." Doc. 191-1 at 4 ¶ 5.

Moreover, as explained above, Rogers was excused from the process for reasons relating to Chavez's complaints against Rogers and her own concerns with the Flor Investigation. UMFs 47-51. Thereafter, Rodriguez adhered to Policy C07 while searching for a replacement. She contacted several other department heads, but many of these people had a conflict that prevented them from participating. UMF 52. Ultimately, she appointed Carey, the Vice Dean of the University's School of Law, as the sanctioning official. UMF 53; *see* Doc. 191-1 at 5 ¶ 5 (providing a vice dean could take the place of a department chair). This process was consistent with paragraph 5's flexible approach to determining an appropriate official to conduct the proceedings. Accordingly, Rodriguez did not shirk her responsibilities under Policy C07.

Flor also contends that the University could have appointed a different authority from the Anderson, namely Interim Dean Berman. Doc. 198 at 26. But Berman would not have been an appropriate authority under Policy C07's terms. In the disciplinary process, a department chair— or vice dean in a non-departmentalized school—must make a written decision regarding the faculty member's discipline, which needs to be approved by the appropriate dean. Doc. 191-1 at 5 ¶ 8; *see*

*also id.* ¶ 10 (requiring the chair meet with the dean if the chair "proposes to suspend the faculty member without pay"). It is then the dean's responsibility to communicate their approval of the discipline. *Id.* ¶ 8. Had Rodriguez appointed Berman to sanction Flor rather than ratify the proposed sanction, she would not only have violated paragraph 8 of Policy C07, but she also would have been obligated to find another dean to review the sanction. *See id.* at 5 ¶ 10. This is because Berman was the dean tasked (by policy) with reviewing Flor's recommended discipline. Instead, consistent with paragraphs 5 and 8 of the policy, Rodriguez retained Carey to recommend a sanction and Berman to ratify that sanction. This course of conduct did not violate Policy C07's terms.

Flor next argues the University violated Policy C07 when Catena reviewed Rogers's draft sanction because neither Policy C07 nor Policy 2740 allowed such action.[26] Doc. 198 at 27. Flor is correct in that the policies do not outline Catena's role in the sanctioning process. That begs the question, however, how could the University have violated non-existent policies and, as a corollary, breached its contract with Flor? He does not provide an answer to this question.[27] Accordingly, the Court finds Flor has not established a breach of Policy C07.

---

[26] As in his Title IX arguments, Flor takes no issue with Catena's review of Carey's proposed sanction. UMF 56 ("Carey shared a draft of her sanction with SVP Rodriguez and Catena for review.").

[27] Flor cites to the revised version of Policy C07, yet he does not allege that that version caused him harm nor does he cite any authority explaining why the amendments are dispositive. *See* Doc. 198 at 27.

### III.   Count V: Breach of the Covenant of Good Faith and Fair Dealing

In Count V of the SAC, Flor alleges the Board breached the covenant of good faith and fair dealing implied in all New Mexico contracts. Doc. 68 at 36 ¶¶ 275-78. But Flor may not maintain a cause of action for a breach of the implied covenant of good faith and fair dealing because the Court has granted Defendants' summary judgment motion with respect to Flor's breach of contract claim. . *Gonzalez-Aller v. N. N.M. Coll.*, No. CV 11-105, 2012 U.S. Dist. LEXIS 208921, at *22 (D.N.M. Sept. 17, 2012); *see also Smoot v. Physicians Life Ins. Co.*, 2004-NMCA-027, ¶ 13, 87 P.3d 545 ("The implied covenant is breached only when a party seeks to prevent the contract's performance or to withhold its benefit from the other party." (citation modified)). A contractual breach is a necessary predicate to find a violation of the covenant of good faith and fair dealing. Accordingly, judgment on Count V shall be entered in favor of the Board and is dismissed as well.

### IV.   Count III: Declaratory Judgment

The Court next addresses Flor's request for declaratory relief. *See* Doc. 68 at 33-34 ¶¶ 259-267. He seeks declarations that three separate aspects of the University proceedings deprived him of his protected property and liberty interests without due process. *See id.* ¶¶ 261-63. The federal Declaratory Judgment Act ("the Act") states, in pertinent part, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). As the Tenth Circuit explained, the Act "does not provide an independent federal cause of action." *Nero v. Oklahoma*, No. 22-6121, 2022 U.S. App. LEXIS 29772, at *3 (10th Cir. Oct. 25, 2022) (citing *Skelly Oil Co. v. Phillips Petrol. Co.*, 339 U.S. 667, 671-74 (1950)). In order to state a legally cognizable basis for declaratory judgment, Flor "must assert a valid federal cause of action—one that exists

independent of any request for declaratory relief." *Id.*; *see, e.g.*, *Briggs v. Univ. of N.M.*, 1:20-cv-00651, 2025 U.S. Dist. LEXIS 99312, at *89 (D.N.M. May 23, 2025) (dismissing the plaintiff's declaratory judgment count after dismissing "all substantive claims for relief"). Based on the foregoing conclusions, there are none. Count III of Flor's SAC could be dismissed on this basis alone.

Even if that were not the case, the Court finds that Flor's requested declaratory judgment relief is now moot.[28, 29] It is undisputed Flor returned to his position as a tenured professor and currently teaches his usual courseload at the University. UMFs 18, 19; Doc. 191-8 at 1 (7:2-8), 2 (12:16-22) (Flor Deposition). Prior to his return, the University amended its policies and procedures governing sexual harassment proceedings, including the investigative process. *See* Doc. 191-1 at 2 ¶ 8; Doc. 198 at 16. Flor argues these revised policies present an ongoing controversy and the possibility of future, discriminatory investigations. Doc. 198 at 22-23. Yet, he does not allege or offer evidence of pending or anticipated disciplinary actions against him, nor identify how this Court's declarations would result in real-world impacts on the University. Simply put, Flor does not provide the requisite showing of a controversy necessary to obtain a declaratory

---

[28] The Court does not conduct a separate state-law analysis of Flor's request for declaratory relief because, as explained below, Count III is moot. *See* Doc. 68 at 33-34 ¶¶ 261-63 (invoking the federal Act as well as the New Mexico Declaratory Judgment Act, NMSA 1978, § 44-6-1 through -15); *see also* NMSA 1978, § 44-6-2 (1975) (requiring that for court to assume jurisdiction under the state's Declaratory Judgment Act, it must be presented with an "actual controversy"). The New Mexico Supreme Court recognizes that mootness is a prudential consideration "founded in concern about the proper—and properly limited—role of courts in a democratic society[.]" *New Energy Econ. v. Shoobridge*, 2010-NMSC-049, ¶ 16, 149 N.M. 42, 243 P.3d 746 (quoting *Warth v. Seldin*, 442 U.S. 490, 498 (1975)). That prudential limitation applies with equal force in determining mootness under state or federal law.

[29] The parties do not raise the discretionary factors addressed in *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994), so the Court does not reach them. Further, a full *Mhoon* analysis would be of limited value given the Court's ultimate conclusion that Flor's declaratory relief claims cannot stand without an independent cause of action and are moot.

judgment.[30] *See Schell v. OXY USA Inc.*, 814 F.3d 1107, 1114 (10th Cir. 2016) (noting "the mootness inquiry looks to whether the requested relief will actually alter the future conduct of the named parties").

In the end, the Court has dismissed all substantive claims for relief against University Defendants or entered summary judgment in their favor. As there is no independent federal cause of action, Flor is not entitled to the requested declaratory relief. And even if Flor substantiated this third cause of action with a federal claim, the issue is moot. *See Atlas Biologicals, Inc. v. Kutrubes*, 50 F.4th 1307, 1329 (10th Cir. 2022) ("[F]ederal courts can issue declaratory judgments if there is an actual dispute between adverse litigants and if there is a substantial likelihood that the favorable federal court decision will bring about some change." (citation omitted)). Therefore, Count III of the SAC is dismissed.

## V.    Remand of Count VII

As a result of the Court's rulings, Count VII—for malicious abuse of process against Chavez—is the sole cause of action remaining. Doc. 68 at 39-40 ¶¶ 299-305. In a civil action in which the district court has original jurisdiction—such as a federal question, 28 U.S.C. §§ 1331— a district court "may decline to exercise supplemental jurisdiction over" state law claims related to the federal civil action if "the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3); *see Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 39 (2025) ("[W]ith any federal anchor gone, supplemental jurisdiction over the residual state

---

[30] A finding that the proceedings resulting in Flor's suspension deprived him of due process of law—to the extent the requested declarations imply such a conclusion—are duplicative and unnecessary. This Court already denied Flor's claim for due process violations when it dismissed Count I of the SAC. Doc. 64 at 39; *see also* Doc. 94 at 39 (regarding Count III, "neither party briefed—and the Court has consequently refused to address . . . whether Individual Defendants' alleged conduct violated [Flor]'s rights to due process").

claims disappears as well."). Given that this case was initially removed, *see* Doc. 1, and Flor's federal claims have been dismissed, the Court will remand this case to New Mexico state court. 28 U.S.C. § 1447(c).

**CONCLUSION**

For the foregoing reasons, University Defendants' Motion for Summary Judgment, Doc. 191, is granted. The Court enters summary judgment in favor of University Defendants as to Counts IV, V, and VI. Count III is dismissed with prejudice.

Lacking a federal cause of action and given this Court's declination to extend supplemental jurisdiction over the remaining state law claim, this case is hereby remanded to the Second Judicial District Court in Bernalillo County for the State of New Mexico pursuant to Section 1447(c). *See* Doc. 1 at 1 ¶ 1.

It is so ordered.

_____
UNITED STATES DISTRICT JUDGE
MATTHEW L. GARCIA